1  FISHER & PHILLIPS LLP
   Andrew C. Crane (State Bar No. 285211)
2  2050 Main Street, Suite 1000
   Irvine, California 92614
3  Telephone: (949) 851-2424
   Facsimile: (949) 851-0152
4  E-mail: acrane@fisherphillips.com

5
   Michael R. Greco (subject to admission *pro hac vice*)
6  James S. Bradbury (subject to admission *pro hac vice*)
   1125 17th Street, Suite 2400
7  Denver, Colorado 80202
   Telephone: (303) 218-3650
8  Facsimile: (303) 218-3651
   E-mail: mgreco@fisherphillips.com
9  E-mail: jbradbury@fisherphillips.com

10
   David W. Erb (subject to admission *pro hac vice*)
11 79 East Main Street, Suite 207
   Westminster, Maryland 21157
12 Telephone: (410) 857-1399
   Facsimile: (410) 857-1133
13 E-mail: derb@fisherphillips.com

14
   *Attorneys for Plaintiff*
15 *First-Citizens Bank & Trust Company*

16
                    **UNITED STATES DISTRICT COURT**
17                  **NORTHERN DISTRICT OF CALIFORNIA**

18
   FIRST-CITIZENS BANK & TRUST                )
19 COMPANY, a Delaware Corporation,           )
                                              )  **PLAINTIFF FIRST-CITIZENS**
20                Plaintiff,                   )  **BANK & TRUST COMPANY'S**
                                              )  **COMPLAINT**
21          vs.                                )
                                              )  **DEMAND FOR JURY TRIAL**
22 HSBC HOLDINGS plc *a/k/a* THE HSBC GROUP   )
23 *a/k/a* HONGKONG AND SHANGHAI BANKING      )
   CORPORATION, an English Corporation; HSBC  )
24 USA Inc., a Delaware Corporation; HSBC BANK )
   USA, N.A., a Delaware Corporation; HSBC UK  )
25 BANK plc., an English and Welsh Corporation; )
   SILICON VALLEY BANK UK LIMITED, an          )
26 English and Welsh Corporation; DAVID        )
   SABOW, an individual; SUNITA PATEL, an      )
27 individual; MELISSA STEPANIS, an individual; )
   PETER KIDDER, an individual; KEVIN LONGO,  )
28

                                      1

1    an individual; REBEKAH HANLON, an individual;)
2    and KATHERINE ANDERSEN, an individual,        )
                                                     )
3    _____ Defendants. _____)
4

       For its Complaint, Plaintiff, First-Citizens Bank & Trust Company ("First Citizens"), states as

follows against Defendants, HSBC Holdings plc *a/k/a* The HSBC Group *a/k/a* Hongkong and Shanghai

Banking Corporation, HSBC USA Inc., HSBC Bank USA, N.A., HSBC UK Bank plc ("HSBC UK"),

Silicon Valley Bank UK Limited ("SVB UK") (the entity defendants are collectively referred to herein

as "HSBC"), David Sabow, Sunita Patel, Melissa Stepanis, Peter Kidder, Kevin Longo, Rebekah

Hanlon, and Katherine Andersen (the individual defendants are collectively referred to herein as the

"Individual Defendants"):

## **INTRODUCTION**

       On March 27, 2023, First Citizens acquired Silicon Valley Bank ("SVB"), which had failed two

weeks before.  Unbeknownst to First Citizens, Defendants were already weeks into executing a scheme

to plunder what they believed to be the "core of [SVB's] profitability engine."  Defendants brazenly took

and misused SVB's confidential, proprietary and trade secret information to execute their scheme.

Indeed, Defendant David Sabow, the chief architect of this scheme, acted as if SVB's "profitability

engine"—and the proprietary information about it—was his for the taking.  He was wrong.

       Just two weeks after First Citizens acquired SVB, Defendants executed the first "wave" of their

scheme, raiding forty-two First Citizens employees around 9:00 p.m. on Easter Sunday.  Over the course

of about thirty minutes, these employees resigned *en masse* by e-mail, effective immediately.  Led to

HSBC by Sabow, who had promised them great fortune for their defection, HSBC onboarded all forty-

two employees without delay.

       Defendants' theft and misuse of confidential, proprietary and trade secret information, disruption

of First Citizens' business operations, unfair competition, and unlawful conduct are reprehensible and

demand a substantial award of compensatory and punitive damages in an amount to be proved at trial in

2

excess of $1 billion.

## NATURE OF THE CASE

1.     When SVB collapsed on Friday, March 10, 2023, it sent shockwaves through the worldwide economy and triggered immediate action from government regulators.  Within forty-eight hours, the Federal Deposit Insurance Corporation ("FDIC") assumed control of SVB and began looking for a healthy and stable bank to buy it.

2.     A similar process played out across the Atlantic, where the Bank of England exercised its supervisory powers to seize the assets of SVB's UK affiliate, SVB UK.  While it would take weeks for SVB to find a new home in the United States with First Citizens, SVB UK was acquired by Defendant HSBC on Monday, March 13, 2023, for a nominal £1 (approximately $1.21).

3.     Upon information and belief, Sabow became an executive of HSBC within days of HSBC's acquisition of SVB UK.  Sabow had been a senior executive of SVB just months before. Together, HSBC and Sabow immediately engineered a scheme to plunder what Sabow deemed the "core of [SVB's] profitability engine."  Sabow metaphorically called this scheme "Project Colony." As a recent SVB senior executive, he was uniquely situated to lead the execution of this scheme.  In doing so, Sabow and the other Individual Defendants unlawfully obtained and then misappropriated (or conspired to obtain and misappropriate) SVB's confidential, proprietary and trade secret information. That information included:

- tables of data reflecting SVB's U.S. Accelerator & Growth "win rate" and volumes against its core competitors;

- data and the underlying analysis supporting SVB's market share within the particular U.S. market segments and borrower types;

- data regarding SVB's Life Sciences & Technology market share percentages based on market capitalization and the total amounts that SVB's Life Sciences & Technology team had in deposits and investments in clients with the amount of future commitments, broken down by types of financing arrangements SVB Life Sciences & Technology is to make and the expected Gross Profit growth, efficiency, and yields on with this SVB team's investments and relationships;

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

- SVB's practice overview notes, including the pace at which "right now" SVB's Accelerator & Growth group adds clients, qualitative and quantitative numbers of clients, as well as an internal ranking of clients according to SVB's valuation criteria;

- information regarding SVB's clients including valuations and growth metrics;

- information regarding SVB's employee capacity, head count, and ability to attract and meet the needs of the particular customers targeted by SVB;

- information identifying the names, positions and salaries of dozens of former SVB employees that Sabow had identified as "key professionals," as well as their locations and the markets they covered;

- information regarding SVB's loan portfolios with implied revenue and growth; and

- an analysis of SVB's loans within its Accelerator & Growth Group.

4.      Sabow's scheme required HSBC "to move quickly" to hire "six identified core leaders in the U.S.," along with an initial wave of an "additional 35 professionals already identified" who were also SVB employees.  Sabow deemed these six core leaders the "Founders."  Upon information and belief, Defendants Patel, Stepanis, Kidder, Longo, Hanlon, and Andersen were chosen as the "Founders" because Sabow considered them to be the "key functional leaders" with "superb client and employee followership."  In fact, First Citizens likewise considered these individuals to be "key functional leaders" and had anticipated them being members of First Citizens' transition team to lead post-acquisition activity for the combined SVB-First Citizens team.

5.      With HSBC's blessing and encouragement, Sabow and HSBC promised the Founders leadership roles and fortune at HSBC—so long as they joined Sabow's quest to "lift out" the additional thirty-five to forty employees from SVB's "profitability engine."

6.      Upon information and belief, HSBC leadership agreed to help orchestrate and to fund Project Colony by hiring the forty-two employees that Sabow had projected because Sabow told HSBC that it stood to profit well over $1 billion from this plan within the next five years.

7.      Sabow's written financial projections in Project Colony were based on, and incorporated, SVB's confidential, proprietary and trade secret information.  And this went well beyond his own knowledge, which he was contractually and by common law bound to keep confidential.

8.      Indeed, when Sabow needed additional proprietary information of SVB's to fill in parts of "Project Colony," he got it from some of the individually named Defendants as well as other, unsuspecting SVB employees in the United States—sometimes telling them (falsely) it was okay because he was coming back to SVB in the U.S.  In one instance, after an employee asked Sabow whether he still worked for SVB, Sabow directed the employee to send the proprietary information he sought to Defendant Patel.  Patel obtained that proprietary information and provided it to Sabow to help develop Project Colony.

9.      By improperly obtaining and misusing SVB's confidential and proprietary information, HSBC and Sabow short-circuited the normally expensive and lengthy process to do things such as conduct market research and develop competent financial projections necessary for launching a commercial banking business of the nature contemplated by Project Colony.  Instead, in a matter of a few weeks, HSBC and the Individual Defendants were able to develop and execute Project Colony.  In Sabow's own words, Project Colony was about "recreating a better version of the prior dominant platform" at SVB.

10.     While formulating Project Colony, Sabow noted that "*if a no name regional bank acquires the team and assets*, I am going to build something to *put them out of business*, because our team members and the market deserves better." (emphasis added).  Sabow also asked some of the other Individual Defendants to plan for "what parts of SVB" they would want to "retain" and to dream about what they could do with those assets.  Sabow ambitiously viewed the SVB team as his own, and it did not matter to him that "the team and assets" were not his to sell.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

11.     After Sabow and HSBC financially incented the "Founders," each "Founder" was tasked with recruiting their "key professional" subordinates.  Undeterred by their fiduciary duties owed to First Citizens and, for some of them, their contractual obligations not to solicit fellow employees, the Founders conspired with Sabow to execute Project Colony.  Never once did they communicate to First Citizens' leaders that the business was under attack from within.

12.     Over Easter weekend, HSBC, Sabow, and the six Founders (who were at that time employees of First Citizens) orchestrated a massive lift-out by extending high-pressure offers to select First Citizens employees, arranging virtual meetings and direct communications with one or more HSBC senior executives, preparing and coordinating *en masse* resignations, and ensuring immediate onboarding with HSBC.  Like Sabow's written financial projections for Project Colony, the employment and compensation offers were formulated using SVB's confidential information.

13.     Around nine o'clock on Easter Sunday evening, April 9, 2023, more than forty First Citizens employees, including the six Founders, began submitting their resignations via e-mail, effective immediately.  Within approximately thirty minutes they had all resigned without any prior notice to First Citizens.  Some of these employees took with them additional confidential and proprietary information belonging to First Citizens and valuable client relationships.

14.     If stable banks are to be incented to rescue failed banks to restore financial stability, opportunistic competitors and insiders cannot take and replicate the bank's assets—its highly sensitive confidential, proprietary and trade secret information—before the resolution can be implemented, like HSBC and the Individual Defendants did here.  To permit otherwise not only condones a breach of legal obligations but discourages stable banks from coming to the rescue when other banks fail.

15.     The "profitability engine" of SVB was never Sabow's to sell or take.  Nor was it his to "colonize."  Rather, First Citizens properly acquired it through the process established by the government to protect SVB's customers and maintain the integrity of the financial system.  First

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

Citizens did so with the reasonable expectation that the purchase would be free from unlawful interference by third parties.

16.     First Citizens remains the healthy and stable bank it has been for 125 years.  But as with any other rescuer of a failed bank, First Citizens is entitled to protect its rights of exclusive ownership of its property.  Defendants have wrongfully interfered with those rights, and First Citizens is entitled to compensation from them.  First Citizens' claims against Defendants relate to Defendants' theft and interference with the property rights that First Citizens acquired, the resulting disruption to First Citizens' business operations, and the loss of future profits.

## **THE PARTIES**

17.     Plaintiff First-Citizens Bank & Trust Company is a corporation organized under the laws of the state of Delaware, with its principal place of business located at 4300 Six Forks Road, Raleigh, North Carolina 27609.

18.     Defendant HSBC Holdings plc *a/k/a* The HSBC Group *a/k/a* Hongkong and Shanghai Banking Corporation is a corporation organized under the laws of England, with its headquarters located at 8 Canada Square, London E14 5HQ, United Kingdom.

19.     Defendant HSBC USA Inc. is a corporation organized under the laws of the state of Delaware, with its headquarters located at 452 Fifth Avenue, New York, New York 10018.

20.     Defendant HSBC Bank USA, N.A. is a corporation organized under the laws of the state of Delaware, with its headquarters located at 452 Fifth Avenue, New York, New York 10018.

21.     Defendant HSBC UK Bank plc. is a corporation organized under the laws of England and Wales, with its headquarters located at 1 Centenary Square, Birmingham, B1 1HQ, United Kingdom.

22.     Defendant Silicon Valley Bank UK Limited is a corporation organized under the laws of England and Wales, with its headquarters located at Alphabeta, 14-18 Finsbury Square, London, EC2A 1BR, United Kingdom.

23.     Defendant David Sabow is an individual who resides in Mill Valley, California.

24.     Defendant Sunita Patel is an individual who resides in Pleasanton, California.

25.     Defendant Melissa Stepanis is an individual who resides in Westport, Connecticut.

26.     Defendant Peter Kidder is an individual who resides in Palo Alto, California.

27.     Defendant Kevin Longo is an individual who resides in Southborough, Massachusetts.

28.     Defendant Rebekah Hanlon is an individual who resides in Alamo, California.

29.     Defendant Katherine Andersen is an individual who resides in Winchester, Massachusetts.

## JURISDICTION AND VENUE

30.     Subject matter jurisdiction exists in this civil action pursuant to 28 U.S.C. § 1331 because First Citizens asserts federal claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 et seq., and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.   The Court also has supplemental or pendent jurisdiction over First Citizens' remaining claims pursuant to 29 U.S.C. § 1367 because they form part of the same case or controversy as the federal claims.

31.     The Court has personal jurisdiction over Sabow because he is a citizen and resident of the state of California.  Moreover, at all relevant times, Sabow knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees he raided live and worked for SVB and First Citizens in California. Sabow repeatedly met with others or initiated contact with others in California to carry out the raid. Many of Sabow's wrongful acts complained of herein were carried out by Sabow in California or by others in California at Sabow's direction, including obtaining and misappropriating confidential,

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

proprietary and trade secret information.  Those intentional acts were aimed at parties and property located within the state of California.  The harmful and intended effects of Sabow's actions have been felt, and will continue to be felt, by First Citizens in California.  Sabow regularly and frequently conducted business for SVB within the state of California including but not limited to the time period 2019 through 2022 when he worked in California for SVB.  Upon information and belief, he continues to regularly conduct business in California on behalf of HSBC.

32.     The Court has personal jurisdiction over Patel because she is a citizen and resident of the state of California.  Moreover, at all relevant times, Patel knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees she raided live and worked for SVB and First Citizens in California.  Upon information and belief, Patel repeatedly met with others or initiated contact with others in California to carry out the raid.  Many of Patel's wrongful acts complained of herein were carried out by Patel in California or by others in California at Patel's direction, including obtaining and misappropriating confidential, proprietary and trade secret information.  Those intentional acts were aimed at parties and property located within the state of California.  The harmful and intended effects of Patel's actions have been felt, and will continue to be felt, by First Citizens in California.  Patel regularly and frequently conducted business for SVB within the state of California including but not limited to the time period 2020 through 2023 when she worked in California for SVB.  Upon information and belief, she continues to regularly conduct business in California on behalf of HSBC.

33.     The Court has personal jurisdiction over Stepanis because, at all relevant times, Stepanis knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees she intended to raid live and worked for SVB and First Citizens in California.  Upon information and belief, Stepanis targeted and solicited employees who lived and worked in California urging them to join HSBC.  Upon

9

information and belief, many of Stepanis's wrongful acts complained of herein were carried out by Stepanis in California or by others in California at Stepanis's direction, including obtaining and misappropriating confidential, proprietary and trade secret information.  Those intentional acts were aimed at parties and property located within the state of California.  The harmful and intended effects of Stepanis's actions have been felt, and will continue to be felt, by First Citizens in California.  Stepanis regularly and frequently visited California throughout her work as an executive for SVB and conducted business for SVB within the state of California.  Numerous of the First Citizens employees that Stepanis recruited (as described below) lived and worked for SVB and First Citizens in California at the time Stepanis worked to divert them to HSBC.

34.     The Court has personal jurisdiction over Kidder because he is a citizen and resident of the state of California.  Moreover, at all relevant times, Kidder knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees he raided live and worked for SVB and First Citizens in California.  Upon information and belief, Kidder repeatedly met with others or initiated contact with others in California to carry out the raid.  Upon information and belief, many of Kidder's wrongful acts complained of herein were carried out by Kidder in California or by others in California at Kidder's direction, including obtaining and misappropriating confidential, proprietary and trade secret information.  Those intentional acts were aimed at parties and property located within the state of California.  The harmful and intended effects of Kidder's actions have been felt, and will continue to be felt, by First Citizens in California.  Kidder regularly and frequently conducted business for SVB within the state of California including but not limited to the time period 1995 through 2023 when he worked in California for SVB.  Upon information and belief, he continues to regularly conduct business in California on behalf of HSBC.

35. The Court has personal jurisdiction over Longo because, at all relevant times, Longo knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees he intended to raid live and worked for SVB and First Citizens in California.  Upon information and belief, Longo targeted and solicited employees who lived and worked in California urging them to join HSBC.  Upon information and belief, many of Longo's wrongful acts complained of herein were carried out by Longo in California or by others in California at Longo's direction, including obtaining and misappropriating confidential information, proprietary and trade secret information.  Those intentional acts were aimed at parties and property located within the state of California.  The harmful and intended effects of Longo's actions have been felt, and will continue to be felt, by First Citizens in California. Longo regularly and frequently visited California throughout his work as an executive for SVB and conducted business for SVB within the state of California.  Numerous of the First Citizens employees that Longo recruited (as described below) lived and worked for SVB and First Citizens in California at the time Longo worked to divert them to HSBC.

36. The Court has personal jurisdiction over Hanlon because she is a citizen and resident of the state of California.  Moreover, at all relevant times, Hanlon knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees she raided live and worked for SVB and First Citizens in California.  Upon information and belief, Hanlon repeatedly met with others or initiated contact with others in California to carry out the raid.  Upon information and belief, many of Hanlon's wrongful acts complained of herein were carried out by Hanlon in California or by others in California at Hanlon's direction, including obtaining and misappropriating confidential, proprietary and trade secret information.  Those intentional acts were aimed at parties and property located within the state of California.  The harmful and intended effects of Hanlon's actions have been felt, and will continue to

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

be felt, by First Citizens in California. Hanlon regularly and frequently conducted business for SVB within the state of California including but not limited to the time period 2019 through 2023 when she worked in California for SVB. Upon information and belief, she continues to regularly conduct business in California on behalf of HSBC.

37.     The Court has personal jurisdiction over Andersen because, at all relevant times, Andersen knew that First Citizens' business (like SVB before it) was substantially carried out in California and that approximately twenty (if not more) of the First Citizens employees she intended to raid live and worked for SVB and First Citizens in California. Upon information and belief, Andersen targeted and solicited employees who lived and worked in California urging them to join HSBC. Upon information and belief, many of Andersen's wrongful acts complained of herein were carried out by Andersen in California or by others in California at Andersen's direction, including obtaining and misappropriating confidential, proprietary and trade secret information. Those intentional acts were aimed at parties and property located within the state of California. The harmful and intended effects of Andersen's actions have been felt, and will continue to be felt, by First Citizens in California. Andersen regularly and frequently visited California throughout his work as an executive for SVB and conducted business for SVB within the state of California. Numerous of the First Citizens employees that Andersen recruited (as described below) lived and worked for SVB and First Citizens in California at the time Andersen worked to divert them to HSBC.

38.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because a substantial part of the property that is the subject of this action is situated in this district.

## DIVISIONAL ASSIGNMENT

39.     Because this action is an Intellectual Property Action within the meaning of Civil Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

# FACTUAL ALLEGATIONS

### *The Critical Role Played by Banks*
### *And the Far-reaching Consequences When Banks Fail*

40.     Banks play a critical role in the economy by serving as financial intermediaries that facilitate the flow of funds between individuals, businesses, and governments.  They provide a wide range of financial services that are essential for economic growth and stability.

41.     Banks offer a safe place for individuals and businesses to deposit their money.  By pooling deposits together, banks have the ability to lend money to individuals and businesses to support their financial needs.

42.     Banks are major providers of credit and loans.  They offer a range of lending products, including personal loans, mortgages, business loans, and lines of credit.

43.     Banks play a central role in facilitating payments and transactions.  They provide payment services that allow individuals and businesses to make transactions efficiently and securely. These services include issuing debit and credit cards, providing electronic fund transfers, and processing checks.

44.     Banks support economic growth by channeling money from savers to borrowers, which helps stimulate economic growth.  Banks provide financing to businesses, enabling them to invest in new projects, purchase equipment, hire employees, and innovate.  By facilitating these activities through lending and investment, banks contribute to job creation, technological advancement and economic development.

45.     Banks work closely with governments by providing them with financial services.  For example, banks process tax payments and manage government accounts.  They also help governments raise funds through the issuance of bonds, and they provide advisory services on fiscal matters.

46.     In light of the wide range of services offered by banks, it is no surprise that when a bank fails, it can cause a ripple effect throughout the economy as individuals and businesses lose access to

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

credit and financial stability.  In addition, if depositors lose confidence in the banking system, they may withdraw their funds from other banks causing further instability.

### ***When Banks Fail, the Government Steps in***

47.     In the United States, the Resolution and Receivership Rules (12 C.F.R. Part 360) were established by the Dodd-Frank Wall Street Reform and Consumer Protection Act in response to the financial crisis of 2008.

48.     The Resolution and Receivership Rules (the "Rules") are regulations implemented by financial regulators to manage and resolve the insolvency of financial institutions, particularly banks.

49.     The Rules aim to protect depositors and prevent the spread of financial instability to the wider economy.  They provide a framework for the effective management of financial institution insolvencies and contribute to the stability of the financial system.

50.     The Rules outline the procedures that regulators use to resolve failing banks, including by appointing the FDIC as a receiver to take control of a failed bank.  In its role as a receiver, the FDIC is responsible for taking over and managing a failed bank, liquidating its assets, or transferring them to a healthy bank.  This helps to ensure that a failed bank's assets and liabilities are transferred to responsible parties who can continue to serve the needs of the bank's customers and maintain the integrity of the financial system.

51.     Interfering with the FDIC's efforts to resolve a failed bank is a serious matter that can have a wide array of detrimental consequences.  These consequence include: (i) disrupting the orderly wind-down of a failed bank, potentially leading to panic and loss of confidence in the banking system, which in turn can have ripple effects throughout the economy impacting other financial institutions and damaging overall stability; (ii) contributing to a loss of depositors' confidence, which can trigger bank runs where depositors withdraw funds and potentially cause a liquidity crisis and additional bank failures; (iii) undermining the efficacy of the FDIC's role in stabilizing the financial system; (iv)

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

deterring healthy banks from acquiring the assets and liabilities of failed banks; (v) augmenting costs associated with resolving failed banks thereby increasing expense to taxpayers; and (vi) delaying economic recovery and contributing to the burden imposed on individuals, businesses and the economy.

### *First Citizens' Long and Distinguished History*

52.     First Citizens is a U.S.-based financial institution that has established itself as a respected entity in the banking industry.  Celebrating its 125th year in business in 2023, it is one of the healthy and stable banks that the FDIC relies upon to help rescue failed banks. The bank is headquartered in Raleigh, North Carolina, and operates in various states, including Arizona, California, Colorado, Florida, Georgia, Kansas, Maryland, Missouri, Nebraska, New Mexico, North Carolina, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wisconsin.

53.     For more than a century, First Citizens has demonstrated stability in the banking industry.  Its long history indicates a track record of successfully navigating through various economic cycles and challenges, including the Great Depression, multiple recessions, and other financial crises.

54.     First Citizens has maintained sound financial performance over the years.  It has shown consistent profitability, demonstrating its ability to manage risk and generate sustainable growth.

55.     First Citizens is actively involved in the communities it serves.  It supports various community initiatives, charitable organizations, and local events. The bank's commitment to community engagement contributes to its positive reputation and demonstrates its dedication to the well-being of the areas in which it operates.

56.     First Citizens offers a variety of personal and commercial banking products and services, including checking and savings accounts, loans, credit cards, online and mobile banking, investment and wealth management services, and more.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

57. As all respectable institutions do, First Citizens prioritizes ethical practices and compliance with regulations. It strives to adhere to industry standards, regulatory requirements, and best practices, ensuring transparency, integrity, and the protection of customer information.

58. Since 2009, First Citizens has partnered with the FDIC to successfully complete more than 20 FDIC-assisted transactions—more than any bank in the country.

59. As noted above, when a bank fails, the government looks for a reputable and stable institution to help fix the problem.  When SVB failed, the FDIC chose First Citizens.

### *History of Silicon Valley Bank*

60. Until recently, SVB Financial Group ("Holdco") was a bank holding company. Through its various subsidiaries and divisions—such as SVB and SVB UK—Holdco offered a diverse set of banking and financial products and services to clients across the United States, as well as in key international innovation markets.

61. For nearly forty years, Holdco's subsidiaries had been dedicated to helping support entrepreneurs and clients of all sizes and stages throughout their life cycles, primarily in the technology, life science/healthcare, private equity/venture capital, and premium wine industries.

62. Holdco offered commercial and private banking products and services through its principal subsidiary, SVB, which, until recently, was a California state-chartered bank founded in 1983 and a member of the Federal Reserve System.

63. SVB had a unique focus among American banks.  It focused on providing its products and services to clients primarily in the technology and life science/healthcare industries as well as global private equity and venture capital clients.

64. SVB provided solutions to the financial needs of its commercial company clients throughout their life cycles, beginning with the "emerging" or "early stage" and progressing through later stages as their businesses matured and expanded.

FP 47185866.1

65.     SVB's technology clients tended to be in the industries of frontier tech and hardware (such as semiconductors, communications, data, storage and electronics), enterprise and consumer software/internet (such as infrastructure software applications, software services, digital content and advertising technology), fintech, and climate technology and sustainability.

66.     SVB's life science/healthcare clients tended to be in the industries of biopharma, healthtech, medical devices, healthcare services, and diagnostics and tools.

67.     SVB offered its technology and life science/healthcare commercial clients a full range of credit solutions.  These solutions included traditional term loans, growth capital term loans, equipment loans, asset-based loans, revolving lines of credit, warehouse facilities, recurring revenue facilities, mezzanine lending, acquisition finance facilities, corporate working capital facilities standby and commercial letters of credit, project finance loans, and credit card programs.

68.     SVB's private equity and venture capital clients were often investors in the commercial companies to whom SVB provided banking services.  SVB cultivated strong relationships within the private equity and venture capital communities, which in turn helped to facilitate deal flow opportunities between these private equity/venture capital firms and the commercial companies.

69.     Key to SVB's success was its ability to attract, retain and motivate qualified employees. SVB relied heavily upon employees who have technical or other specialized expertise and/or a strong network of relationships with individuals and institutions within the markets it served.

70.     SVB invested significant time, money and resources in recruiting, training and developing its skilled and specialized workforce.

### *The Collapse of SVB*

71.     Over a period of two days in March 2023, SVB went from solvent to broke.

72.     On or about March 8, 2023, SVB announced it would book a $1.8 billion loss after selling some of its investments to cover increasing withdrawals.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

73.     When trading opened on March 9, 2023, SVB Financial's stock price plummeted,  panic spread across social media, and venture capital firms began pulling their money out of SVB.  By the end of the day, depositors had withdrawn approximately $42 billion.

74.     On March 10, 2023, SVB was closed by the California Department of Financial Protection and Innovation, which appointed the FDIC as receiver.  SVB's collapse marked the second largest bank failure in U.S. history.

75.     Fears of contagion and systemic failure began to spread.  These fears were rooted in a recognition that banks are interlinked; if there is a run on one bank, that may lead to a lack of confidence in the market and a run on other banks.

76.     International media added to the concerns.  For example, CNN reported that "SVB's downfall continue[d] to reverberate across global financial markets."  See https://www.cnn.com/2023/03/13/investing/silicon-valley-bank-collapse-explained/index.html.  It also reported that in the wake of SVB's collapse, there were "already some signs of stress at other banks." Id.

77.     Also on March 10, 2023, the FDIC created the Deposit Insurance National Bank of Santa Clara ("DINB") to protect SVB's insured depositors.  In an effort to calm fears, the FDIC announced that all depositors would continue to have full access to their insured deposits no later than Monday, March 13, 2023.  See https://www.fdic.gov/news/press-releases/2023/pr23016.html.  It also announced that uninsured depositors would receive a receivership certificate for the remaining amount of their uninsured funds.  Id.  The FDIC made an additional assurance that as it sold the assets of SVB, future dividend payments would be made to uninsured depositors.  Id.

78.     On Sunday, March 12, 2023, the Department of the Treasury, the Federal Reserve, and the FDIC issued a joint statement:

> Today we are taking decisive actions to protect the U.S. economy by
> strengthening public confidence in our banking system.  This step will ensure

18

that the U.S. banking system continues to perform its vital roles of protecting deposits and providing access to credit to households and businesses in a manner that promotes strong and sustainable economic growth.  After receiving a recommendation from the boards of the FDIC and the Federal Reserve, and consulting with the President [of the United States of America], [Treasury] Secretary Yellen approved actions enabling the FDIC to complete its resolution of Silicon Valley Bank, Santa Clara, California, in a manner that fully protects all depositors.  Depositors will have access to all of their money starting Monday, March 13.  No losses associated with the resolution of Silicon Valley Bank will be borne by the taxpayer.

\*          \*          \*

[T]oday's actions demonstrate our commitment to take the necessary steps to ensure that depositors' savings remain safe.

See https://www.fdic.gov/news/press-releases/2023/pr23017.html

79.     That same day, the Federal Reserve Board announced that it would make available additional funding to eligible depository institutions to help ensure that banks would have the ability to meet the needs of all their depositors.  Id.

80.     Meanwhile, fears of contagion continued to spread, and Signature Bank was closed on March 12, 2023 by its state chartering authority.  Id.  This was the third largest bank failure in U.S. history.

81.     The immediate actions of the Department of the Treasury, the Federal Reserve, and the FDIC illustrated the magnitude of the emergency.

82.     On Monday, March 13, 2023, in a televised address, President Biden sought to restore confidence in the banking system.  Despite his assurances, shares of numerous regional banks continued to slide.

83.     Also on Monday, March 13, 2023, the FDIC transferred all deposits—both insured and uninsured—and substantially all assets of DINB (i.e., the former Silicon Valley Bank of Santa Clara, California) to a newly created, full-service FDIC-operated "bridge bank" with the stated intent of protecting all depositors of SVB.  See https://www.fdic.gov/news/press-releases/2023/pr23019.html. A bridge bank is a chartered national bank that operates under a board appointed by the FDIC.  Id.  It

assumes the deposits and certain other liabilities and purchases certain assets of a failed bank.  Id.  The

bridge bank structure is designed to "bridge" the gap between the failure of a bank and the time when

the FDIC can stabilize the institution and implement an orderly resolution.  Id.

84.    The FDIC also announced that all depositors of the new bank, Silicon Valley Bridge

Bank, N.A. (the "Bridge Bank") would continue to have full access to their money.  Id.  All depositors

and borrowers of SVB immediately became customers of the Bridge Bank.  Id.  Additionally, all

employees of SVB became employees of the Bridge Bank.

85.    On March 13, 2023, the Bridge Bank enacted an Enabling Resolution, adopting, among

other things: (i) SVB's Standards of Conduct, however identified; (ii) SVB's policies and procedures;

and (iii) SVB's compliance regime.  As such, Defendants Patel, Stepanis, Kidder, Longo, Hanlon, and

Andersen remained bound by SVB's Standards of Conduct and policies and procedures.

### *The FDIC Puts The Bridge Bank Up For Auction*

86.    The FDIC is statutorily required to resolve failed institutions in a way that minimizes

losses to the Deposit Insurance Fund.  See https://www.fdic.gov/buying/franchisemarketing/index.html.

When doing so, the FDIC's "primary objective is to maintain financial system stability and public

confidence."  Id.  The FDIC also "tries to reduce the impact on the community."  Id.

87.    With respect to SVB, the FDIC elected to hold an auction.  Pursuant to its established

practices, the FDIC invited "qualified bidders" to submit bids to acquire the assets and assume the

liabilities of the Bridge Bank.  Although qualified bidders may participate in the resolution process for

a variety of strategic reasons, a successful resolution can provide a seamless transition for depositors

and borrowers and calm financial markets and systems.  Consequently, the public, businesses, the

government, and the entire U.S. and global financial system are all stakeholders in the successful

resolution of a failed bank.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

88.    The collective shared interest in successful resolution of SVB was illustrated by a "Statement of Support" signed by approximately 100 venture capitalists shortly after SVB's collapse. Since that time, the Statement of Support has been adopted by an additional 600 or so venture capitalists.  The Statement of Support provides as follows:

> Silicon Valley Bank has been a trusted and long-time partner to the venture capital industry and our founders. For forty years, it has been an important platform that played a pivotal role in serving the startup community and supporting the innovation economy in the US.
>
> The events that unfolded over the past 48 hours have been deeply disappointing and concerning. In the event that SVB were to be purchased and appropriately capitalized, we would be strongly supportive and encourage our portfolio companies to resume their banking relationship with them.

89.    The Statement of Support reflects the venture banking market's collective experience and desire—when a bank failure threatens the stability of our financial markets and systems, someone must come to the rescue.  In this case, First Citizens was that someone.

90.    The auction period lasted about two weeks.  According to the FDIC, nineteen other companies submitted bids for at least some portion of the Bridge Bank.  HSBC was not one of them.

91.    On Sunday, March 26, 2023, the FDIC announced that it had entered into a purchase and assumption agreement for all deposits and loans of the Bridge Bank by First Citizens.

### *HSBC Seeks to Take That Which It Would Not Buy And it Does So Through the Misuse of SVB's Confidential and Trade Secret Information*

92.    On or about March 13, 2023, HSBC U.K. acquired SVB UK for £1 (approximately $1.21).  HSBC announced its acquisition stating, "We've acquired the UK arm of US lender Silicon Valley Bank (SVB)."  See https://www.hsbc.com/news-and-media/hsbc-news/hsbc-buys-silicon-valley-bank-uk.  Portraying HSBC as a savior, Noel Quinn, HSBC Group Chief Executive stated, "SVB UK customers can continue to bank as usual, safe in the knowledge that their deposits are backed by the strength, safety and security of HSBC."  Id.  It would not take long for HSBC's purportedly altruistic intentions to succumb to greed.

PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT

FP 47185866.1

93.     While the FDIC was scrambling to stabilize matters in the United States, Defendant Sabow and HSBC were plotting to exploit the situation for their own economic gain.

94.     Upon information and belief, on or about March 13, 2023, Sabow was an employee of SVB UK. It had barely been two months, perhaps less, since he left SVB to join SVB UK. Indeed, until March 1, 2023, Sabow still had an executive function within SVB with respect to awarding 2022 year-end performance awards and compensation to those SVB employees within the Technology and Healthcare Banking group that he had led until the end of 2022. With his knowledge of SVB fresh in his head, Sabow began drafting what he called "Project Colony."

95.     Project Colony was Sabow's written plan to steal some of the most lucrative portions of SVB's business.

96.     Sabow's "Project Colony" plan noted that the "collapse of Silicon Valley Bank" presented a "narrow window of opportunity for a scaled, stable, and well-capitalized platform [such as HSBC] to become the landing ground for key talent across the market – recreating a better version of the prior dominant platform." He further explained, "**I have identified 6 core leaders to serve as our "Founders" for this US venture banking business.**" (boldface emphasis in original). Upon information and belief, the six "core leaders" identified by Sabow were Defendants Patel, Stepanis, Kidder, Longo, Hanlon, and Andersen.

97.     Sabow chose these particular six "core leaders" because they were "key functional leaders" with "superb client and employee followership." He further noted that they were well positioned to carry out two "waves" of hiring: "Wave 1," which would begin with "an additional 35 professionals already identified," and "Wave 2," which would target "an additional 40 professionals at junior levels." Sabow noted that the SVB professionals he was targeting cut "across Venture Capital Relationship Management, Relationship Management, and Credit Solutions," i.e., the business groups that were essential to successfully lifting out "the core of [SVB's] profitability engine."

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

98.     Sabow noted that previous efforts to establish a foothold in the market by hiring key individuals away from SVB had been successful: "In 2019 JP Morgan lifted out a small group of individuals with Venture relationships and venture debt Credit Solutions expertise and in a very short period they became the #2 player in the market."

99.     Sabow proceeded to make his sales pitch by employing his knowledge of SVB's confidential and proprietary information.  For example, he began by setting forth tables reflecting SVB's "win rate" against its core competitors segmented by deal size and numbers of loans.  Recognizing the confidential nature of this data, Sabow redacted it.  Upon information and belief, he later shared the unredacted data with HSBC.

100.    Sabow proceeded to outline his intent to seize percentages of various market shares identical to those held by SVB (the amounts of which are not publicly available), and he justified the merits of his plan by citing and leveraging confidential information.  This included his recitation of SVB's "annual gross profit per core borrower" and "per non-core borrower."  It also included non-public statistical information identifying by percentage the amount of SVB clients falling within certain borrowing classifications.  He laid out a "preliminary financial model leveraging [his] key assumptions" which were predicated on specific dollar amounts for loan portfolios, implied revenue and growth, and employee salaries, which include non-public data he obtained as a result of his role as an executive and fiduciary of SVB and from the other Individual Defendants.  As explained below, Sabow filled in parts of his plan throughout March and April of 2023 by obtaining additional non-public data from SVB employees, and by incorporating input from the six "core leaders" in violation of their fiduciary duties to SVB and First Citizens.

101.    In one particularly egregious example of misconduct, on March 16, 2023, Sabow sent an instant message to an employee of what was then the Bridge Bank.  In that message, he asked the employee to provide information that he intended to use (and which he did in fact use) to refine,

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

enhance and develop his "Project Colony" plan.  Specifically, Sabow asked the employee the following:

> 1)  What is the average annual gross profit for the Tech AG Non-Core Borrower
>
> 2)  What is the average annual gross profit for the Tech AG Core Borrower (including loan, deposits, everything)
>
> 3)  Same as 1, and 2 above for the LS AG [i.e., Life Science & Accelerator & Growth Group] portfolio under Kevin Longo
>
> 4)  What is the total population of the venture backed U.S. market in the segments we serve (not those that have gone public but those that have raised any round of venture capital over the last couple of years)
>
> 5)  Per 4 above, do we have a map showing where those are located around the US by chance? (I think this may have been part of the Series A work you did, but not sure if that is just Series A or all prospects).

102.    Sabow asked the employee to turn this information around the same day.

103.    Unsure as to whether Sabow was an employee of the Bridge Bank (or even SVB UK because it had already been purchased by HSBC), the employee asked, "Hi Dave – checking if you are still an employee of the US entity?"  Sabow responded, "Good point [employee name] – I have a UK co tract [sic] but am no longer the CEO here" and he falsely told the employee he was "likely heading back to US with SVB."  To assuage the employee's concern, he told the employee to "send [the requested information] to Sunita [Patel]" because Patel was an SVB employee in the U.S.

104.    The employee followed Sabow's direction and provided the requested information by email to Patel with the Subject line "RE: Dave Sabow requests on Gross Profit across Segment and Borrower types."  On March 16 and March 17, 2023, the employee and Patel exchanged emails regarding the information, and Patel thanked the employee for the information.  It is evident that Patel then provided the requested information to Sabow because Sabow incorporated the information into his "Project Colony" plan.

105.    Upon information and belief, it appears that in her March 17, 2023 email to the employee, Patel attempted to create a false justification for having requested the information from the employee in the emails with the Subject line: "RE: Dave Sabow requests on Gross Profit across Segment and Borrower types" by writing to the employee, "Forgot to mention – we're looking at pulling deposit trend data for the VC firms that pledged support for SVB. Would be at the firm and portco level to help prioritize outreach. Will likely come early next week."

106.    On or about March 21, 2023, Sabow met with Defendants Patel, Stepanis, Longo, Hanlon, and Andersen to discuss the vision for Project Colony. At that time, all of the Individual Defendants were employees of the Bridge Bank. Sabow's noted in his opening that "[N]o one has any commitment by being here right now . . ." and he explained that the situation with SVB "creates an amazing market opportunity . . . If we find a top 5 balance sheet with a strong reputation is acquiring the core of the Accelerator & Growth portfolio, I want to be part of that platform; . . . if a no name regional bank acquires the team and assets, I am going to build something to put them out of business, because our team members and the market deserves better . . . ."  Sabow additionally explained what HSBC USA brought to the table and noted that they "Need to actually hire this at size in order for this to be meaningful; Don't nibble at this – show your commitment; Every person you hire is going to bring accounts with it – can gain market share fast; . . . going to big leap and need to be comfortable with this – this might be the best time in history to enter this market; what are the limits on size and scale for this – quick decision making."  Sabow also noted that they "Need to make a splash with 30, 40, 50 people out of the gate . . ."

107.    On or about March 21, 2023, Katherine Andersen prepared and saved notes of what appears to be a conversation with Sabow about Project Colony and her input on business development and what staffing would be needed for lift-out and support from HSBC, based on SVB's confidential and proprietary information.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

108.    Andersen's notes of March 21, 2023 include numerous pieces of SVB's confidential and proprietary information concerning SVB's Life Science & Healthcare Technology team's deployment of SVB's resources and expected Gross Profit and growth from SVB's customers. This confidential information included the total amount of SVB's Life Science & Healthcare Technology group's commitments broken down by "Sponsor Finance / LevFin & Corporate Banking" and venture debt and growth capital invested in categories of healthcare technology clients. Andersen's notes discuss how they need to "create followership" to get other employees to come with them.  Upon information and belief, Andersen shared confidential and proprietary information with Sabow.

109.    Andersen's notes reflect her thoughts on modeling for taking clients and employees from SVB and what they would need to get from HSBC to handle their projected volume of clients and loan commitments.

110.    Upon information and belief, Sabow also sought input from each of the other Individual Defendants regarding "Project Colony."  Upon information and belief, Sabow spoke with each Individual Defendant numerous times to refine and further develop the plan throughout March and April 2023.  These meetings were by telephone, and they occurred while the Individual Defendants were still employees of the Bridge Bank and First Citizens.

111.    On March 23, 2023, at least one of the Individual Defendants, Stepanis, had access to and printed on her personal printer a report (the "9-box Report") concerning approximately 830 employees.  The 9-box Report is a confidential report used by SVB to analyze, display, and compare employee work performance and potential.  It is a talent management tool that helps human resources and managers effectively identify leaders and strategically prepare employees for future roles.  It identifies employees by name, level, performance rating, and potential.  It contains notes specific to employees detailing their strengths and experience.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

112.    First Citizens believes and therefore alleges that Stepanis did not have any legitimate business need to print the entire 9-box Report concerning 830 employees.  Upon information and belief, Stepanis printed the 9-box Report at the same time she was considering and planning her defection and the departure of dozens of SVB employees.  First Citizens believes and therefore alleges that Stepanis used this information to aid HSBC's coordinated attack on First Citizens and its workforce.

113.    The information contained within the 9-box Report is a compilation of SVB's business information that is secret and valuable because it is not generally known to, and not capable of being readily ascertained through proper means by competitors such as HSBC who can obtain economic value from the disclosure or use of the information.

114.    Each Individual Defendant understood that the plan was predicated upon confidential information that was not publicly available.  Each Individual Defendant also understood that the plan required a simultaneous "lift-out" of dozens of key employees, the effect of which was intended to inflict serious damage upon the Bridge Bank's (and any acquiring entity's) ability to preserve its Technology & Healthcare Accelerator & Growth market share.

115.    Upon information and belief, Sabow discussed or provided a copy of his "Project Colony" plan to numerous high ranking officers at the various HSBC entities that are Defendants in this case.

116.    HSBC approved Sabow's "Project Colony" plan.  Upon information and belief, it offered Sabow millions of dollars' worth of compensation to motivate and incentivize him, and it has agreed to pay for his counsel and to indemnify him for any judgment obtained as a result of any litigation arising from the conduct described herein.

117.    Upon information and belief, when Sabow initially provided the plan to the various HSBC officers, it was redacted in part.  Curiously, the redaction concealed some, but not all, of the

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

confidential and proprietary information contained within the plan.  By redacting portions of the plan, Sabow made plain to the HSBC officers that he was willfully and maliciously using SVB's confidential and proprietary information.  Upon information and belief, Sabow eventually provided unredacted copies of the plan to HSBC.

118.     Before and after receiving HSBC's blessing, Sabow set out to execute "Project Colony."  To that end, Sabow created various spreadsheets containing a compilation of valuable, non-public information that is not readily ascertainable by SVB's or First Citizens' competitors including: (i) the identities, names, positions, and salaries of the Defendant executives and more than three dozen of their subordinates that Sabow had identified as "key professionals," as well as their locations and the markets they cover; (ii) "preliminary financial model leveraging [Sabow's] key assumptions" which were predicated on specific dollar amounts for SVB's loan portfolios with implied revenue and growth; (iii) an analysis of SVB's loans for its US Accelerator & Growth Group with "compromised institutions;" (iv) tables reflecting SVB's "win rate" against its core competitors segmented by deal size and numbers of loans; (v) data underlying analysis of SVB's "win rate"; (vi) SVB practice overview notes, including numbers of clients ranked by value to SVB, total value of loans, total client funds, total value of deposits, total revenue, total pre-tax income, total dollar amount of core fees, total number of clients, total percentage of return on equity, percentage of market share, headcount of Life Science employees, and total headcount of employees in relationship management, business development, and credit solutions groups.

119.     Throughout March and April 2023, Sabow spoke with the Individual Defendants numerous times by telephone, video and in person.  He met with some of them in California.

120.     Upon information and belief, during these meetings, Sabow obtained, discussed and validated the above-described confidential information, and he also solicited the executives to leave SVB *en masse*.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

121.    Upon information and belief, Sabow—with HSBC's blessing, aid and encouragement—utilized his knowledge of the executives' compensation to offer them increases in salary and other compensation worth many hundreds of thousands of dollars.

122.    Upon information and belief, Sabow—with HSBC's blessing, aid and encouragement—informed the executives that HSBC has agreed to pay for their counsel and to indemnify them for any judgment obtained as a result of any litigation arising from the conduct described herein.

123.    Economically motivated and satisfied that they were insulated from any adverse economic consequences, Sabow and the executives finalized their list of "key" professionals to target in the first "wave."  Sabow and the executives met with, solicited and recruited the targeted "key" professionals laying out their plan for a mass resignation designed to maximize the prospect for moving clients and revenues from First Citizens to HSBC.

124.    The plan for "wave 1" culminated over Easter weekend, April 7-9, 2023.  During the weekend, Sabow and the executives worked with HSBC to interview and extend offers to dozens of First Citizens' (formerly SVB) employees.  Dividing them into two groups, Michael Roberts (CEO of HSBC Bank USA) held a Zoom call with the targeted "key professionals" to persuade them to leave First Citizens together and join HSBC.  He explained that they were all receiving job offers with significant financial inducements that had to be accepted within hours.  The job offers were fashioned using the confidential, proprietary and trade secret information described above.  By using this information, HSBC was able to craft right-sized compensation packages that enabled it to entice the targeted employees to leave First Citizens while still leaving room to generate a tidy profit off the business it was lifting out of First Citizens.

125.    At the direction of HSBC and Sabow, around 9:00 pm on Easter Sunday, more than forty employees (including the other Individual Defendants) began sending notice of their resignations,

effective immediately.  In less than half an hour, they were gone.  Many of their resignation emails were nearly identical.  Upon information and belief, HSBC drafted the emails for them.

126.   Sabow and the other Individual Defendants used their unique knowledge of non-publicly available information concerning the employees they spirited away.  For example, the Individual Defendants identified the employees essential to taking the business HSBC aimed to steal, and upon information and belief, they used their knowledge of the employees' talents, skillsets, business relationships, job responsibilities, and compensation to enable HSBC to carry out its coordinated Easter weekend attack.  The executives also set their sights on employees who have access to and familiarity with SVB's trade secrets and confidential information, such as its lending and pricing strategies, deal lists, deal structuring strategies, research, business plans, technology, and finances, as well as SVB's customers' and prospective customers' financial information, points of contact information, borrowing practices, purchasing habits, service requirements, prices, and costs, among other things.

127.   Not surprisingly, and perhaps by design, some of the employees took more than they should have on their way out the door.  For example, one employee emailed himself a spreadsheet on Monday, April 10, 2023, the day after the Easter Sunday raid (i.e., the day after the employee resigned from First Citizens).  The spreadsheet contained an array of confidential and trade secret information including: (i) names of more than 100 clients and prospects; (ii) notes regarding the content of interactions with the clients and prospects concerning facts pertinent to their financial needs, in some instances related to specific transactions; (iii) value of client deposits; (iv) investment balances; (v) dollar amount of loans and credit lines; (vi) segmentation of clients/prospect by geographic region; (vii) classification of clients based on value, importance and level of engagement with the business; and (viii) dates of last call with the client/prospects.  Accompanying this spreadsheet, the employee also emailed himself a list of the clients'/prospects' names and email addresses.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

128.    The above-mentioned confidential information used by Sabow, the executives and HSBC provided them with an unfair competitive advantage.  Likewise, the simultaneous lift-out from First Citizens of approximately forty "key professionals," which was accomplished with the aid of the executives' breach of their fiduciary duties and duties of loyalty also provided Defendants with an unfair competitive advantage.

129.    The unfair competitive advantage seized by Defendants enabled them to short-circuit the time normally required by a market entrant to: (i) identify a target market and to validate the viability and potential profitability of a business plan to enter that market; (ii) develop comprehensive financial projections that forecast revenues, costs and expenses associated with a business plan, including financial modeling of estimated sales volumes, production costs, operating expenses and anticipated cashflow; (iii) formulate the operational efficiency needed to streamline processes, minimize waste, and reduce costs; (v) identify and assess potential risks that could impact the profitability of the business plan, such as evaluating market risks, competitive risks, regulatory risks, financial risks, and operational risks; (vi) develop risk mitigation strategies to minimize the impact of pertinent risks and protect profitability.  By seizing these unfair advantages, HSBC was able to expedite the timeframe within which it could enter this market, which itself has an incredibly high barrier to entry, a fact acknowledged by Sabow in his written "Project Colony" plan.

130.    HSBC further secured an unfair advantage because the employees are delivering a readymade business without having to build it from the ground up.  The employees already have data to know which clients and services are most profitable and to know what their funding cycle and needs are.  Consequently, HSBC can target its products, services and marketing to a preselected elite group of clients without the need to spend the significant amount of time, money and resources that are normally required.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

131.    There can be no mistake that Sabow understood he was talking about taking business away from the entity that would acquire the Bridge Bank's assets (<u>i.e.</u>, First Citizens).  In his "Project Colony" plan he stated: "re-taking this position of dominance will be core to the strategic thesis of any ultimate acquiror of SVB's U.S. portfolio."  He continued: "If a 'super-regional' or institution outside of the top 10 U.S. banks acquires the assets of SVB US, they will have an inherent governor on their growth and market share in the near term."

132.    Sabow urged HSBC to move quickly: "***If the strategy described [in this "Project Colony" plan] is of interest, we need to move quickly to secure the six identified core leaders in the U.S. that will become the pillars for this US venture banking business.***"  (boldface and italics emphasis in original.

133.    On April 11, 2023, just sixteen days after First Citizens acquired the Bridge Bank, HSBC announced that it had hired a slate of SVB executives from First Citizens.  <u>See</u> <u>https://www.about.us.hsbc.com/newsroom/press-releases/hsbc-usa-hires-silicon-valley-veterans-to-lead-new-dedicated-offering-for-innovation-economy</u>.  These were the very same executives who had resigned *en masse* with their subordinates on April 9, 2023.  In HSBC's own words, the group was "led by David Sabow."  <u>Id.</u>  Sabow was the former Head of SVB's Life Sciences and Technology Banking.  In this position, Sabow had unique and extensive knowledge of SVB's proprietary information and trade secrets, and he had extensive knowledge about and relationships with SVB's workforce.  Sabow was uniquely situated to exploit and undermine SVB's significant investments of time, money and resources in recruiting, training and developing its workforce.

134.    On April 28, 2023, First Citizens, by and through its counsel, sent letters to each and every one of the Individual Defendants.  True and correct copies of the letters, not including their attachments, are attached as **Exhibits A through G** and incorporated as if set forth in full herein.

135.    Each letter outlined each of the Individual Defendants' obligations not to use confidential information they acquired from SVB/First Citizens (the "Company") and not to compete unfairly with the Company.

136.    Each letter expressed the Company's concern that each Individual Defendant has violated his/her obligations.

137.    Each letter contained four specific demands that the Defendant receiving the letter: (i) immediately purge and return all confidential information relating to the Company's business; (ii) immediately cease and desist from using or disclosing the Company's confidential information and provide a written assurance that s/he will refrain from such use and disclosure; (iii) provide a list of each and every employee of the Company with whom s/he communicated concerning her/his actual and/or potential departure from the Company; and (iv) provide a written assurance that s/he will take steps necessary to ensure that all evidence will be preserved.  See **Exhibits A through G.**

138.    To this date, except to state that evidence will be preserved, not one of the Individual Defendants has provided the requested written information or assurances.  To be clear, the Individual Defendants' counsel, who also represents HSBC Bank USA, N.A., communicated with Plaintiff's counsel and stated that no confidential information had been misappropriated.  Plaintiff's counsel requested a written response to the four specific demands in **Exhibits A through G.**  To date, no such written response has been provided (except to state that evidence will be preserved).  Instead, the Individual Defendants have taken an "I only intend to address that which you can specifically prove" approach to First Citizens' demands, and they have asked First Citizens to "inform [them] if [First Citizens is] aware of any specific confidential information that First Citizens believes was disclosed to HSBC and which employee First Citizens believes made that disclosure."

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### _The Defendants' Actions Have Caused Significant Harm to First Citizens_

139.    By and through their wrongful conduct described throughout this Complaint, the Defendants have caused significant harm to First Citizens.

140.    As explained above, the FDIC's role in the face of a bank failure is to bring calm and stability to the situation.  One way it does that is to liquidate the assets of a failed bank and sell them to a healthy bank.

141.    When one bank buys another bank, it typically does so in order to expand its operations and increase its profitability.  Increased profitability comes from:

    a.  Increased market share, i.e., gaining access to new customers and markets, which leads to increased revenue and profitability;

    b.  Cost savings, e.g., streamlining the two banks' operations through elimination of duplicate systems and processes, and consolidating physical locations; and

    c.  Cross-selling opportunities, e.g., gaining access to new customers, products and services that the acquiring bank did not previously have, and by offering new customers, products and services to the acquired bank that it previously lacked.

142.    In bidding for SVB's assets, First Citizens had a reasonable expectation that it would acquire the assets it purchased free from unlawful interference.  HSBC, with the assistance of the Individual Defendants, deliberately undermined the value of the assets acquired by First Citizens.

143.    In addition to causing economic harm and loss, the Defendants have eroded the integrity of the auction process and diminished the trust that future buyers will have in the fairness and reliability of such transaction.

144.    By poaching the targeted executives and "key professionals"—particularly through the use of confidential, proprietary and trade secret information—HSBC unfairly replicated and took a

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

large cross section of SVB's operational knowledge and unlawfully acquired an unfair competitive advantage.

145.   When banks fail, their employees face uncertainty and potential job loss.  By poaching employees here and seeking to have them provide confidential, proprietary and trade secret information, HSBC exacerbated this uncertainty and contributed to the disruption of the job market.

146.   The Defendants' actions were not only unethical, but they distort the fairness of the auction process, serve to discourage future buyers, and undermine the stability of the banking industry.

147.   In sum, the Defendants' conduct represents an egregious breach of confidentiality and misuse of insider knowledge.  The massive resignation of employees orchestrated by HSBC and aided by the Individual Defendants disrupted First Citizens' business operations while eroding client trust. By cherry-picking key personnel who had access to and knowledge of First Citizens' confidential and proprietary information concerning SVB's operations, relationships, strategies, and other confidential information, HSBC has acquired an unfair competitive advantage, inflicted substantial damages upon First Citizens, and compromised the public interest.

148.   First Citizens is entitled to damages that include compensation for the diminution of the value of the business it acquired which is traceable to the Defendants' wrongful conduct, including such damages as are reflected by lost profits and expenses incurred.  It is also entitled to recover amounts (without seeking a double recovery) that reflect the unjust enrichment of the Defendants and/or a reasonable royalty.

149.   The fact that the Defendants' actions harm the public interest and undermine the public trust only makes the conduct at issue that much more reprehensible.  In addition to all damages requested herein, punitive damages of a significant magnitude are warranted to discourage HSBC and others from undermining and destabilizing the FDIC's resolution and receivership process for the purpose of enriching themselves at the expense of their competitors.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

150.    Defendants' naked ambitions cannot justify their actions. Sabow's own words are that it is his "ambition" "to build a market leading venture-banking platform globally and my best team members share this ambition."  But taking property that does not rightfully belong to you is not building a business; that is simply theft.

151.    Aside from ambitious plans, Sabow touted the merits of his "Project Colony" plan by telling the other Defendants that the business they aimed to steal would yield immediate and extraordinary profits.  Misusing the data described above, Sabow projected that "Project Colony" would generate more than $66 million of direct profit contribution in its first year alone.  He further projected that it would generate direct profit contribution in years two through five amounting to more than $278 million, $541 million, $868 million, and $1.275 billion respectively.

152.    There can be no doubt—a massive damages award is warranted in this case.  Just based on Sabow's projections, that amount should be at least $1 billion.

## FIRST CAUSE OF ACTION

**(Breach of Contract – Confidentiality, Assignment, Non-Solicitation, and Unauthorized Competition Obligations – Against Sabow, Patel, Stepanis, Longo, and Hanlon)**

153.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 152 as if set forth fully herein.

154.    Sabow began his employment with SVB in or about May 2012 as a Senior Relationship Manager.  Throughout his employment, Sabow ascended through a series of increasingly senior positions.   In 2017, he became the Head of Life Sciences, Client Funds and Products.  In 2019, he became the Head of Life Sciences and Technology Banking.  In 2022, he was offered the position of CEO Silicon Valley Bank UK and Head of EMEA (i.e., Europe, the Middle East, and Africa).  He was slated to begin this most recent position on April 1, 2023.

FP 47185866.1

155.     As a condition of his employment, Sabow executed a <u>Confidential Information and Invention Assignment Agreement for Employees</u> (Sabow's "Agreement").  A true and correct copy of Sabow's Agreement is attached as **Exhibit H** and incorporated by reference as if set forth fully herein. The Agreement—which is between Sabow and Holdco and its subsidiaries, affiliates, successors, and assigns—expressly contemplates that it would continue to apply to Sabow throughout his various positions.  <u>See</u> **Exhibit H** at ¶ 12(a) ("Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.").  Holdco, and its subsidiaries, affiliates, successors, and assigns, including SVB and First Citizens (by means of the March 27, 2023 acquisition), are referred to hereafter as the "Company."

156.     Sabow's Agreement contains his promise not to use or disclose the Company's Confidential Information except for the benefit of the Company.  <u>See</u> **Exhibit H** at ¶ 3(a).  The Agreement defines "Confidential Information" in paragraph 3(a) as follows:

> any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, the Company's: approach to lending, lending and pricing strategies, deal structuring strategies, research, product plans, products, services, suppliers, business plans and strategies, markets, software, developments, inventions, technology, designs, drawings, engineering, hardware configuration information, marketing information and methods, licenses, financial proposals, financial statements, finances, transactions, budgets, all personnel information, customer lists and customers (both current and prospective, including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship) as well as customers' point of contact information, borrowing practices[,] purchasing habits, service requirements, prices and costs; or other business information disclosed to me by the Company either directly or indirectly in writing or orally or by observation of documentation, data, parts or equipment or created by me during the period of the Relationship, whether or not during working hours. . . . [Further,] "<u>Confidential Information</u>" includes, but is not limited to, information pertaining to any aspects of the Company's business which is either information not known by actual or potential competitors of the Company or is proprietary or trade secret information of the Company or its customers or suppliers, whether of a technical nature or otherwise.

FP 47185866.1

157.   Sabow's agreement contains his obligation to assign any rights to "Works," and to "concepts, know-how, improvements or trade secrets" to the Company so that it is clear that the Company owns these rights – and not Sabow. Specifically, the Agreement provides in paragraphs 4(b) and 4(c) as follows:

4(b)      Assignment of Works. I agree that I will promptly make foil written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and ah inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets which I may solely or jointly conceive or develop of reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time in which I am employed by the Company (collectively referred to as "Works") related to the Company's business Or which relate to any actual or anticipated research or development which results from any work that I perform for the Company, of any inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets which involves, in any way, the use of the Company's equipment, supplies, facilities, trade secrets, or confidential information.. I further acknowledge that all inventions, original works of authorship, developments, concepts, know-how,-improvements Or trade secrets which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company are "Works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary, unless regulated otherwise by the mandatory law of the state of California or the State in which 1 perform the majority of my service for the Company. I agree to execute all documents necessary to the perfection of the assignment or for the perfection and/or protection of the Company's interest or rights in such intangible assets.

4(c) Consistent with subsection 4(b) above, this Agreement does not require assignment of any inventions which fully qualifies for protection under Section 2870 Of the California Labor Code which provides as follows: Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in any invention to his of her employer Shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and (a) which does not relate (l) to the business of the employer or (2) to the employer's actual of demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision, which purports to apply to such an invention, is to that extent against public policy of this state and is to that extent void and unenforceable.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

158.    Sabow's agreement also contains his commitment to return all of the Company's property and documents upon the termination of his employment with the Company.  Specifically, the Agreement provides in paragraph 5 as follows:

> I agree that, at the time of termination of my Relationship with the Company, I will immediately, without delay, deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all Company property and documents obtained or provided to me during the Relationship. Such Company property and documents, includes, but is not limited to: records, data, notes, reports, proposals, plans, lists, forecasts, formulas, projections, bids, financial data, promotional or marketing materials, client related information or correspondence, customer lists, correspondence, tools, equipment, devices, specifications, programs, plans, proposals, ideas, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, confidential information as defined above in paragraphs 3(a) and 3(c), and any other documents or property as well as any copies, reproductions or electronic storage files containing any of the aforementioned items including but not limited to any files downloaded to cellular phone, computers or other electronic devices, or forwarded to third parties or other electronic data storage depositories.

159.    Sabow's Agreement also contains his acknowledgement that his "knowledge of the Company's employees' and consultants' skills, knowledge, relationships and abilities itself constitutes the Company's trade secret information." Id. at ¶ 8.  Accordingly, he promised in paragraph 8 that during his employment and for a period of six months thereafter, he would not solicit, induce, recruit or encourage the Company's employees or consultants to terminate their relationship with the Company.  Specifically, paragraph 8 of the agreement states:

> I agree that during the term of my Relationship with the Company, and for a period of six (6) months immediately following the termination of my Relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or take away such employees or consultants, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity without first notifying and obtaining the express written approval of the Company's President and CEO.

160.    Sabow's Agreement also contains his promise not to compete unfairly with the Company either during or after his employment.  To this end, paragraph 9 states:

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

I agree that for any period during which I am employed by the Company, I will not participate in selling product lines that compete with the Company to existing Company customers or identified prospects. I further agree that, after my employment with the Company ends, that I shall not participate in selling product lines that compete with the Company to existing Company customers or its identified prospects if such conduct would require or in any way cause the disclosure, use or exploitation of any of the Company's trade secrets or confidential information (as defined by the Uniform Trade Secrets Act) or if trade secrets or confidential information obtained during my employment at the Company would give a competitive advantage over the Company. I agree that these limitations are necessary and reasonably calculated to protect the Company's trade secrets and confidential information. There shall be no exceptions to these limitations on competition unless I obtain express written approval for any exception from the Company's President and CEO. Except for these reasonable limitations, I am free to obtain employment with other companies in the financial services industry. Accordingly, I understand this provision shall not be construed to prevent me from being gainfully employed in the financial services industry by a competitor of the Company.

161.     Just like Sabow, Defendants Patel, Stepanis, Longo, and Hanlon signed Agreements with the Company.  True and correct copies of their Agreements are attached as **Exhibits I through L** and incorporated by reference as if set forth fully herein.  Although the verbiage of Patel's, Stepanis's, Longo's, and Hanlon's Agreements differs slightly from Sabow's Agreement, the substance is the same.  Like Sabow, Patel, Stepanis, Longo, and Hanlon agreed that: (i) they will not use or disclose the Company's Confidential Information except on behalf of the Company; (ii) they will return the Company's property and documents upon the termination of their employment; (iii) during their employment and for a period of at least six months thereafter, they would not solicit, induce, recruit or encourage the Company's employees or consultants to terminate their relationship with the Company; and (iv) they will not compete unfairly with the Company.  See **Exhibit I** at ¶¶ 3, 5, 7 and 9; **Exhibits J and K** at ¶¶ 3, 5, 7, and 8; **Exhibit L** at ¶¶ 3, 5, 8 and 9.

162.     By and through their conduct described above, Sabow, Patel, Stepanis, Longo, and Hanlon breached their Agreements.

163.     The Company has performed, or substantially performed, all of its obligations under the Agreements and met and satisfied all conditions precedent.

164.    The Agreement of Sabow, Patel, Stepanis, Longo, and Hanlon are valid and enforceable.

165.    The Agreement was supported by adequate consideration.

166.    Plaintiff has been damaged by these breaches in an amount to be determined at trial, but in excess of $1 billion.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Notice Obligations – Against Andersen and Patel)

167.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 166 as if set forth fully herein.

168.    On or about April 15, 2019, Andersen became the Head of Relationship Management, Life Sciences for SVB.  This position was a promotion for Andersen, and she received an increase in pay.  She also received additional benefits including incentive compensation and the ability to participate in SVB's Equity Incentive Plan Awards.  In this position, she reported directly to Sabow, who at the time was the Head of Life Sciences and Technology Banking.  In her offer letter, which was signed by Sabow, and which she accepted and signed, Andersen agreed to provide SVB with sixty days' notice of her resignation.  Her offer letter, which was also signed by Sabow, stated in pertinent part as follows:

> Because continuity is critical to both SVB Financial Group's operations as well as that of our clients, **you agree to provide sixty (60) days' notice prior to terminating your employment with us to assure the successful completion of projects and transition of work to your successor, and you also agree not to commence employment elsewhere until completion of this sixty ( 60) day notice period. Similarly, SVB Financial Group agrees to provide you with sixty (60) days' notice prior to terminating your employment for performance or economic reasons.** This mandatory notice period will not apply if you are terminated for fraud, harassment, conflict of interest in violation of SVB Financial Group's Code of Conduct or other acts of moral or legal turpitude. During the sixty (60) day notice period, you will continue to receive your full pay and benefits, and your duties will focus on assisting SVB Financial Group in transitioning work to which you were assigned and other administrative tasks on an as-needed basis. During this sixty (60) day notice

41

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

period, SVB Financial Group in its sole discretion may cease to assign work to you, modify the work you perform, place you on leave or require you not to attend work for all or a portion of the notice period. You agree that even if you are inactive for some or all of the notice period, this notice period shall not constitute constructive discharge of your employment. You further agree that this mandatory notice period does not otherwise alter your at-will employment with SVB Financial Group. **Throughout the sixty (60) day notice period, the terms of your employment will continue in force including those relating to your compensation, duty of loyalty and exclusivity of employment with SVB Financial Group.** This sixty (60) day notice period can only be modified through written agreement between you and SVB Financial Group, except that it may be waived in SVB Financial Group's sole discretion upon request.

(emphasis added).  A true and correct copy of Andersen's offer letter is attached is **Exhibit M** and incorporated by reference as if set forth fully herein.  Andersen also agreed to provide notice in exchange for subsequent increases in compensation.

169.    As of September 29, 2020, Andersen's title was Head of Relationship Management, Life Sciences & Healthcare Banking for SVB.

170.    On December 19, 2022, Andersen executed a contract rendering her eligible to receive a retention award in exchange for certain promises (the "Retention Award Agreement").  A true and correct copy of the Retention Award Agreement is attached as **Exhibit N** and incorporated by reference as if set forth fully herein.

171.    Pursuant to the Retention Award Agreement, Andersen was eligible to receive hundreds of thousands of dollars if she continued her employment with SVB through December 31, 2025.  The Retention Award Agreement contained mutual promises between SVB and Andersen to provide one another at least sixty days' notice prior to terminating Andersen's employment to ensure the successful completion of projects and transition of work.  The Retention Award Agreement stated in pertinent part as follows:

**Continuity is critical to both SVB Financial Group's operations as well as that of our clients. Accordingly, as further consideration for your eligibility to receive payments under this Retention Awards Program, you agree to provide sixty (60) days' notice (the "Notice Period") prior to terminating your employment with us to assure the successful completion of projects**

**and transition of work to your successor, and you also agree not to commence employment elsewhere until completion of this Notice Period. Similarly, SVB Financial Group agrees to provide you with the same Notice Period prior to terminating your employment.** This mandatory Notice Period will not apply if you are terminated for cause and/or in violation of SVB Financial Group's Code of Conduct. **Throughout the Notice Period, the terms of your employment will continue in force including those relating to your compensation, duty of loyalty and exclusivity of employment with SVB Financial Group and your duties will focus on assisting SVB Financial Group in transitioning work to which you were assigned and other administrative tasks as-needed.** SVB Financial Group in its sole discretion may cease to assign work to you, modify the work you perform, place you on leave or require you not to attend work for all or a portion of the Notice Period. You agree that even if you are inactive for some or all of the Notice Period, this Notice Period shall not constitute constructive discharge of your employment. You also agree that this Notice Period supersedes the "without notice" aspect of SVB Financial Group's ordinary at-will policy but does not otherwise alter your at-will employment with SVB Financial Group. This Notice Period can only be modified through written agreement between you and SVB Financial Group, except that it may be waived in SVB Financial Group's sole discretion upon request.

Except for the Notice Period set forth above, nothing in this offer, or your acceptance of it, alters your at-will employment status with the company. Either party has the right to terminate your employment with or without cause or notice upon notice as set forth above. SVB Financial Group reserves the right to change your benefits with or without notice upon notice as set forth above.

(emphasis added).

172.    Similar to Andersen, Patel agreed to provide notice of her resignation from SVB. Specifically, on or about August 31, 2020, Patel became the Head of Business Development for SVB. In exchange for accepting this position and the terms of her offer letter, Patel received an annual salary and other compensation and benefit worth millions of dollars.  In her offer letter, which she accepted and signed, Patel agreed to provide SVB with sixty days' notice of her resignation.  Her offer letter stated in pertinent part as follows:

Because continuity is critical to both SVB Financial Group's operations as well as that of our clients, we agree to provide you with sixty (60) days' notice prior to terminating your employment for performance or economic reasons. This mandatory notice period will not apply if you are terminated for fraud, harassment, conflict of interest in violation of SVB Financial Group's Code of Conduct or other acts of moral or legal turpitude. Similarly, you agree to provide

sixty days' notice to SVB Financial Group before commencing employment elsewhere. During the sixty (60) day notice period, you will continue to receive your full pay, equity vesting, bonus eligibility and benefits, and your duties will focus on assisting SVB Financial Group in transitioning work to which you were assigned and other administrative tasks on an as-needed basis. During this sixty (60) day notice period, SVB Financial Group in its sole discretion may cease to assign work to you, modify the work you perform, place you on leave or require you not to attend work for all or a portion of the notice period. You agree that even if you are inactive for some or all of the notice period, this notice period shall not constitute constructive discharge of your employment. Throughout the sixty (60) day notice period, the terms of your employment will continue in force including those relating to your compensation, duty of loyalty and exclusivity of employment with SVB Financial Group.

A true and correct copy of Patel's Offer Letter is attached as **Exhibit O** and incorporated by reference as if set forth fully herein.

173.    At or about 9:00 p.m. on April 9, 2023, Easter Sunday, Andersen and Patel breached their contracts by resigning without providing sixty days' notice.

174.    The Company has performed, or substantially performed, all of its obligations under the Agreements and met and satisfied all conditions precedent.

175.    The notice obligations of Andersen and Patel are valid and enforceable.

176.    The notice obligations were supported by adequate consideration.

177.    Plaintiff has been damaged by these breaches in an amount to be determined at trial, but in excess of $1 billion.

### THIRD CAUSE OF ACTION

### (Breach of Contract – First Citizens Agreements –

### Against Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen)

178.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 177 as if set forth fully herein.

179.    After First Citizens won the auction for SVB, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen each applied to become and subsequently became executive employees of First Citizens.

FP 47185866.1

180.    As a condition of their employment with First Citizens, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen each executed First Citizens' <u>New Hire Acknowledgement</u> agreement.  True and correct copies of the New Hire Acknowledgement agreements are attached as **Exhibits P through U** and incorporated by reference as if set forth fully herein.

181.    The <u>New Hire Acknowledgement</u> agreements state in pertinent part as follows:

- I read, understood, and agree to comply with the Code of Ethics.

- I read, understood, and agree to comply with [First Citizens'] policies and standards, including but not limited to:

  o   Corporate Compliance Policy…

  o   Information Security Acceptable Use Standards…

- At the beginning of my employment, I will review additional [First Citizens] policies and standards applicable to my role, including but not limited to, [First Citizens'] Human Resources policies and standards.

182.    The <u>Code of Ethics</u> to which the <u>New Hire Acknowledgement</u> agreements refer states in part as follows:

You must comply with all laws and regulations applicable to your role at First Citizens and avoid even the slightest appearance or suspicion of wrongdoing, conflict of interest or other improper conduct.

\*   \*   \*

You must promptly report: (i) Any act or omission you know or suspect to be illegal, dishonest, fraudulent, or unethical that may affect or involve First Citizens; (ii) Any act or omission you suspect to be a violation of the Code of Ethics or First Citizens' policies, standards, or procedures to which you are subject;

\*   \*   \*

1.    **Comply with All laws, Regulations, and First Citizens' Policies, Standards and Procedures**

**1.1  In General**

You are responsible for understanding and obeying all laws, regulations, policies, standards, and procedures to which you are subject and that govern

your actions within and for First Citizens. Strict attention to and compliance with federal and state laws and regulations applicable to the financial services business as well as ethical business conduct rules and regulations, such as the Federal Bank Secrecy Act, are REQUIRED to protect you and First Citizens.

\* \* \*

### 1.4  First Citizens' Policies, Standards and Procedures

You are responsible for understanding and following all First Citizens' policies, standards, and procedures to which you are subject….

## 2.  Maintain Integrity

### 2.1  In General

As used in this Code, "integrity" means possessing and steadfastly adhering to principles of honesty, reliability, courtesy, accuracy, confidentiality, and trustworthiness. Associates are expected to act with integrity in all matters and protect and maintain the first citizens integrity and reputation at all times.

### 2.2  Confidentiality and Privacy of Information…

You **must not access, disclose, or use** non-public information concerning First Citizens, its customers, suppliers, vendors, or anyone doing business with First Citizens **unless there is a business need to do so and you have the appropriate authorization**. Your responsibilities regarding non-public information include, but are not limited to, the following:

- …Use information only for its intended use in carrying out your duties as a First Citizens associate;

- **Do not send non-public information to your personal email address**…;

- Do not use information for unauthorized purposes, such as for your personal advantage or to provide advantage to others….
  Safeguarding and protecting non-public information are continuing obligations, even after you are no longer employed by First Citizens. When you leave First Citizens' employ, you must immediately do the following regarding non-public information:

- Return to First Citizens all records or files in any format, whether written, printed, or electronic (including all originals and any copies or other reproductions), and all lists, summaries, compilations, extracts, or other representations of information, in your possession or control;

46

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

- Permanently delete any information electronically stored on any personal devices; and

- Not use information for your own personal benefit or for the benefit of any third party.

**3.0 Avoid Conflicts of Interest**

**3.1 In General**

As used in this Code, a conflict of interest means a situation or activity that could compromise, or appear to compromise, your judgment, objectivity, or effectiveness in the performance of your duties with First Citizens.

Conflicts of interest, whether real or perceived, can undermine the trust and confidence of our customers, vendors and suppliers, the public, and our fellow associates.  Whether or not a conflict of interest exists or will exist can be unclear.  You must avoid any activity or situation that involves, or appears to involve, a conflict of interest….

A conflict of interest may also arise when your personal activities and relationships with immediate family members, friends, coworkers, etc. interfere, or appear to interfere, with your ability to act in the best interest of First Citizens.

**3.2 Using Position for Personal Gain**

You must manage your personal and business affairs to avoid situations that cause, or appear to cause, a conflict of interest between your self-interest and your duty to First Citizens….

Self-dealing means using your employment or position for personal gain, to advance personal interests, or to obtain favors or unauthorized benefits for yourself or any other person….

**3.3 Activities Detrimental to the First Citizens' Business**

You must avoid in engaging in activities that place you in competition with or which are otherwise detrimental (directly or indirectly) to First Citizens' business. Examples of activities that are considered inappropriate include, but are not limited to, the following:

\*     \*     \*

- Diverting business or personnel away from First Citizens

A true and correct copy of the <u>Code of Ethics</u> is attached as **Exhibit V** and incorporated by reference as

if set forth fully herein.  (all emphasis in original).

183.   The <u>Acceptable Use Standards</u> state in part as follows:

**2. Overview**

The Acceptable Use Standards (Standards) define specific requirements that must be followed when using First Citizens BancShares Inc. and subsidiaries including First-Citizens Bank & Trust Company, (FCB or Bank) technology and information resources (assets) to protect FCB from illegal or damaging actions, either knowingly or unknowingly, that could affect the confidentiality, integrity, and availability of information created, collected, and maintained.

Access to and use of assets is a privilege granted to Associates and Non-Employee Workers as defined in the Human Resources Policies & Standards Manual (collectively, Users). All Users are expected to use FCB assets in a responsible and ethical manner for their intended business purpose in serving the interests of FCB and of FCB's clients and customers. Effective security is a team effort involving the participation and support of every User who deals with FCB information and/or information systems.

The purpose of this Standards is to define the acceptable use of FCB's assets by Users. Inappropriate use exposes FCB to risk including virus attacks, compromises of the network systems and services, violation of license and contractual agreements, and legal and regulatory requirements.

**3. Scope**

All assets that process, store, receive, transmit or otherwise could impact the confidentiality, integrity, and accessibility of FCB data and information must meet the required security controls defined in these Standards that are based on the National Institute of Standards and Technology (NIST) SP 800-53, Security and Privacy Controls.

These Standards apply to all business units, departments, and functions within FCB, as well as Users that access, process, store, and/or transmit FCB data and information.

**4. General Requirements – Acceptable Use of Information Assets**

**4.1 Intended Business Purpose**

Except as permitted in these Standards or under applicable law, FCB owned and managed technology resources and information assets must be used only for the intended business purpose.

\*   \*   \*

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

### 4.6 Return First Citizens Assets

Users must return FCB owned hardware, software, and Restricted Data (as defined in the Data Classification & Handling Standards) to FCB upon request or termination of access.

\*   \*   \*

### 8. Acceptable Use of Company Information

### 8.1 Business Need

Users must not attempt to access any Restricted data (as defined in the Data Classification and Handling Standards) without a direct business need and authorization to do so.

### 8.2 Disclosure

Restricted data may be used only for legitimate FCB business purposes and may not be used or disclosed by any User for any personal purpose as per the Data Classification and Handling Standard.

### 8.3 Processing and Storage

FCB data that is classified as Restricted or Business Use Only may only be processed or stored on technology resources owned, leased, contracted, or approved by FCB. Any other use of technology resources or service providers to process or store Restricted or Business Use Only data is prohibited.

\*   \*   \*

### 8.5 Non-FCB Owned Devices

Restricted or Business Use Only data must not be stored or printed on non-FCB owned computers or devices, unless at least one of the following FCB approved protection methods is used:

- • FCB managed data loss prevention controls
- • FCB approved vendor provided data loss prevention controls
- • Other solutions as approved by Information Security

\*   \*   \*

### 8.7 Mobile Devices

Mobile devices must not store, transmit, or receive Restricted FCB information without FCB approved protection mechanisms (such as the secure messaging service, whole-disk encryption, or Virtual Private Network (VPN).

*   *   *

**13. Acceptable Use of Email and Messaging Platforms**

**13.1 Business Use**

Email and instant messaging must only be used for business related communications and must not be used for personal use, except as permitted by these Standards or applicable law.

**13.2 Unlawful Messages**

Email and instant messaging systems must not be used to send fraudulent, harassing, obscene, threatening, or other unlawful messages.

**13.3 Approved Messaging Systems**

Users must not send business related email or electronic messages containing Restricted data to Users, clients, customers, and business partners through any means other than FCB's approved email and messaging systems. Use of external / public email and instant messaging systems (e.g., Hotmail, Gmail, AOL, AIM, MSN Messenger) for sending business related information is prohibited.

*   *   *

**13.4.4 Secure Messages in Accordance with Data Classification**

Email containing Restricted information must be sent securely using established FCB procedures and must not be sent without an acceptable business need and justification.

**13.4.5 Personal Email Addresses**

Email containing business related Restricted data must not be sent to a User's personal email address or any other User's personal email address, except when sending communications related to a customer's business to the customer's email address, provided that FCB approved security standards to protect the customer's Restricted information are followed.

**13.5 Messaging Platforms**

**13.5.1 Non-Approved Platforms**

Users must not copy or download FCB data from any FCB approved instant message platform and share on non-approved platforms.

*   *   *

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

### 13.5.4 Text Messages Including Restricted Data

Users are prohibited from sending or receiving text messages that contain Restricted data as defined in the Data Classification and Handling Standards.

### 13.5.5 Approved Messaging Platforms

Only FCB approved messaging platforms (e.g., MS Teams) may be used for making material business decisions or other business communications.

A true and correct copy of the Acceptable Use Standards is attached as **Exhibit W** and incorporated by reference as if set forth fully herein.  (all emphasis in original).

184.    The Data Classification and Handling Standards define "Restricted Data" to include information that is intended only for First Citizens and that relates to key financial, strategic, R&D, legal, or other critical aspects of First Citizens' operations.  Examples of Restricted Data include information that provides a competitive advantage such as details of business and marketing strategies and pricing of services and any financial data that is held in confidence by First Citizens.  A true and correct copy of the Data Classification and Handling Standards is attached as **Exhibit X** and incorporated by reference as if set forth fully herein.

185.    By and through their conduct described above, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen breached their New Hire Acknowledgement agreements.

186.     The Company has performed, or substantially performed, all of its obligations under the New Hire Acknowledgement agreements and met and satisfied all conditions precedent.

187.    The New Hire Acknowledgement agreements with Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen are valid and enforceable.

188.    The New Hire Acknowledgement agreements were supported by adequate consideration.

189.    Plaintiff has been damaged by these breaches in an amount to be determined at trial, but in excess of $1 billion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION

### (Breach of Duty of Loyalty Against Stepanis,

### Patel, Kidder, Longo, Hanlon, and Andersen)

190.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 189 as if set forth fully herein.

191.    As employees of First Citizens, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen owed First Citizens an undivided duty of loyalty and care to act in the utmost good faith with undivided interests and with faithful service, and to place First Citizens' interests ahead of their own and not to act for persons or entities whose interests would conflict with those of First Citizens.  This duty includes an obligation not to take action which is inimical to the best interests of First Citizens.  It also includes an obligation to warn First Citizens of imminent threats, particularly those that were being planned and orchestrated by the Defendants.  It also includes an obligation to refrain from competing with First Citizens during employment, and to refrain from taking actions on behalf of or otherwise assisting a competitor of First Citizens.  It also includes an obligation not to acquire a material benefit from a third party in connection with actions taken through the use of their positions with First Citizens.  It also includes a duty not to communicate First Citizens' confidential information for their own benefit or the benefit of a third party.

192.    By and through the conduct described above, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen breached their duty of loyalty.

193.    The foregoing conduct of Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  The conduct of Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen was undertaken in furtherance of their own personal interests and for the benefit of HSBC.

194.    Plaintiff has been damaged by these breaches in an amount to be determined at trial, but in excess of $1 billion.

## FIFTH CAUSE OF ACTION

**(Breach of Fiduciary Duty Against Sabow, Stepanis,**

**Patel, Kidder, Longo, Hanlon, and Andersen)**

195.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 194 as if set forth fully herein.

196.    At the time he left SVB to join SVB UK in early 2023, Sabow was a senior executive for SVB with the title of Head of SVB's Life Sciences and Technology Banking.

197.    Stepanis was a senior executive with the title of Head of Technology Credit Solutions for SVB at the time First Citizens acquired SVB's assets.  At the time she resigned from First Citizens, Stepanis was a senior executive with the title of SV-Head of Credit Solutions (within the Tech Credit Solutions Admin division).

198.    Patel was a senior executive with the title of Head of Business Development for SVB at the time First Citizens acquired SVB's assets.  At the time she resigned from First Citizens, Patel was a senior executive with the title of SV-Head of Investor Coverage and Business Development.

199.    Kidder was a senior executive with the title of Head of Loan Administration for SVB at the time First Citizens acquired SVB's assets.  At the time he resigned from First Citizens, Kidder was a senior executive with the title of SV-Head of Loan Administration.

200.    Longo was a senior executive with the title of Head of U.S. Life Science & Healthcare Credit Solutions at the time First Citizens acquired SVB's assets. At the time he resigned from First Citizens, Longo was a senior executive with the title of SV-Head of Credit Solutions Life Science & Healthcare.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

201.    Hanlon was a senior executive with the title of Head of Relationship Advisors at SVB at the time First Citizens acquired SVB's assets.  At the time she resigned from First Citizens, Hanlon was a senior executive with the title of SV-Head of Relationship Advisors.

202.    Andersen was a senior executive with the title of Head of Relationship Management, Life Science & Healthcare Banking for SVB at the time First Citizens acquired SVB's assets.  At the time she resigned from First Citizens, Andersen was a senior executive with the title of SV-Head of Relationship Management Life Science & Healthcare.

203.    As senior executives of the Company, Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen owed the Company a fiduciary duty through which they were bound to act with the utmost good faith for the benefit of the Company.  This duty included an obligation to act in the utmost good faith with undivided interests and with faithful service, and to place the Company's interests ahead of their own and not to act for persons or entities whose interests would conflict with those of the Company.  This duty includes an obligation not to take action which is inimical to the best interests of the Company.  It also includes an obligation to warn the Company of imminent threats, particularly those that were being planned and orchestrated by Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen.  It also includes an obligation to refrain from competing with the Company during employment, and to refrain from taking actions on behalf of or otherwise assisting a competitor of the Company.  It also includes an obligation not to acquire a material benefit from a third party in connection with actions taken through the use of their positions with the Company.  It also includes a duty not to communicate the Company's confidential information for their own benefit or the benefit of a third party both during and after their agency.  It also includes a duty not to recruit the executives' direct reports and subordinate employees to go work for a competitor.

204.    By and through the conduct described above, Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen breached their fiduciary duty.

205.    The foregoing conduct of Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  The conduct of Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen was undertaken in furtherance of their own personal interests and for the benefit of HSBC.

206.    Plaintiff has been damaged by these breaches in an amount to be determined at trial, but in excess of $1 billion.

### SIXTH CAUSE OF ACTION

**(Aiding and Abetting Breach of Duty of Loyalty**

**and Fiduciary Duty Against the HSBC Defendants and Sabow)**

207.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 206 as if set forth fully herein.

208.    By and through the conduct described above, Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen each breached their duty of loyalty and/or their fiduciary duty.

209.    HSBC knew that Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen were breaching their duty of loyalty and/or their fiduciary duty.  Sabow knew that Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen were breaching their duty of loyalty and their fiduciary duty.

210.    HSBC aided and encouraged Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen in breaching their duty of loyalty and/or their fiduciary duty.  Upon information and belief, HSBC instructed Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen to identify the employees to be targeted, accepted the confidential and trade secret information they provided concerning these employees, assisted with and coordinated the Easter weekend interviews and offers, and coordinated the simultaneous 9:00 p.m. resignations on Easter Sunday.  Upon information and belief, HSBC provided Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen with substantial financial incentives to induce them to breach their duty of loyalty and/or fiduciary duty.

211.    Sabow aided and encouraged Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen in breaching their duty of loyalty and their fiduciary duty.  Upon information and belief, Sabow instructed Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen to identify the employees to be targeted, accepted the confidential and trade secret information they provided concerning these employees, assisted with and coordinated the Easter weekend interviews and offers, and coordinated the simultaneous 9:00 pm resignations on Easter Sunday.  Upon information and belief, Sabow facilitated the provision of substantial financial incentives to Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen to induce them to breach their duty of loyalty and fiduciary duty.

212.    HSBC's conduct was a substantial factor in causing the harm that Plaintiff sustained as a result of Sabow's, Stepanis's, Patel's, Kidder's, Longo's, Hanlon's, and Andersen's breaches of their duty of loyalty and/or their fiduciary duty.  Sabow's conduct was a substantial factor in causing the harm that Plaintiff sustained as a result of Stepanis's, Patel's, Kidder's, Longo's, Hanlon's, and Andersen's breaches of their duty of loyalty and their fiduciary duty.

213.    The foregoing conduct of HSBC was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  HSBC's conduct was undertaken in furtherance of its own personal interest.  The foregoing conduct of Sabow was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  Sabow's conduct was undertaken in furtherance of his own personal interest.

214.    Plaintiff has been damaged by HSBC's and Sabow's actions in an amount to be determined at trial, but in excess of $1 billion.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

**SEVENTH CAUSE OF ACTION**

**(Tortious Interference With First Citizens' Contracts and**

**SVB Obligations Against the HSBC Defendants and Sabow)**

215.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 214 as if set forth fully herein.

216.    The contracts signed by Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen are valid and enforceable contracts.

217.    Upon information and belief, HSBC knew or should have known about the contracts signed by Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen.  Upon information and belief, Sabow knew or should have known about the contracts signed by Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen.

218.    Upon information and belief, HSBC instructed, aided and encouraged Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen to engage in the conduct that constitutes a breach of their contracts.  Upon information and belief, Sabow instructed, aided and encouraged Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen to engage in the conduct that constitutes a breach of their contracts.

219.    Upon information and belief, HSBC provided Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen with substantial financial incentives intended to induce them to breach their contracts.  Upon information and belief, Sabow facilitated the provision of substantial financial incentives to Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen intended to induce them to breach their contracts.

220.    Sabow, Stepanis, Patel, Kidder, Longo, Hanlon, and Andersen did in fact breach their contracts.

221.    The foregoing conduct of HSBC and Sabow was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  HSBC's and Sabow's conduct were undertaken in furtherance of its/his own personal interest.

222.    Plaintiff has been damaged by HSBC's and Sabow's actions in an amount to be determined at trial, but in excess of $1 billion.

**EIGHTH CAUSE OF ACTION**

**(Tortious Interference With Prospective**

**Economic Advantage Against All Defendants)**

223.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 222 as if set forth fully herein.

224.    Defendants knew that Plaintiff entered into a purchase and assumption agreement with the FDIC for all the assets of the Bridge Bank.

225.    Defendants knew that Plaintiff stood to profit from the purchase of SVB.  They understood that as a result of the purchase, Plaintiff would gain increased market share through access to new customers and markets.  They likewise understood that Plaintiff would profit through cross-selling opportunities, such as by gaining access to new products and services arising from SVB's unique market.  They also knew that Plaintiff would profit by continuing to employ key members of SVB's workforce.

226.    HSBC wished to steal that which it could not or did not purchase, and it conspired with the Individual Defendants to engage in the misconduct described above to effectuate the theft of First Citizens' business for their collective economic benefit.

227.    By and through their wrongful conduct described above, Defendants disrupted Plaintiff's employment relationships with First Citizens' employees, and Defendants disrupted Plaintiff's economic relationships with First Citizens' customers.

228.    The foregoing conduct of Defendants was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  The Defendants' conduct was undertaken in furtherance of their own personal interest.

229.    Plaintiff has been damaged by Defendants' actions in an amount to be determined at trial, but in excess of $1 billion.

## NINTH CAUSE OF ACTION

### (Violation of the Defend Trade Secrets Act,

### 18 U.S.C. § 1836 Against All Defendants)

230.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 229 as if set forth fully herein.

231.    The confidential and proprietary information described above constitutes Plaintiff's trade secrets.

232.    This information is valuable because Plaintiff, and SVB before it, have invested great sums of money and years of effort to create the information, and it is not generally known or readily accessible, through proper means, to others (like HSBC) who can profit from its disclosure or use.

233.    Plaintiff, and SVB before it, have taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring passwords to be used to access Company computer systems and records, restricting access to business premises, and having employees such as the Individual Defendants sign contracts that expressly prohibit, among other things described above, the use, removal and disclosure of such information outside of the Company.

234.    In addition, like First Citizens, SVB required the Individual Defendants to sign and abide by various policies the content of which contain reasonable steps to maintain the secrecy of the information the Defendants misappropriated in this case.  This includes a Code of Conduct Acknowledgment Form, which stated "I acknowledge and confirm that I have received, read, and

understood the policy document listed below [i.e., the SVB Code of Conduct] and agree to comply with its requirements.  True and correct copies of the Code of Conduct Acknowledgement Forms executed by the Individual Defendants are attached as **Exhibits Y through EE** and incorporated by reference as if set forth fully herein.

235.    The SVB Code of Conduct state that it "applies to all employees and entities of SVB Financial Group (SVBFG) and its subsidiaries" and that the employees "are required to comply with the Code" and must "protect Company assets."  A true and correct copy of the SVB Code of Conduct is attached as **Exhibit FF** and incorporated by reference as if set forth fully herein.

236.    The Code of Conduct requires employees, among other things, to report Code violations or suspected violations, refrain from any actions that constitute or can be perceived as constituting conflicts of interest, disclose conflicts of interest, to adhere to applicable policies concerning the use of Confidential Information, and to refrain from using, disclosing, transmitting or releasing any financial or other Confidential Information regarding SVB or any of its current or prospective client except when necessary for a required business purpose.

237.    In addition, SVB required the Individual Defendants (except Sabow) to sign an Employee Handbook Acknowledgment Form for the SVB Employee Handbook – United States of America. (Sabow signed the Acknowledgement Form for the SVB UK Employee Handbook).  The Acknowledgement Form for the US Handbook stated "I acknowledge and confirm that I have received, read, and understood the policy document listed below [i.e., the SVB Employee Handbook – United States of America] and agree to comply with its requirements.  True and correct copies of the Employee Handbook Acknowledgement Forms executed by the Individual Defendants (excluding Sabow) are attached as **Exhibits GG through LL** and incorporated by reference as if set forth fully herein.

FP 47185866.1

238.    The SVB Employee Handbook states that employees must, among other things avoid conflicts of interest; avoid actions that are dishonest, fraudulent or that jeopardize the security of SVB's operations, its employees or clients; limit transmission of Confidential Information (even within SVB) to purposes that are necessary for a legitimate business purpose; comply with the Code of Conduct; understand and comply with SVB's applicable information security policies; and return all property including Confidential Information in any form upon the end of their employment.

239.    The Bridge Bank adopted SVB's Code of Conduct, policies, procedures, and compliance regime.

240.    The Individual Defendants misappropriated Plaintiff's trade secrets by disclosing them to HSBC despite knowing they had a duty to maintain their secrecy.

241.    HSBC misappropriated Plaintiff's trade secrets by acquiring them through improper means including through breach or inducement of a breach of a duty to maintain secrecy.

242.    All Defendants misappropriated Plaintiff's trade secrets by using them despite knowing that they were acquired under circumstances giving rise to a duty to maintain their secrecy.

243.    Plaintiff did not consent to the use and disclosure of its trade secrets, nor did it consent to HSBC's acquisition of its trade secrets.

244.    Plaintiff's trade secrets at issue in this case are related to products and services that are placed in or are intended to be placed in, interstate or foreign commerce due to the fact that SVB's products and services are used and sold across the United States and internationally.

245.    Defendants expended great effort to conceal their misappropriation of Plaintiff's trade secrets including by expediting the use of trade secrets over the course of Easter weekend so that Plaintiff would be caught by surprise.

246.    Upon information and belief, Defendants intend to continue using Plaintiff's trade secrets.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

247.    Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  Defendants' conduct was undertaken in furtherance of their own personal interest.

248.    Plaintiff has been damaged by Defendants' actions in an amount to be determined at trial, but in excess of $1 billion.

## TENTH CAUSE OF ACTION

**(Violation of the California Uniform Trade Secrets Act,**

**Cal. Civ. Code § 3426, And/Or the North Carolina Trade Secrets**

**Protection Act, § 66-152 et seq. Against All Defendants)**

249.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 248 as if set forth fully herein.

250.    The information described above constitutes Plaintiff's trade secrets.

251.    This information is valuable because Plaintiff, and SVB before it, have invested great sums of money and years of effort to create the information, and it is not generally known to the public or to others (like HSBC) who can profit from its disclosure or use.

252.    Plaintiff, and SVB before it, have taken more than reasonable measures under the circumstances to maintain the secrecy of this information, including requiring passwords to be used to access Company computer systems and records, restricting access to business premises, and having employees such as the Individual Defendants sign contracts that expressly prohibit the use, removal and disclosure of such information outside of the Company.

253.    In addition, SVB and First Citizens required the Individual Defendants to sign and abide by various policies as described above the content of which contain reasonable steps to maintain the secrecy of the information the Defendants misappropriated in this case.

254.    The Individual Defendants misappropriated Plaintiff's trade secrets by disclosing them to HSBC despite knowing they had a duty to maintain their secrecy.

255.    All Defendants misappropriated Plaintiff's trade secrets by using them despite knowing that they were acquired under circumstances giving rise to a duty to maintain their secrecy.

256.    HSBC misappropriated Plaintiff's trade secrets by acquiring them through improper means including through breach or inducement of a breach of a duty to maintain secrecy.

257.    Plaintiff did not consent to the use and disclosure of its trade secrets, nor did it consent to HSBC's acquisition of its trade secrets.

258.    Defendants expended great effort to conceal their misappropriation of Plaintiff's trade secrets including by expediting the use of trade secrets over the course of Easter weekend so that Plaintiff would be caught by surprise.

259.    Upon information and belief, Defendants intend to continue using Plaintiff's trade secrets.

260.    Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  The Defendants' conduct was undertaken in furtherance of their own personal interest.

261.    Plaintiff has been damaged by Defendants' actions in an amount to be determined at trial, but in excess of $1 billion.

## ELEVENTH CAUSE OF ACTION

### (Violation of the Computer Fraud and Abuse Act,

### 18 U.S.C.§ 1030 Against Sabow and the HSBC Defendants)

262.    Plaintiff repeats, realleges, and incorporates paragraphs 1 through 261 as if set forth fully herein.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

263.    The computer system used by the employee from whom Sabow requested information via instant message on March 16, 2023 is a "protected computer" pursuant to 18 U.S.C. § 1030 in that it was and is a computer used regularly and consistently by the Company to conduct business and communicate throughout the United States, and thus, in and affecting interstate commerce or communication.

264.    The computer system used by the employee who emailed himself a spreadsheet on Monday, April 10, 2023, the day after the Easter Sunday raid (i.e., the day after the employee participated in the *en masse* resignation from First Citizens to join the Individual Defendants at HSBC) is a "protected computer" pursuant to 18 U.S.C. § 1030 in that it was and is a computer used regularly and consistently by the Company to conduct business and communicate throughout the United States, and thus, in and affecting interstate commerce or communication.

265.    The Defendants were not authorized to access or use the Company's computer systems for the purpose of misappropriating the Company's confidential, proprietary and trade secret information.  Nor were the Defendants authorized to access the Company's computer systems indirectly through Company employees or by directing, inducing, or encouraging Company employees to do so without authorization or in excess of any authorization.

266.    By engaging in the wrongful actions alleged herein, the Defendants knowingly and wrongfully obtained information from the protected computers with the intent to defraud the Company and to further their illicit conspiracy; used such protected computers for fraudulent purposes; misappropriated valuable information belonging to the Company from the protected computers; and damaged the integrity of the information stored on the protected computers.

267.    The damage that the Defendants caused to the protected computers and the information stored therein resulted in, among other things, the impairment to the integrity, confidentiality, and availability of data, programs, systems, and information contained in the protected computers.

268.   Based upon such wrongful actions, the Company has incurred losses exceeding $5,000.00 in a one year period; the costs of responding to the wrongful actions of the Defendants, conducting damage assessments, identifying and tracing the information the Defendants have misappropriated, and restoring data, programs, systems, and information to the conditions in which they existed prior to the Defendants' wrongful activity; lost revenue; and other consequential damages incurred by the Company related thereto.

269.   As a result of the wrongful acts alleged herein, the Defendants caused the Company to be damaged in an amount to be determined at trial and in excess of the jurisdictional threshold.

## **TWELFTH CAUSE OF ACTION**

### **(Civil Conspiracy Against All Defendants)**

270.   Plaintiff repeats, realleges, and incorporates paragraphs 1 through 269 as if set forth fully herein.

271.   Defendants (between them and with others) formed and operated a malicious combination with a common design to injure Plaintiff by (a) performing unlawful acts by violating Plaintiff's contractual, statutory and common law rights as described above for the unlawful purpose of diverting business and economic gain from Plaintiff, and/or (b) performing the lawful acts of competing with Plaintiff and hiring certain of Plaintiff's personnel, but to do so through the unlawful means of violating Plaintiff's contractual, statutory and common law rights as described above.

272.   The foregoing conduct of the Defendants was malicious, was performed with intent to injure Plaintiff, and was without justification or privilege.  The individual Defendants' conduct was undertaken in furtherance of their own personal interests and for the benefit of HSBC.

273.   One or some or all of the Defendants engaged in overt unlawful acts and conduct violative of Plaintiff's contractual, common law and statutory rights as described above, causing actual harm to Plaintiff.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**
FP 47185866.1

274.     By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to Plaintiff thereby, each Defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each Defendant/co-conspirator.

275.     Plaintiff has been damaged by Defendants' actions in an amount to be determined at trial, but in excess of $1 billion.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and jointly and severally against Defendants on each and every count, together with the following relief:

A.  an award of damages for such actual losses as may be proven at trial in an amount to exceed $1 billion; and/or

B.  an award of damages for unjust enrichment caused by the Defendants' unauthorized use or disclosure of confidential information and trade secrets belonging to Plaintiff which are not otherwise addressed in computing actual losses; and/or

C.  in lieu of damages measured by other methods, an award of reasonable royalties for the Defendants' unauthorized use or disclosure of Plaintiff's confidential information and trade secrets; and/or

D.  an award of punitive and/or exemplary damages as permitted by law in an amount to be proved at trial; and/or

E.  an award of attorneys' fees, costs, and interest as permitted by law; and/or

F.  an award for prejudgment interest; and/or

G.  such other and further relief as this Court deems just and equitable.

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1

1

## **JURY DEMAND**

2

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands trial by jury of all

3

issues properly triable thereby.

4

5

Dated: May 22, 2023

6

By: _____

7

Andrew C. Crane (State Bar No. 285211)

8

FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000

9

Irvine, California 92614
Telephone: (949) 851-2424

10

Facsimile: (949) 851-0152
E-mail: acrane@fisherphillips.com

11

12

Michael R. Greco (subject to admission *pro hac vice*)
James S. Bradbury (subject to admission *pro hac vice*)

13

FISHER & PHILLIPS LLP
1125 17th Street, Suite 2400

14

Denver, Colorado 80202
Telephone: (303) 218-3655

15

Facsimile: (303) 218-3651
E-mail: mgreco@fisherphillips.com

16

E-mail: jbradbury@fisherphillips.com

17

David W. Erb (subject admission *pro hac vice*)

18

FISHER & PHILLIPS LLP
79 East Main Street, Suite 207

19

Westminster, Maryland 21157
Telephone: (410) 857-1399

20

Facsimile: (410) 857-1133
E-mail: derb@fisherphillips.com

21

22

*Attorneys for Plaintiff*

23

*First-Citizens Bank & Trust Company*

24

25

26

27

28

**PLAINTIFF FIRST-CITIZENS BANK & TRUST COMPANY'S COMPLAINT**

FP 47185866.1