United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| FIRST-CITIZENS BANK & TRUST COMPANY, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>HSBC HOLDINGS plc a/k/a THE HSBC GROUP a/k/a HONGKONG AND SHANGHAI BANKING CORPORATION, et al.,<br><br>Defendants. | Case No. 23-cv-02483-LB<br><br>**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING MOTION TO STAY DISCOVERY**<br><br>Re: ECF Nos. 46, 48 |

**INTRODUCTION**

Silicon Valley Bank (SVB) collapsed on Friday, March 10, 2023. Its depositors (concentrated in the tech sector) had withdrawn substantial cash, resulting in the bank's sale of investments on March 8 at a loss to cover the withdrawals and then, on March 9, a run on the bank's deposits by other depositors.[1] The FDIC was appointed as the receiver and, on Monday, March 13, transferred the assets (through a transfer agreement) into a bridge bank to protect depositors.[2] On Monday, March 27, plaintiff First Citizens Bank acquired SVB's deposits and loans through a purchase agreement

---

[1] Compl. – ECF No. 1 at 3 (¶ 1), 16 (¶ 63), 17–18 (¶¶ 74). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents and page numbers at the bottom.

[2] *Id.* at 18–20 (¶¶ 74–84); Transfer Agreement, Ex. 7 to Mufson Decl. – ECF No. 48-8. The court considers the transfer agreements under the incorporation-by-reference doctrine. *See infra* Statement.

United States District Court
Northern District of California

with the FDIC.[3] SVB's UK subsidiary SVB UK collapsed too: the Bank of England seized its assets and by March 13 had sold SVB UK to defendant HSBC for £1 (approximately $1.21).[4]

Defendant David Sabow was a longtime senior executive at SVB until early 2023, when he transferred to SVB UK to become CEO and head of Europe, the Middle East, and Africa (effective April 1, 2023).[5] He became an HSBC executive "within days of HSBC's acquisition of SVB UK."[6] On April 9, 2023 (Easter Sunday), at 9:00 p.m., forty-two former SVB employees — including six "core leaders" in the U.S. (individual defendants Sunita Patel, Melissa Stepanis, Peter Kidder, Kevin Longo, Rebekah Hanlon, and Katherine Andersen) — resigned from First Citizens to work at HSBC.[7] Mr. Sabow allegedly targeted the employees (all senior bankers) because they could bring other employees with them.[8] First Citizens alleged that this poaching (dubbed "Project Colony" by Mr. Sabow) included misappropriation of SVB's "confidential, proprietary[,] and trade secret information."[9] It asserts rights to SVB's intellectual property through the transfer agreement.[10]

---

[3] Compl. – ECF No. 1 at 2, 21 (¶ 91).

[4] *Id.* at 3 (¶ 2), 21 (¶ 92). The plaintiff refers to the five entity defendants — HSBB Holdings a/k/a Hongkong and Shanghai Banking Corporation, HSBC USA Inc., HSBC Bank USA, N.A., HSBC UK, and SVB UK Ltd. — collectively as HSBC. *Id.* at 2.

[5] *Id.* at 3 (¶ 3), 36 (¶ 154).

[6] *Id.* at 3 (¶ 3).

[7] *Id.* at 2, 3–4 (¶ 3), 6 (¶ 13).

[8] *Id.* at 2, 4 (¶¶ 4–5), 22 (¶ 97).

[9] *Id.* at 3–4 (¶ 3) (bullet points of information, including SVB's "win rate" and volumes against its core competitors, data about SVB's market share within U.S. segments and borrower types, data about market-share percentages for SVB's Life Sciences & Technology based on market cap and total amounts of deposits and investments (including the amount of future commitments, broken down by various factors), SVB's practice overview notes about clients (including pace of adding clients, numbers, ranking, valuations, and growth metrics), information about employees (capacity, head count, names, positions, and salaries), SVB's ability to attract and meet needs of targeted customers (possibly tied to the employee information), information about SVB's loan portfolio (including implied revenue and growth), and an analysis of loans within SVB's Accelerator & Growth Group).

[10] Opp'n – ECF No. 60 at 10.

1    The complaint has (1) claims against individual defendants for breach of their employment

2    contracts with SVB (claim one) and First Citizens (claim three), (2) claims against the individual

3    defendants (except for Mr. Sabow) for breach of their duty of loyalty and fiduciary duty to First

4    Citizens (claims four and five), (3) aiding and abetting these breaches (by Mr. Sabow and the

5    HSBC defendants) (claim six), (4) tortious interference with contract and prospective economic

6    advantage by all defendants (claims seven and eight), (5) misappropriation of trade secrets by all

7    defendants, in violation of the federal Defend Trade Secrets Act (DTSA) and state law (either

8    California's Uniform Trade Secrets Act (CUTSA) or North Carolina Trade Secrets Protection Act)

9    (claims nine and ten), and (6) civil conspiracy by all defendants.[11]

10   The defendants moved to dismiss on the grounds that (1) First Citizens lacks standing to bring

11   claims one and five through ten and twelve because its purchase agreement with the FDIC precludes

12   claims based on conduct that predates the agreement's execution on March 27, 2023, and, for claim

13   one, because it did not acquire a right to enforce confidentiality agreements, (2) it did not plausibly

14   plead claims, and (3) there is no personal jurisdiction over the five entity defendants and three out-

15   of-state individual defendants.[12]

16   First Citizens has standing: it rests its claims only on conduct that post-dates its purchase of the

17   SVB assets, and it acquired the right in its purchase agreement (and through the earlier transfer

18   agreement to the bridge bank) to enforce the confidentiality provisions. First Citizens plausibly

19   pleads viable theories supporting the contract and misappropriation claims against the HSBC

20   successor to SVB UK and Mr. Sabow. But it lumps the other defendants together, thus does not

21   give fair notice of the claims against them, and seemingly predicates claims on conduct that

22   predates the purchase agreement (even though it disavowed reliance on those acts in its opposition).

23   At minimum, the complaint is confusing and needs to be cleaned up. CUTSA preempts the state tort

24   claims (as alleged in this complaint). Finally, First Citizens said at the hearing that it would clean up

---

[11] Compl. – ECF No. 1 at 36–66 (¶¶ 153–275). The plaintiff voluntarily dismissed claims two and eleven. Opp'n – ECF No. 60 at 12 n.3.

[12] Mot. – ECF No. 49.

its jurisdictional allegations. First Citizens must address these deficiencies by filing an amended complaint within twenty-eight days.

The court denies the motion to stay discovery because there is a viable case going forward.

## STATEMENT

### 1. SVB's Collapse and First Citizens' Acquisition

SVB Financial Group was a bank holding company that provided banking services through its "subsidiaries and divisions, such as" SVB in the U.S. and SVB UK in the United Kingdom.[13] The individual defendants are former employees of SVB or SVB UK.[14] David Sabow started at SVB in 2012, became the head of Life Sciences and Technology Banking, and, in early 2023, became CEO of SVB UK and head of Europe, the Middle East, and Africa (effective April 1, 2023, but apparently necessitating a transfer of functions earlier).[15] He allegedly had an executive function at SVB until March 1, 2023, to award 2022 compensation awards.[16]

"Over a period of two days in March 2023, SVB went from solvent to broke."[17] On March 8, it announced a $1.8 billion loss after it sold investments at a loss to cover withdrawals.[18] The next day, its stock "plummeted," and VC firms "began pulling their money out of SVB." By the end of the day, depositors had withdrawn $42 billion.[19] On March 10, 2023, California regulators closed the bank and appointed the FDIC as receiver.[20] On March 13, the Bank of England, which had seized the assets of SVB's UK affiliate, SVB UK, sold them to HSBC UK for £1.[21] That day, the FDIC transferred SVB's deposits and entities — via a transfer agreement — to a new entity (the

---

[13] Compl. – ECF No. 1 at 16 (¶ 60).

[14] *Id.* at 3–4 (¶¶ 3–4).

[15] *Id.* at 22 (¶ 94), 36 (¶ 154).

[16] *Id.* at 22 (¶ 94).

[17] *Id.* at 17 (¶ 71).

[18] *Id.* (¶ 72).

[19] *Id.* at 18 (¶ 73).

[20] *Id.* (¶ 74).

[21] Compl. – ECF No. 1 at 3 (¶ 2), 21 (¶ 92).

Bridge Bank) to protect depositors.[22] Section 2.03 of the transfer agreement specified the assets that were transferred to the Bridge Bank and the assets that remained with the FDIC as receiver:

> (a) <u>Transferred</u>. The Receiver contributes and assigns to the Bridge Bank, and the Bridge Bank accepts and assumes all right, title and interest of the Receiver in and to the Transferred QFCs [qualified financial contracts], the FHLB [Federal Home Loan Bank] Assets, and all other rights, assets, and property of all kinds, real and personal, tangible, and intangible and all related Transferred Litigation, Claims, including, without limitation, all Claims relating to Assumed Deposits, rights, interests, and receivables, excluding all right, title, or interest in the Retained Assets and any related rights, interests, and receivables ( collectively, the "Transferred Assets").

> (b) <u>Retained</u>. The Receiver retains all of, and the Bridge Bank has no interest in, the Claims, rights, assets, and property of all kinds, real or personal, tangible or intangible, and all related rights, interests, and receivables relating to the following. . .: (ix) any agreement establishing the compensation, benefits or terms of employment for any director, officer, or employee or groups thereof.[23]

The agreement had provisions related to SVB employees and former employees. The Bridge Bank agreed to assist the FDIC in providing them health insurance.[24] The Bridge Bank was responsible for "salaries and payroll costs" for SFB employees until it made "a final determination as to whether it will retain or terminate that employee."[25] The Bridge Bank agreed to pay for certain accrued employee leave time, and the FDIC agreed to reimburse the Bank.[26]

From March 13 through March 26, the FDIC held an auction for bidders to acquire the assets and assume liabilities of the Bridge Bank. Nineteen companies submitted bids. HSBC was not one of them.[27] During this time period, Mr. Sabow developed a written plan called "Project Colony" to

---

[22] *Id.* at 19–20 (¶ 83); Transfer Agreement, Ex. 7 to Mufson Decl. – ECF No. 48-8. The court judicially notices documents that are either incorporated by reference in the complaint or public records. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation-by-reference doctrine). There are two contracts at issue: the transfer agreement and the purchase agreement. This section cites the provisions from the agreements that the parties identified in their briefs as relevant.

[23] Transfer Agreement, Ex. 7 to Mufson Decl. – ECF No. 48-8 at 11–12 (pp. 10–11) (§ 2.03(a)–(b)(ix)).

[24] *Id.* at 27 (p. 26) (§ 6.11).

[25] *Id.* (§ 6.12(a)).

[26] *Id.* at 28 (p. 27) (§ 6.12(b)).

[27] *Id.* at 20–21 (¶¶ 87, 90–91).

hire SVB employees.[28] On March 21, 2023, he met with five of the individual defendants (Patel, Stepanis, Long, Hanlon, and Andersen) to discuss the plan.[29]

On March 27, 2023, the FDIC and plaintiff First Citizens entered into a purchase and assumption agreement for the deposits and loans of the Bridge Bank.[30]

Its opening recitals say that the FDIC transferred "certain assets and obligations of SVB" to the Bridge Bank, and First Citizens "desires to purchase certain deposits and other liabilities" of SVB.[31]

Article III is titled "Purchase of Assets and Qualified Financial Contracts."[32] "With the exception of assets . . . that are expressly excluded in Sections 3.5 and 3.6," First Citizens "purchases from the Receiver, and the Receiver sells, assigns, transfers, and conveys and delivers" to First Citizens, "all right, title, and interest of the Receiver in and to all assets (real, personal, and mixed, wherever located and however acquired)" of SVB "as of the Bank Closing Date." "For the avoidance of doubt, the term Acquired assets specifically includes all assets, whether or not specifically identified, that enable the ongoing operation of the bank . . . except as otherwise excluded in this Agreement."[33] Section 3.5 addresses assets not purchased:

> **3.5 <u>Assets Not Purchased by Assuming Institution</u>.** The Assuming Institution does not purchase, acquire or assume . . .
>
> (b) any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank . . . on or prior to the Bank Closing Date arising out of any act or omission of that person in that capacity . . . or (iv) any other Person for any loss arising from a breach of any duty, tortious conduct of any kind whatsoever, violation of any law, or any other wrongdoing, . . . provided, that for the purposes of this Section 3.[5](b), the act, omissions, or other events giving rise to any claim must have occurred on or before the Bank Closing Date [of March 27, 2023].[34]

---

[28] Compl. – ECF No. 1 at 22 (¶¶ 94–97).

[29] *Id.* at 25 (¶ 106).

[30] *Id.* at 21 (¶ 91); Purchase & Assumption Agreement, Ex. 6 to Mufson Decl. – ECF No. 48-7.

[31] Purchase & Assumption Agreement, Ex. 6 to Mufson Decl. – ECF No. 48-7 at 5 (p. 1).

[32] *Id.* at 19 (p. 15) (Art. III).

[33] *Id.* (§ 3.1).

[34] *Id.* at 23–24 (pp. 19–20) (§ 3.5).

United States District Court
Northern District of California

Article IV is titled "Assumption of Certain Duties and Obligations."[35] Section 4.8(b) lists excluded agreements and provides that First Citizens "does not assume any liabilities or acquire any rights under any of the" listed agreements, including "any consulting, management, or employment agreements between the Failed Bank and its employees or other Persons. . . ."[36] Like the transfer agreement, it provides that First Citizens pays the salaries of former SFB employees until it "makes a final determination as to whether [to] retain" them.[37]

## 2. Alleged Misappropriation

First Citizen alleges that the individual defendants "unlawfully obtained and then misappropriated . . . SVB's confidential, proprietary and trade secret information. That information included:

- tables of data reflecting SVB's U.S. Accelerator & Growth "win rate" and volumes against its core competitors;

- data and the underlying analysis supporting SVB's market share within the particular U.S. market segments and borrower types;

- data regarding SVB's Life Sciences & Technology market share percentages based on market capitalization and the total amounts that SVB's Life Sciences & Technology team had in deposits and investments in clients with the amount of future commitments, broken down by types of financing arrangements SVB Life Sciences & Technology is to make and the expected Gross Profit growth, efficiency, and yields on with this SVB team's investments and relationships;

- SVB's practice overview notes, including the pace at which "right now" SVB's Accelerator & Growth group adds clients, qualitative and quantitative numbers of clients, as well as an internal ranking of clients according to SVB's valuation criteria;

- information regarding SVB's clients including valuations and growth metrics;

- information regarding SVB's employee capacity, head count, and ability to attract and meet the needs of the particular customers targeted by SVB;

---

[35] *Id.* at 27 (p. 23).

[36] *Id.* at 34 (p. 30) (§ 4.8(b)).

[37] *Id.* at 36 (p. 32) (§ 4.12(c)).

United States District Court
Northern District of California

- information identifying the names, positions and salaries of dozens of former SVB employees that Sabow had identified as "key professionals," as well as their locations and the markets they covered;

- information regarding SVB's loan portfolios with implied revenue and growth; and

- an analysis of SVB's loans within its Accelerator & Growth Group.[38]

Mr. Sabow "created various spreadsheets containing a compilation of valuable, non-public information that is not readily ascertainable by SVB's or First Citizens' competitors," including (1) names, salaries, and positions of the SVB individual defendants and their subordinates, (2) a financial model predicated on dollar amounts for SVB's loan portfolio, (3) an analysis of SVB's loans, (4) tables reflecting SVB's win rates against its core competitors segmented by deal size and loan numbers, (5) the data underlying the analysis of the win rate, and (6) "SVB practice overview notes," including numbers of clients ranked by value to SVB, total value of the loans, total client funds, total value of deposits, total revenue, total pretax income, total dollar amount of core fees, total number of clients, total percentage of return on equity, percentage of market share, headcount of Life Science employees, and headcount of total employees in relationship management, business development, and credit solutions.[39] In other paragraphs, the complaint provides additional allegations about the alleged trade secrets used as part of Project Colony.[40]

---

[38] *Id.* at 3–4 (¶ 3).

[39] *Id.* at 28 (¶ 118).

[40] *Id.* at 23 (¶ 99) & 27–28 (¶ 117) (Sabow tables about win rates), (¶ 100) (non-public information about SVB clients and non-public information about employees gained while at SVB), 23–25 (¶¶ 101–05) (obtaining non-public information from SVB employee about gross profits and borrower types), 25–26 (¶¶ 107–09) (defendant Katherine Andersen's notes about conversation with Mr. Sabow that included confidential and trade-secret information), 26–27 (¶¶ 111–13) (defendant Melissa Stepanis's printing confidential report about employees), 30 (¶ 126) (individual defendants' identification and use of non-public employee information in aid of Project Colony) & (¶ 127) (departing employee emailed himself confidential and trade-secret information including client names, notes about client prospects and needs, value of client deposits, investment balances, dollar amount of loans and credit lines, segmentation of clients/prospects by geographic region, classification of clients based on value, and dates of last calls with clients/prospects); *see also* Opp'n – ECF No. 60 at 36 (identifying Compl. – ECF No. 1 at 3–7 (¶¶ 1–16) & 21–33 (¶¶ 92–138) as the paragraphs specifying the allegedly improper acquisition, use, and disclosure of the trade secrets).

### 3. SVB Employees Join HBSC

With the confidential and trade-secret information, Mr. Sabow recruited key professionals to leave SVB en masse. Then, on April 9, 2023 (Easter Sunday), at 9:00 p.m., forty-two former SVB employees — including the six "core leader" defendants (Sunita Patel, Melissa Stepanis, Peter Kidder, Kevin Longo, Rebekah Hanlon, and Katherine Andersen) — resigned by email from SVB to work at HSBC, effective immediately, and without notice.[41]

The individual defendants had confidentiality agreements with SVB, which addressed confidentiality (§ 3), assignment of inventions (§ 4), return of records (§ 5), right of inspection of the workplace (§ 6), notifications to new employers about the employees' confidentiality obligations (§ 7), non-solicitation of fellow employees (§ 8), and a prohibition on unfair competition including non-disclosure and non-use of trade-secret and confidential information (§ 9).[42] They permit disclosure of confidential information to affiliates.[43] As part of the acquisition, the SVB individual defendants (other than Mr. Sabow) transitioned from senior executive roles at the Bridge Bank to equivalent roles at First Citizens. As part of that process, they signed "New Hire Acknowledgement" forms, agreeing to comply with First Citizens' code of ethics, compliance policy, and information-security standards.[44]

### 4. Procedural History

The plaintiff conceded dismissal of claims two and eleven.[45] There are ten claims remaining: (1) claim one (against defendants Sabow, Patel, Stepanis, Longo, and Hanlon) for breach of their employment contracts with SVB; (2) claim three (against the individual defendants except Mr. Sabow) for breach of their agreements with First Citizens; (3) claim four (against the same

---

[41] *Id.* at 2, 4 (¶ 3) 6 (¶ 13), 28–32 (¶¶ 118–33).

[42] Compl. – ECF No. 1 at 37–40 (¶¶ 155–161); Confidentiality Agreements, Exs. H–L to *id.* – ECF Nos. 1-8–1-12).

[43] *See, e.g.*, Confidentiality Agreement, Ex. I – ECF No. 1-8 at 6 (p. 5) (§ 14(c)).

[44] Compl. – ECF No. 1 at 44—45 (¶¶ 178–181) & New Hire Acknowledgments, Exs. P–U to *id.* – ECF Nos. 1-16–1-21; Compl. – ECF No. 1 at 53–53 (¶¶ 196–202).

[45] Opp'n – ECF No. 60 at 12 n.3.

defendants) for breach of the duty of loyalty to First Citizens; (4) claim five (against the seven individual defendants) for breach of their fiduciary duty (to SVB by Mr. Sabow and — apparently, as suggested by use of the word "Company" to define the entity owed the duty — to SVB and First Citizens by the other defendants);[46] (5) claim six (against Mr. Sabow and the HSBC defendants) for aiding and abetting the breaches of duty of loyalty and fiduciary duty in claims four and five; (6) claim seven (against the same defendants) for tortious interference with First Citizens' contracts; (7) claim eight (against all defendants) for tortious interference with prospective economic advantage; (8) claim nine (against all defendants) for violating the DTSA, 18 U.S.C. § 1836; (9) claim ten (against all defendants) for the CUTSA, Cal. Civ. Code § 3426, and/or the North Carolina Trade Secrets Protection Act, N.C. Civ. Gen. Stat. § 66-152 et seq.; and (11) claim twelve (against all defendants) for civil conspiracy.[47] The defendants moved to dismiss.[48] The parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c)(1).[49] The court has federal-question jurisdiction over the DTSA claim and supplemental jurisdiction over the state claims. 28 U.S.C. §§ 1331, 1367. The court held a hearing on December 21, 2023.

## ANALYSIS

The defendants move to dismiss on three main grounds: (1) First Citizens has no right to assert claims that precede the execution of the purchase agreement for SVB and thus lacks standing for claims one, five through ten, and twelve; (2) it does not plead claims plausibly; and (3) it did not establish personal jurisdiction over the HSBC entities and three individual defendants.[50] First Citizens has standing, there are plausible theories of liability for the contract and misappropriation claims at least against Mr. Sabow and the HSBC successor to SVB UK, the complaint otherwise

---

[46] First Citizens limits claim five to breach of the fiduciary duty owed to First Citizens. Opp'n – ECF No. 60 at 49.

[47] Compl. – ECF No. 1 at 36–66 (¶¶ 153–275). The plaintiff voluntarily dismissed claims two and eleven. Opp'n – ECF No. 60 at 12 n.3.

[48] Mot. – ECF No. 48.

[49] Consents – ECF Nos. 23, 33.

[50] Mot. – ECF No. 48 at 16–17; Reply – ECF No. 61 at 9–10.

United States District Court
Northern District of California

1  lumps the other defendants together and does not give fair notice of the claims or provide the

2  jurisdictional predicate for personal jurisdiction over the entity defendants and three individual

3  defendants, and CUTSA preempts the state tort claims.

4

5  **1.   Standing**

6       The purchase agreement for the sale of SVB to First Citizens was executed on March 27,

7  2023. The parties dispute whether First Citizens acquired rights under the purchase agreement to

8  bring the contract and tort claims: claim one for breach (by some individual defendants) of their

9  employment contracts with SVB, claim five for the individual defendants' breaches of their

10  fiduciary duty, claim six against Mr. Sabow and the HSBC defendants for aiding and abetting that

11  breach, claims seven and eight against all defendants for tortious interference with First Citizens'

12  contracts and prospective economic advantage, claims nine and ten against all defendants for

13  trade-secrets violations under federal and state law, and claim twelve against all defendants for

14  civil conspiracy.[51] Absent an enforceable right, First Citizens lacks standing. *Pinkert v. Schwab*

15  *Charitable Fund*, No. 20-cv-07657-LB, 2021 WL 24776869, at *4 (N.D. Cal. June 17, 2021) (a

16  plaintiff must assert injury to its own legal rights, not the rights of others) (citing *Session v.*

17  *Moralez-Santana*, 137 S. Ct. 1678, 1689 (2017)).

18       The parties agree that "First Citizens does not have a right to assert a claim that arises out of

19  actions that took place prior to the Purchase Agreement. . . ."[52] The defendants contend that First

20  Citizen identifies only a few allegations that post-date the agreement, and they do not plausibly

21  state a claim.[53] First Citizens counters that conduct that precedes the agreement is relevant to

22  understanding conduct that postdates the agreement: in the complaint, it "mentions the Pre-

23  Agreement actions because they are relevant to its post-Agreement Claims and provide

24  background helpful to understanding the post-March 27 misconduct."[54]

25  ─────────────────

26  [51] Mot. – ECF No. 48 at 23–30; Opp'n – ECF No. 60 at 18–28; *see supra* Statement.

    [52] Opp'n – ECF No. 60 at 27 n.13; Reply – ECF No. 61 at 10; Mot. – ECF No. 48 at 23–30.

27  [53] Mot. – ECF No. 48 at 25–26; Reply – ECF No. 61 at 10–11.

28  [54] Opp'n – ECF No. 60 at 27 n.13.

ORDER – No. 23-cv-02483-LB               11

United States District Court
Northern District of California

1    Conceptually, earlier conduct can illuminate conduct that establishes a claim (here, using

2  confidential and trade-secret information). The complaint alleges a scheme for HSBC to hire SVB

3  employees (based on confidential information that enabled them to lift the business wholesale).

4  Meetings took place at the end of March and in April and involved "validat[ing]" the earlier-

5  acquired confidential information.[55] The scheme was consummated when the employees left First

6  Citizens en masse. First Citizens plausibly pleads post-agreement conduct and thus standing.

7    That does not end the inquiry: the transfer and purchase agreements define the rights that First

8  Citizens acquired, and if it did not acquire those rights, even post-agreement conduct might not

9  save the claims. The defendants contend that First Citizens did not acquire any rights to bring any

10  contract claims arising out of the SVB employment agreements and thus lacks standing to bring

11  claim one.[56] First Citizens counters that the plain language of the agreements confirms that they

12  acquired the right to assert their claims.[57]

13    The defendants cite two contract provisions to support their argument that claim one is barred.

14  First, the transfer agreement (excerpted in full in the Statement) specifies the assets that the FDIC

15  transferred to the Bridge Bank and that it retained: it retained any claim, right, or interest "relating

16  to . . . any agreement establishing the compensation, benefits or term of employment for any

17  director, officer, or employee. . . ."[58] Second, in the purchase agreement for SVB, First Citizens

18  did "not assume any liabilities or acquire any rights" under "any consulting, management, or

19  employment agreements between the Failed Bank and its employees. . . ."[59] The defendants

20  contend that First Citizen attempts in claim one to enforce confidentiality provisions that were not

21  transferred to the Bridge Bank and that First Citizens did not acquire in the purchase agreement.[60]

22

23

---

[55] *See, e.g.*, Compl. – ECF No. 1 at 28 (¶¶ 119–20).

[56] Mot. – ECF No. 48 at 27–30.

[57] Opp'n – ECF No. 60 at 18–26.

[58] Transfer Agreement, Ex. 7 to Mufson Decl. – ECF No. 48-8 at 11–12 (pp. 10-11) (§ 2.03).

[59] Purchase & Assumption Agreement, Ex. 6 to Mufson Decl. – ECF No. 48-7 at 34 (p. 30) (§ 4.8(b)).

[60] Reply – ECF No. 61 at 12–14.

1    But looking at the entire transfer agreement, the FDIC transferred "all rights, assets, and

2  property or all kinds, real and personal, tangible, and intangible," retaining rights and interests

3  relating to employment agreements about compensation, benefits, and like terms of employment.[61]

4  The agreements that First Citizens wants to enforce are confidentiality agreements that addressed

5  confidentiality, assignment of inventions, records, notifications to new employers about the

6  employees' confidentiality obligations, non-solicitation of fellow employees, and a prohibition on

7  unfair competition including non-disclosure and non-use of trade-secret and confidential

8  information.[62] They are not like the retained employment agreements about compensation and

9  benefits. This reading makes sense too in light of the transfer agreement's assignment of

10  obligations for employee compensation, benefits, and retention: after all, this was a bridge solution

11  to keep the bank going, including paying employees.[63]

12    Similarly, under the purchase agreement, First Citizens acquired the Bridge Bank's assets.[64] It

13  agreed to pay employees pending its decision whether to retain them.[65] It did not assume

14  obligations or liabilities under employment benefits.[66]

15    Read in context, the employment exemptions in both agreements address employment

16  agreements about benefits and compensation, not confidentiality agreements that protected SVB's

17  assets. The transfer agreement and the purchase agreement transferred SVB's assets and interests,

18  first to the Bridge Bank and then to First Citizens, all to keep the bank going. The employment

19  provisions provided for interim payment of employee benefits but allowed the Bridge Bank and,

20  ultimately, First Citizens to determine who stayed employed, unsaddled by unknown preexisting

21

22

23  ───────────────

[61] Transfer Agreement, Ex. 7 to Mufson Decl. – ECF No. 48-8 at 11–12 (pp. 10-11) (§ 2.03(a)(b)(ix)).

24  [62] Compl. – ECF No. 1 at 37–40 (¶¶ 155–161); Confidentiality Agreements, Exs. H–L to *id.* – ECF
    Nos. 1-8–1-12).

25  [63] Transfer Agreement, Ex. 7 to Mufson Decl. – ECF No. 48-8 at 27–28 (pp. 27–28) (§§ 6.11–.12(b))
26  (excerpted in Statement).

    [64] Purchase & Assumption Agreement, Ex. 6 to Mufson Decl. – ECF No. 48-7 at 19 (p. 15) (§ 3.1).

27  [65] *Id.* at 36 (p. 32) (§ 4.12(c)).

28  [66] *Id.* at 34 (p. 30) (§ 4.8(b)).

United States District Court
Northern District of California

obligations about pay or retention. [67] Not only is this conclusion supported by the plain language of the contracts, but also, the deals do not make sense otherwise: who would buy a failed bank's assets without protection for confidential and trade-secret information. The defendants' argument rests on isolating provisions, not reading them in context, and not giving effect to the mutual intent of the contracting parties. *Skilstaff v. CVC Caremark Corp.*, 669 F.3d 1005, 1014–15 (9th Cir. 2012) ("Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting.") (cleaned up). [68] On this record and argument, the contract terms do not support the defendants' position. Even if they were ambiguous, the issue would not be resolvable at the pleadings stage. *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1084 (N.D. Cal. 2012) ("A court may resolve contractual claims on a motion to dismiss if the terms of the contract are unambiguous.") (cleaned up) (citing *Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000)); *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991) ("what the parties intended by an ambiguous contract is a factual determination; Where the language leaves doubt as to the parties' intent, the motion to dismiss must be denied.") (cleaned up).

The defendants' cases do not compel a different conclusion. *Bunn* — cited by the defendants for the proposition that the term "employment agreement" has "broad meaning"[69] — involved a former employee's claim against a failed bank for payment of his salary. The issue was whether a salary-continuation agreement was an employment agreement. If it was, then the purchasing bank did not assume the obligations under it. *Bunn v. Great S. Bank, N.A.*, 2018 WL 3097088, at *3 (C.D. Ill. 2018). The case did not address issues about confidentiality agreements, which are

---

[67] Opp'n – ECF No. 60 at 22 (making this point) (collecting cases); *see also* Mertic Decl. – ECF No. 53-1 at 2–4 (¶¶ 4–5, 8–9) (the FDIC reads the contracts this way too); *cf.* Mot. – ECF No. 48 at 29–30 (recognizing that the purchase agreement facilitates the unwinding of a failed bank by freeing a purchaser from the failed bank's employment obligations). This order does not rely on the FDIC's declaration. As the defendants point out, if the contract text were ambiguous, then the procedurally appropriate result is to deny the motion, not consider the declaration. Reply – ECF No. 61 at 16 & n.11.

[68] Opp'n – ECF No. 60 at 22 (making this point) (quoting *Skilstaff*, 669 F.3d at 1014–15).

[69] Mot. – ECF No. 48 at 29.

1    different than benefits agreements. *Modzelewski* also involved a dispute about a right to a salary.

2    *Modzelewski v. Resol. Tr. Corp.*, 14 F.3d 1374, 1377 (9th Cir. 1994).

3           In sum, First Citizens has standing.

4

5    **2.   Motion to Dismiss**

6           The defendants contend that (1) First Citizens does not plausibly state a claim for breach of

7    contract (claims one and three), (2) it does not plausibly state trade-secret claims (claims nine and

8    ten), (3) CUTSA preempts the common-law tort claims, which in any event are not plausibly

9    pleaded (claims four through eight and twelve), and (4) the complaint is a shotgun pleading that

10   (among other defects) lumps defendants together.[70] At least conceptually, First Citizens plausibly

11   pleads viable theories supporting the contract and misappropriation claims, particularly against the

12   HSBC successor to SVB UK and Mr. Sabow. But the complaint is confusing for several reasons:

13   it lumps the defendants together, it thus does not give individual defendants fair notice of the

14   claims against them, and it confusingly predicates claims on pre-March 27 conduct (even though it

15   limited its theory of prosecution in its opposition to post-March 27 conduct). First Citizen must

16   address these deficiencies in an amended complaint.

17          The next sections address the contract claims, the trade-secrets claims, CUTSA preemption,

18   and the fair-notice issues.

19   **2.1  Contract Claims**

20          First, the defendants contend that First Citizens cannot bring contract claims because it did not

21   acquire rights in its purchase agreement.[71] The last section disposed of this argument: First Citizen

22   acquired rights to assert claims predicated on acts after March 27, 2023.[72]

23          Second, the defendants contend that the non-compete and non-solicitation provisions are

24   unenforceable under California law.[73] First Citizens counters that there is no non-compete

25

26   [70] *Id.* at 30–62; Reply – ECF No. 61 at 18–36.

     [71] Mot. – ECF No. 48 at 30.

27   [72] Opp'n – ECF No. 60 at 27 (all claims "rely on acts that took place after March 27, 2023").

28   [73] *Id.* at 30–31.

United States District Court
Northern District of California

provision, it predicates its claims only on confidentiality and non-solicitation provisions, and no California court has held as a matter of law that non-solicitation provisions are void per se.[74] This is the solicitation provision at issue:

> 8. **<u>Solicitation of Employees, Consultants and Other Parties</u>.** I acknowledge that my knowledge of the Company's employees' and consultants' skills, knowledge, relationships and abilities itself constitutes the Company's trade secret information. Therefore, I agree that during the term of my Relationship with the Company, and for a period of six (6) months immediately following the termination of my Relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or take away such employees or consultants, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity[,] without first notifying and obtaining the express written approval of the Company's President and CEO.[75]

The issue is better addressed at summary judgment.

In California, "every contract by which anyone is restricted from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600(a). This statute "evinces a settled legislative policy in favor of open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008). In *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, the California Court of Appeal held that a post-employment non-solicitation provision was "void under section 16600." 28 Cal. App. 5th 923, 935 (2018) (holding, at summary judgment, that the contract unlawfully restrained (for at least a year following termination) the individual defendants from their lawful profession of recruiting travel nurses). In *Parsable, Inc. v. Landreth*, the district court applied *AMN* and voided at the pleadings stage a non-solicitation clause that prevented a departing employee from soliciting other employees for a year. No. 22-cv-01741-CRB, 2022 WL 19692034, at *3–4 (N.D. Cal. Aug. 5, 2022) (holding that "[a] non-solicitation clause works a restraint on any former employee by restricting who may work alongside them") (cleaned up) (collecting cases).

---

[74] Opp'n – ECF No. 60 at 29.

[75] *See, e.g.*, Confidentiality Agreement, Ex. H to Compl. – ECF No. 1-8 at 5 (p. 4) (§ 8).

1    No California court has invalidated a non-solicitation provision as void per se. At least some

2    district courts have. *See id.* (collecting cases). That authority is persuasive. But the claims here

3    turn on use of confidential and trade-secret information to solicit others. Perhaps the solicitation

4    alone is not unlawful and is an impermissible restraint, but the claims are really about the

5    improper use of confidential and trade-secret information. Unlike *Parsable*, the claim does not

6    stand or fall on the non-solicitation provision and instead turns on misuse of information. That

7    issue is best addressed through summary judgment, as it was in *AMN*.[76] First Citizens plausibly

8    alleged that at least some defendants misappropriated confidential and trade-secret information

9    after First Citizens signed the purchase agreement.

10   Third, claim three is for breach of the new-hire agreements.[77] The defendants contend that First

11   Citizens did not plausibly plead breach or damages.[78] Those agreements have provisions about

12   misuse of confidential information.[79] To the extent that the claims are predicated on misuse, viable

13   legal theories support them. Also, damages are plausibly pled: the complaint alleges a poaching

14   scheme predicated on use of confidential information that lifted the banking business wholesale, to

15   HSBC's benefit and First Citizens' detriment.[80]

16   That said, as discussed below, the complaint lumps defendants together and does not give

17   some defendants fair notice of the claims against them. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v.*

18   *Twombly*, 550 U.S. 544, 555 (2007).

19   **2.2  Trade-Secret Claims**

20   The defendants contend that First Citizens did not allege misappropriation by any defendant or

21   the existence of any trade secrets.[81]

22

23

---

24   [76] Opp'n – ECF No. 60 at 31 (making this point).

25   [77] *See* Statement (summarizing claims).

26   [78] Mot. – ECF No. 38 at 35–36.

     [79] *See, e.g.,* New Hire Acknowledgments, Exs. P–U to Compl. – ECF Nos. 1-16–1-21.

27   [80] Compl. – ECF No. 1 at 3 (¶ 3), 4 (¶ 6), 6–7 (¶¶ 12–13, 16–17), 27–32 (¶¶ 114–32), 34–35 (¶¶ 139–51).

28   [81] Mot. – ECF No. 48 at 36–44.

United States District Court
Northern District of California

United States District Court
Northern District of California

1      The DTSA "creates a cause of action for the 'owner of a trade secret that is misappropriated . . .

2  if the trade secret is related to a product or service used in, or intended for use in, interstate or

3  foreign commerce.'" *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-

4  SI, 2017 WL 1436044, *3 (N.D. Cal. Apr. 24, 2017) (quoting 18 U.S.C. § 1836(b)(1)). "A 'trade

5  secret' includes 'all forms and types' of information that derives value from being secret and that the

6  owner took reasonable measures to keep secret." *Id.* (quoting 18 U.S.C. § 1839(3)(A), (B)).

7  "'Misappropriation' consists of (a) 'acquisition of a trade secret' by a person who knows or should

8  know the secret was improperly acquired or (b) 'disclosure or use of a trade secret of another

9  without express or implied consent.'" *Id.* (quoting 18 U.S.C. § 1839(5)(A), (B)). The DTSA thus

10  "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use" of a trade secret.

11  *Id.* (citing 18 U.S.C. § 1839(5)).

12      To state a claim for trade-secrets theft under the CUTSA, which is essentially the same inquiry

13  as under the DTSA, a defendant must plead the existence of a trade secret, the misappropriation of

14  it, and resulting damages. Cal. Civ. Code § 3426.1(b); *AccuImage Diagnostics Corp. v. Terarecon,*

15  *Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003); *compare* 18 U.S.C. § 1839(5).

16      A plaintiff "need not spell out the details of the trade secret," but it must "describe the subject

17  matter of the trade secret with sufficient particularity to separate it from matters of general

18  knowledge in the trade or of special persons who are skilled in the trade, and to permit the

19  defendant to ascertain at least the boundaries within which the secret lies." *Space Data Corp. v. X*,

20  No. 16-CV-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (cleaned up). At the

21  pleadings stage, the plaintiff "must identify the trade secrets [and show] that they exist." *Logtale,*

22  *Ltd. v. IKOR, Inc.*, No. C 11-5452 CW, 2012 WL 6044876, at *7 (N.D. Cal. Dec. 5, 2012)

23  (quoting *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)).

24      The complaint is predicated on use of confidential and trade-secret information — specified in

25  the Statement — to poach key SVB employees and set up a new bank. First Citizen relies only on

26  acts that took place after March 27, 2023.[82] The complaint specifies the materials that were used

27

28  ───────────────
[82] Opp'n – ECF No. 60 at 27 (all claims are predicated on acts after March 27, 2023).

1  and alleged that they were confidential. The defendants contend that four categories are not trade

2  secrets: compensation information, former SVB employee names and positions, outdated

3  information, and information owned by SVB's clients.[83]

4  First, the compensation information is protectible information about a group of employees.

5  *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 350–52 (1966) ("It is beyond question that a

6  corporate officer breaches his fiduciary duties when, with the purpose of facilitating the recruiting

7  of the corporation's employees by a competitor, he supplies the competitor with a selective list of

8  the corporation's employees who are, in his judgment, possessed of both ability and the personal

9  characteristics desirable in an employee, together with the salary the corporation is paying the

10  employee and a suggestion as to the salary the competitor should offer in order to be successful in

11  recruitment. This conclusion is inescapable even if the information regarding salaries is not deemed

12  to be confidential."); *Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*, 236 Cal. App.

13  4th 243, 263 n.11 (2015) ("Salary information, unlike the mere names of employees, has long been

14  recognized as potentially sensitive in a competitive labor market.") (citing *Bancroft-Whitney*, 64

15  Cal. 2d at 350–51). The information here is names, positions, and salaries of key professionals, their

16  markets, and their skills (as recounted more fully in the Statement).[84] First Citizens does not assert

17  that names and positions alone are trade secrets: it is the tethering of the information to salary,

18  markets, skills, and business relationships that makes them protectible and valuable.[85]

19  Second, the alleged trade secrets are not stale. The information was valuable because it was

20  current and thus allegedly allowed HSBC to wholesale lift the SVB business model.

21  Third, First Citizens did not counter the defendants' contention that it can protect as trade

22  secrets only what it owns, not what its clients own, and that the valuations and growth metrics do

23  not plausibly show trade secrets belonging to First Citizens.[86] This issue can be cleaned up on

24  amendment.

25

26  [83] Mot. – ECF No. 48 at 42–44.

27  [84] Compl. – ECF No. 1 at 3–4 (¶¶ 3–4), 26–27 (¶¶ 111–13), 30 (¶ 126); *see supra* Statement.

27  [85] Opp'n – ECF No. 60 at 44.

28  [86] Mot. – ECF No. 48 at 44.

United States District Court
Northern District of California

1    Finally, as discussed below, except for the claims against the HSBC successor to SVB UK and

2    Mr. Sabow, First Citizens lumps defendants together and does not plausibly provide the individual

3    defendants with fair notice of the claims. Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 555. There

4    are viable theories of trade-secret misappropriation, but the complaint needs flesh out what the

5    defendants did after the effective date of the purchase agreement (March 27, 2023).

6       **2.3  CUTSA Preemption of State Claims**

7       The defendants contend that CUTSA preempts the state claims: claims four and five (against

8    individual defendants for breach of their duty of loyalty and fiduciary duty), claim six (against Mr.

9    Sabow and the HSBC defendants for aiding and abetting the breaches in claims four and five),

10   claims seven and eight (for tortious interference with contracts and prospective economic

11   advantage), and claim twelve (for civil conspiracy).[87] First Citizens counters that it does not

12   premise its claims on trade-secret or confidential information: the breach-of-duty claims are based

13   on the failure to disclose the alleged plot, and the tortious-interference and civil-conspiracy claims

14   are similarly based on the wrongful plot.[88]

15      "CUTSA provides the exclusive legal remedy for conduct falling within its terms and

16   supersedes other civil remedies based on misappropriation of a trade secret." *Waymo, LLC v. Uber*

17   *Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (citing Cal. Civ. Code § 3426.7 and

18   *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010), *disapproved on other grounds*

19   *by Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310 (2011)). "It therefore supersedes claims . . . based

20   on the same nucleus of facts as trade secret misappropriation." *Id.* (cleaned up) (citing *Silvaco*, 184

21   Cal. App. 4th at 232). "At the pleadings stage, the supersession analysis asks whether, stripped of

22   facts supporting trade secret misappropriation, the remaining factual allegations can be

23   reassembled to independently support other causes of action." *Id.*

24      As discussed in the next section, the most specific allegations are those involving Mr. Sabow

25   and the HSBC entity that is the successor to SVB UK. The claims against them are predicated on

26

27   ───────────────
     [87] *Id.* at 44–47; *see supra* Statement (summarizing claims).

28   [88] Opp'n – ECF No. 45–47.

United States District Court
Northern District of California

allegations about unlawful use of confidential and trade-secrets information to poach an entire business. As pleaded, these claims are preempted by CUTSA. The same analysis seemingly applies to the remaining claims against the other individual defendants: perhaps there are independent duties that they breached or other actions unrelated to confidential information, but the reach of the complaint is about unfair use of confidential and trade-secret information. Moreover, the complaint lumps defendants together, muddles the time frame for the alleged bad acts, and does not provide individual defendants with fair notice of the claims. Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 555. The court dismisses the claims with leave to amend.

### 3. Motion to Dismiss For Lack of Fair Notice

The defendants characterize the complaint as a shotgun pleading that does not give the defendants fair notice of the claims against them.[89] At least as to the trade-secret claims against Mr. Sabow and the HSBC successor to SVB UK, there are viable theories that support the claims (as discussed above). But the complaint lumps the other defendants together and — despite First Citizens' limiting its case to post-March 27, 2023, acts — has a timeline that includes substantial pre-March 27 conduct. The timeline and acts should be cleaned up, and the court thus directs amendment.

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Shotgun pleading" occurs when one party pleads that multiple parties did an act, without identifying which party did what specifically, or when one party pleads multiple claims and does not identify which specific facts are allocated to which claim, or when some of the named

---

[89] Mot. – ECF No. 48 at 60–61.

1   defendants do not appear in the factual allegations. *Hughey v. Camacho*, No. 2:13-CV-2665-TLN-

2   AC, 2014 WL 5473184, at *4 (E.D. Cal. Oct. 23, 2014); *see also Mason v. Cnty. of Orange*, 251

3   F.R.D. 562, 563 (C.D. Cal. 2008) (a complaint that alleged each claim for relief is alleged against

4   all defendants, regardless of whether the facts alleged support such an allegation, was a shotgun

5   pleading subject to dismissal.) A complaint that employs this pleading device violates Rule 8 and

6   should be dismissed. *Id.*

7       Except for acts of misuse attributed specifically to Mr. Sabow and the successor entity to SVB

8   UK, the complaint generally lumps the other defendants together, and it jumbles the timeline,

9   making it hard to assess the liability of the individual defendants based only on conduct that

10  postdates March 27. For example, there is nothing alleged about defendants Hanlon, Kidder, and

11  Longo. As to the entity defendants, presumably at least one HSBC entity is arguably responsible

12  (presumably HSBC UK), but HSBC entities are lumped together.

13      This inquiry bleeds into the personal-jurisdiction analysis in the next section. At the hearing,

14  First Citizens said that it could clean up its allegations about the individual defendants. The court

15  orders that approach.

16

17  **4.   Personal Jurisdiction**

18      The defendants move to dismiss the entity defendants and three individual defendants

19  (Stepanis, Longo, and Andersen) for lack of personal jurisdiction.[90] First Citizens agreed at the

20  hearing that it could clean up its jurisdictional allegations.

21

22  **5.   Motion to Stay Discovery**

23      The defendants separately move to stay discovery pending resolution of this motion.[91]

24      The court has discretion: a stay can be appropriate when a dismissal motion is pending,

25  especially when the court is evaluating whether the case will go forward. *Wenger v. Monroe*, 282

26

27  ---

[90] *Id.* at 64.

28  [91] Mot. – ECF No. 46.

United States District Court
Northern District of California

1   F.3d 1068, 1077 (9th Cir. 2002). The parties and the court effectively did this by calendaring the

2   motions to dismiss and stay together. But now, the court has determined that the case will go

3   forward on the main claims involving misappropriation of confidential and trade-secret

4   information, at least as to some defendants. *Pac. Lumber Co. v. Nat'l Union Fire Ins. Co. of*

5   *Pittsburgh, PA*, 220 F.R.D. 349, 351 (N.D. Cal. 2003). The court thus denies the motion to stay.

6

7                                       **CONCLUSION**

8        There is a case here, at least against Mr. Sabow and the successor to SVB UK for claims

9   predicated on the wrongful use of confidential and trade-secret information. The court directs

10  amendment of the complaint to (1) clarify the roles of the HSBC defendants and the individual

11  defendants (all claims where they are named), (2) delineate the acts after execution of the purchase

12  agreement (on March 27, 2023) that are attributable to the individual defendants, (3) add any

13  allegations to address CUTSA preemption of the state tort claims (claims four through eight and

14  twelve), and (4) address the personal-jurisdiction issues. The court denies the motion to stay

15  discovery.

16       First Citizens must file its amended complaint within twenty-eight days and attach as an

17  exhibit a blackline of the amended complaint against the current complaint.

18       This resolves ECF Nos. 46 and 48.

19       **IT IS SO ORDERED.**

20       Dated: January 10, 2024

21

22       _____

23       LAUREL BEELER
         United States Magistrate Judge

24

25

26

27

28

United States District Court
Northern District of California