1

2

3

4

5

6

7

8

9               UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                    San Francisco Division

12   FIRST-CITIZENS BANK AND TRUST          Case No. 3:23-cv-02483-LB
     COMPANY,
13                                          **ORDER DISMISSING CLAIMS TWO**
                     Plaintiff,             **THROUGH SEVEN AND TEN (BUT**
14                                          **NOT CLAIM ONE)**
           v.
                                            Re: ECF No. 81
15   HSBC HOLDINGS PLC, et al.,

16                   Defendants.

17

18                     **INTRODUCTION AND STATEMENT**

19        Silicon Valley Bank (SVB) collapsed on March 10, 2023, following a run on its deposits by its

20   customers. The FDIC assumed control of the bank and on March 27 sold SVB assets to First

21   Citizens. SVB UK collapsed too: the Bank of England seized its assets and on March 13 sold SVB

22   UK to HSBC UK Bank plc (HBUK).[1]

23        On April 9 (Easter Sunday), starting at 9 p.m., more than forty former SVB employees submitted

24   their resignations by email to First Citizens and began work at HSBC Bank USA, N.A. (HBUS). First

25   Citizens sued six former SVB employees (Sunita Patel, Melissa Stepanis, Peter Kidder, Kevin Longo,

26

27   _____

     [1] First Am. Compl. (FAC) – ECF No. 76 at 4, 5 (¶¶ 1–2), 26 (¶¶ 99–101), 41 (¶ 184). Citations refer to
28   material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers
     at the top of documents.

     ORDER – No. 23-cv-02483-LB

United States District Court
Northern District of California

United States District Court
Northern District of California

Rebekah Hanlon, and Katherine Andersen), a former SVB senior executive named David Sabow (who became an SVB UK employee before First Citizens acquired SVB and then an HBUK employee after HBUK acquired SVB UK on March 13), SVB UK, HBUS, and other HSBC entities. The gist of the complaint is that Mr. Sabow organized a scheme (called Project Colony) to poach former SVB employees, thereby obtain SVB's confidential, proprietary, and trade-secret information, and (essentially) steal the SVB business model, to First Citizens' financial detriment.[2]

All claims are grounded in this alleged scheme. The employees breached their employment agreements with SVB (claim one against Sabow, Patel, Stepanis, Longo, and Hanlon) and First Citizens (claim two against Patel, Stepanis, Longo, Hanlon, and Andersen) and their duty of loyalty to First Citizens (claim three against Patel, Stepanis, Longo, Hanlon, and Andersen). The HSBC entities and Sabow aided and abetted the breach of the duty of loyalty (claim four) and tortiously interfered with First Citizens' contracts by inducing the mass resignations and causing the breaches of the employment agreements (claim five). All defendants tortiously interfered with First Citizens' prospective economic advantage by inducing the mass resignations and breaches of the duty of loyalty (claim six) and engaged in unfair and deceptive trade practices by executing the mass departure of former SVB employees, in violation of N.C. Gen. Stat. § 75-1.1 (claim seven). All defendants violated the federal Defend Trade Secrets Act (claim eight) and either the California Uniform Trade Secrets Act (CUTSA) or the North Carolina Trade Secrets Protection Act (claim nine). And all defendants conspired to injure First Citizens by these unlawful acts (claim ten).[3]

The defendants move to dismiss the claims on the following grounds.

First, they contend that there is no personal jurisdiction over entity defendants HBUK, HSBC Holdings, and HS Bank USA Inc. (HUSI). Similarly, there is no personal jurisdiction against the out-of-state defendants Stepanis, Longo, and Andersen because the only acts alleged occurred outside of California or via Zoom calls to recruit them to work for HBUS.[4]

---

[2] *Id.* at 5–9 (¶¶ 3–18).

[3] *Id.* at 59–92 (¶¶ 261–406).

[4] Mot. – ECF No. 81 at 11.

United States District Court
Northern District of California

Second, they move to dismiss all claims against certain defendants (the defendants in the last paragraph plus three in-state defendants, Patel, Kidder, and Hanlon) because the allegations against them based on their conduct after March 27 do not plausibly plead claims (except for trade-secret claims against Hanlon).[5] (The asset-purchase agreement with the FDIC precludes First Citizens from asserting claims arising from conduct that predates March 27.[6])

Third, they contend that CUTSA preempts the common-law tort claims (claims three through six and ten).[7]

Fourth, they contend that common-law tort and contract claims are not pleaded plausibly because (a) there are no allegations that the individual defendants owed First Citizens a duty of loyalty (claims three and four) or interfered with contracts or prospective economic advantage (claims five and six), (b) conspiracy (claim ten) is not a standalone tort, (c) there is no plausible claim for breach of the SVB employment agreements (claim one) because First Citizens did not allege that it acquired the contracts with its purchase of assets (SVB Financial Group had the contracts, never transferred assets, and is in bankruptcy proceedings), and (d) there is no plausible claim for breach of the First Citizens agreements (claim two) because First Citizens did not allege that the individual defendants breached the agreement's terms after they signed the agreement's acknowledgment form.[8]

Fifth, they contend that claim seven — implicating North Carolina's Unfair and Deceptive Practices Act — must be dismissed because no deceptive conduct occurred in North Carolina or had the requisite substantial effect on commerce there.[9]

Given the defendants' declarations with jurisdictional facts, there is no personal jurisdiction over HSBC Holdings, HUSI, and HBUK. The allegations against HSBC Holdings and HUSI are grounded in a misunderstanding about the corporate structure. The jurisdictional case against

---

[5] *Id.*

[6] Order – ECF No. 71 at 11 (the parties agree on this point). This order incorporates the earlier order's analysis by this reference.

[7] Mot. – ECF No. 81 at 11.

[8] *Id.* at 12.

[9] *Id.* The court held a hearing on May 30, 2024. The parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c). Consents – ECF Nos. 23, 33.

United States District Court
Northern District of California

1   HBUK is closer given its acquisition of SVB UK on March 13, 2023, but the declaration defeats

2   the jurisdictional allegations (given that the relevant executives were at HBUS). The court allows

3   the jurisdictional discovery discussed below. The allegations against the out-of-state defendants

4   Stepanis, Longo, and Andersen do not establish personal jurisdiction. The court denies the motion

5   to dismiss the breach-of-contract claim predicated on the SVB agreement (claim one): the earlier

6   order held that First Citizens acquired the right to enforce the agreements, and the counterparty

7   includes SVB Financial's affiliates. The court otherwise grants the Rule 12(b)(6) motion to

8   dismiss for the reasons advanced by the defendants. The effect of this ruling is that claim one (for

9   breach of the SVB contract) survives against Sabow and claims eight and nine (for theft of trade

10  secrets) are live against HBUS, SVB UK, Sabow, and Hanlon.

## STANDARD OF REVIEW

### 1.  Personal Jurisdiction — Rule 12(b)(2)

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff

bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059,

1068 (9th Cir. 2015) (cleaned up). The parties may submit, and the court may consider,

declarations and other evidence outside the pleadings in determining whether it has personal

jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). "Where, as here, the

defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff

need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss."

*Ranza*, 793 F.3d at 1068 (cleaned up). "Uncontroverted allegations must be taken as true, and

conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's

favor." *Id.* (cleaned up). But courts "may not assume the truth of allegations in a pleading which

are contradicted by affidavit." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th

Cir. 2011) (cleaned up); *accord Ranza*, 793 F.3d at 1068 ("A plaintiff may not simply rest on the

bare allegations of the complaint.") (cleaned up).

### 2. Motion to Dismiss — Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations that, when accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th Cir. 2020). "[O]nly the claim needs to be plausible, and not the facts themselves. . . ." *NorthBay Healthcare Group, Inc.*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

If a court dismisses a complaint because of insufficient factual allegations, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court dismisses a complaint because its legal theory is not cognizable, the court should not give leave to

United States District Court
Northern District of California

amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal theory if given the opportunity").

## ANALYSIS

The issues are (1) whether there is personal jurisdiction over the HSBC entities and individual defendants and (2) whether First Citizens plausibly pleaded claims.

### 1.  Personal Jurisdiction

"Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1089 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 693 (2024). California's long-arm statute provides for personal jurisdiction co-extensive with the limits of federal due process. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). The court's "inquiry centers on whether exercising jurisdiction comports with due process," which requires that defendants have "certain minimum contacts with the State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.*; *Daimler AG v. Bauman*, 571 U.S. 117, 125–26 (2014) (cleaned up).

Personal jurisdiction is general or specific. *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779–80 (2017). First Citizens asserts only specific jurisdiction. Specific jurisdiction exists when the suit arises out of or relates to the defendant's contacts with the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Bristol-Myers Squibb*, 137 S. Ct. at 1779–80. "In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or occurrence that takes place in the forum State and thus is subject to the State's regulation." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (cleaned up). "For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S.

United States District Court
Northern District of California

Ct. 1017, 1024 (2021). The Ninth Circuit analyzes specific jurisdiction under a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot*, 780 F.3d at 1211; *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). "The plaintiff has the burden of proving the first two prongs." *Picot*, 780 F.3d at 1211–12. "If he does so, the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* at 1212 (cleaned up).

A plaintiff satisfies the first prong by "demonstrating that the defendant either purposefully availed itself of the privilege of conducting activities in the forum or purposefully directed its activities at the forum," *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012), *abrogated on other grounds by Axiom Foods*, 874 F.3d 1064, or engaged in "some combination thereof," *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (per curiam) ; *accord Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023), *cert. denied,* No. 23-874, 2024 WL 2262336 (May 20, 2024).

The court's application of the purposeful-direction or purposeful-availment test "turns on the nature of the underlying claims." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021). When a defendant's conduct takes place primarily outside the forum state, the Ninth Circuit generally applies the purposeful-direction "effects" test and "look[s] to whether the defendant expressly aimed acts at the forum state knowing that they would harm the plaintiff there." *Impossible Foods*, 80 F.4th at 1088; *Washington Shoe*, 704 F.3d at 672–73 (the "effects" test "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum") (cleaned up). It applies a purposeful-availment analysis when "the defendant has taken deliberate action within the forum state or has created continuing obligations to forum residents." *Impossible Foods*, 80 F.4th at 1088. "Thus, purposeful availment

United States District Court
Northern District of California

generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort." *Id.* (cleaned up); *see Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004); *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).

First Citizens argues only purposeful direction.[10]

Purposeful direction exists if the defendant (1) commits an intentional act (2) expressly aimed at the forum (3) that causes harm that the defendant knows is likely to be suffered in the forum. *Washington Shoe*, 704 F.3d at 673; *Calder v. Jones*, 465 U.S. 783, 788–90 (1984) (articulating this "effects" test). "However, referring to the *Calder* test as an effects test can be misleading. For this reason, we have warned courts not to focus too narrowly on the test's third prong — the effects prong — holding that something more is needed in addition to a mere foreseeable effect." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006) (cleaned up).

Then, as to prong two of the specific-jurisdiction test, the issue is whether the plaintiff's claims arise out of or are related to the defendants' contacts with the forum. *Ford Motor Co.*, 141 S. Ct. at 1026; *Ayla*, 11 F.4th at 983. "In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (cleaned up). Ninth Circuit precedent before *Ford* required a showing of but-for causation for prong two. *Ayla*, 11 F.4th at 983 n.5 (collecting cases). But "[t]he Supreme Court announced in *Ford* that 'arise out of' and 'relate to' are alternatives: for a claim to arise out of a defendant's forum contacts requires causation, while a claim can relate to those contacts[] even absent causation." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504–05 (9th Cir. 2023). Thus, a showing of but-for causation is permitted, but not required, to satisfy prong two. *Ayla*, 11 F.4th at 983 n.5 (collecting cases).

The defendants conced[e] that there is personal jurisdiction over HBUS, SVB UK, Sabow, Patel, Kidder, and Hanlon but contend that there is no personal jurisdiction over HBUK, HSBC Holdings,

---

[10] Opp'n – ECF No. 84 at 12–19. For the individual defendants, the section title has the words "purposefully directed," but the text has "purposefully availed." *Id.* at 16:19, 16:25. The analysis in the briefs and at oral argument addresses purposeful direction. *E.g.*, Tr. – ECF No. 96 at 16:16–19.

United States District Court
Northern District of California

and HUSI or Stepanis, Longo, and Andersen.[11] In the next sections, the court summarizes the jurisdictional facts for the entities and the individual defendants and concludes that there is no personal jurisdiction (but allows jurisdictional discovery).

### 1.1 Jurisdictional Facts: HSBC Entities

First Citizens contends that the defendants' California-focused conspiracy — to poach former SVB employees to work for HBUS — establishes personal jurisdiction over them.[12] The next paragraphs summarize first the overall allegations that First Citizen identifies and then its identification of allegations by HSBC entity.[13]

On March 17, 2023, Sabow sent a copy of Project Colony to Greg Guyett, HSBC Holdings' CEO, calling it an opportunity for U.S. venture banking and saying it might make sense to meet with Michael Roberts (identified as HBSC Holdings' Group Managing Director and an ex-committee member, HUSI's chairman, president, and CEO, and HSUS's chairman).[14] Sabow sent it on March 18 to Ian Stuart, HBUK's CEO, who responded in part that "HSBC see[s] this as a key market," said they'd have to move fast, and suggested a meeting with Guyett and Roberts.[15] On March 21, Sabow had a phone call with Guyett and Will McClean (HBUK's Group Head of Strategy) about Project Colony.[16] Parts of the document were redacted, showing that it contained SVB's confidential and proprietary information.[17]

By March 27, Sabow continued to refine his plan, spending many hours on a document with a five-year plan he titled "HSBC Future State Document 3-27-23."[18] In it he wrote, "HSBC

---

[11] Mot. – ECF No. 81 at 14–22.

[12] Opp'n – ECF No. 84 at 13–14 (citing FAC – ECF No. 76 at 33 (¶ 131), 34–35 (¶¶ 140–41), 36 (¶ 153), 41–42 (¶¶ 187–88), 42–43 (¶¶ 191–92), 48–49 (¶¶ 213–15) and then citing *id.* at 5–7 (¶¶ 1–18) and 29–57 (¶¶ 111–248), which is a string cite to all the fact allegations in the complaint about the wholesale lifting of former SVB employees after First Citizens acquired SVB).

[13] This approach is a little repetitive, but it captures First Citizens' summary more efficiently.

[14] FAC – ECF No. 76 at 33 (¶ 131).

[15] *Id* at 34–35 (¶¶ 140–41).

[16] *Id.* at 36 (¶ 153); *see id.* (¶ 150) (Ian Stuart, HBUK's CEO, introduced McLane as "our Group Head of strategy").

[17] *Id.* at 34 (¶ 139), 40 (¶ 141).

[18] *Id.* at 42–43 (¶¶ 188–85).

assembled a team of 40 people hand-picked based on their relationships, reputations, and functional expertise across the innovation ecosystem."[19] He sent it that day to Sungmahn Seo, managing director of HSBC Holdings, and spoke to him about it on Zoom.[20] On March 29, HBUS sent Sabow documents about the benefits it offers U.S.-based employees.[21] That day, Sabow introduced Hanlon to Seo and Jennifer Capasso, HUSI's and HBUS's head of Embedded Banking & Platforms, so that Hanlon could be included in a discussion about the "US onboarding journey."[22]

On April 3, 2023, Sabow flew from San Francisco to New York to meet the next day with executives from HUSI and HBUS.[23] On April 4, he told Erin Platts, SVB UK's CEO, that he was expecting to discuss that day the specifics of HSBC's investment in Project Colony.[24] Also on April 4, Sabow met with Roberts, Mabel Rius (head of HR for HUSI), Wyatt Crowell (HSUS's head of commercial banking), and Mauricio Rose (HSUS's head of Performance & Rewards USA and Americas) in person. First Citizens believes that the conversation included how to execute Project Colony, which was predicated on confidential information.[25]

All the HSBC entities allegedly were involved in this California-focused conspiracy.[26] HBUS celebrated the hiring in a press release that quoted Roberts (HBSC Holdings, HUSI, and HBUS): "As we look to grow our business, this offering allows us to connect the innovation ecosystem with the size, strength, and international network of HSBC."[27]

---

[19] *Id.* at 41–42 (¶ 187).

[20] *Id.* (¶¶ 187–88).

[21] *Id.* at 42 (¶ 191).

[22] *Id.* at 42–43 (¶¶ 191–92).

[23] *Id.* at 48 (¶ 213).

[24] *Id.* at 49 (¶ 214).

[25] *Id.* at 48–49 (¶¶ 213–15).

[26] Opp'n – ECF No. 84 at 14 (citing FAC – ECF No. 76 at 7 (¶¶ 9–10) (alleging concerted activity by the HSBC entities to hire six core leaders in the U.S., meaning, the individual defendants other than Sabow), 77 (¶ 323) (alleging concerted activity by the HSBC entities and Sabow, Roberts, and Ruis to recruit and onboard the former SVB/then First Citizens employees and encourage them to breach their duty of loyalty), 82 (¶ 343) (the individual defendants breached their duty of loyalty)).

[27] Press Release, Ex. 1 to Hemann Decl. – ECF No. 84-2 at 3); *see also* Press Release, Ex. 3 to *id.*– ECF No. 84-4 at 2–4 (HSBC touting its plan to recruit fifty bankers in its U.S. bank to lend to startups, discussing the hire of the forty SVB employees, and quoting Crowell). First Citizens' request for

After this identification of the collective allegations of the involvement in the scheme by HSBC Holdings, HBUK, and HUSI, First Citizens then identifies the allegations by entity.[28] The next paragraphs synopsize the allegations.

HSBC Holdings was involved because numerous high-level executives approved Project Colony.[29] On March 15, 2023, Sabow met in London with three HSBC Holdings executives — CEO Noel Quinn, Chief Legal Officer Bob Hoyte and Greg Guyett — about Project Colony.[30] He then made plans to fly to San Francisco to execute the plan.[31] Before he left, Sabow gave Guyett a copy of the plan, and they discussed it.[32] On March 18, 2023, the day that Sabow flew from London to San Francisco, Roberts contacted Sabow and asked to discuss the plan.[33] From March 18 through April 9, the date of the mass resignations, Sabow refined the plan by speaking to those at HSBC Holdings: Guyett, Will McLane (Head of Strategy), Seo, and Barry O'Byrne (Chief Executive of Global Commercial Banking).[34]

---

judicial notice at ECF No. 85 is unopposed. Reply – ECF No. 88 at 10 (addressing press releases).The court judicially notices the documents in First Citizens' request.

[28] Opp'n – ECF No. 84 at 14–16.

[29] *Id.*

[30] FAC – ECF No. 76 at 30 (¶ 116).

[31] *Id.* at 30 (¶ 116), 31 (¶ 123), 34 (¶ 136).

[32] *Id.* at 33 (¶ 131), 34–35 (¶ 140).

[33] *Id.* at 34 (¶ 136), 35 (¶ 142).

[34] *Id.* at 36 (¶ 149) (on March 21, Guyett contacted Sabow, suggested that they speak, and introduced Sabow to O'Byrne so that the two could speak, which they did that day), 36 (¶ 153) (on March 21, Sabow spoke with Guyett and McLane by phone about Project Colony), 38–39 (¶¶ 161–63) (on March 22, McLane told Seo and Mary MacLeod to speak with Sabow about rolling out the future venture-debt business, Sabow told O'Byrne that McLane was connecting him to O'Byrne's strategy team to build out the model, and Sabow told McLane, Seo, and MacLeod that people he had targeted had resigned from the Bridge Bank [where the FDIC transferred assets to protect SVB's investors, *see* Order – ECF No. 71 at 4–5] and that they needed to move faster "to make this happen"), 39 (¶ 165) March 23 call between Sabow and O'Byrne about more material departures at SVB and the need to move faster), 40 (¶ 170) (Roberts contacted Sabow and asked to chat at 10 a.m.), 42 (¶ 188) (on March 27, Sabow sent the Future State document to Seo), 42–43 (¶¶ 192) (on March 29, Sabow introduces Hanlon to Seo and Capasso to discuss onboarding), 44 (¶ 200) (on March 31, Roberts asks Sabow for a call and, First Citizens believes, spoke later that day), 52 (¶ 226) (on April 7, Sabow updates Roberts and Crowell that he, Ruis, and Ruis's team were "hitting the phones hard" to call the targeted employees regarding proposed compensation packages), 53 (¶ 230) (Sabow celebrated the success of the employee calls by thanking Roberts and Crowell for their call, apparently with the new employees).

HBUK was involved because its executives were involved in Project Colony.[35] On March 15, 2023, Sabow pitched the plan to Noel Quinn (CEO of HSBC Holdings) and Ian Stuart (CEO of HBUK) and discussed it with HBUK's Head of Commercial Banking, Stuart Tait.[36] After Sabow sent a copy of the plan to Tait on March 18, touting it as a "once in a generation opportunity," Tait responded that the proposal sounded exciting and that they "need[ed] to maximise all the opportunities created by coming together."[37] On March 19, the day after Sabow flew back to San Francisco, Tait asked for an update about whether the plan had been shared with Quinn and others.[38] On March 21, Sabow gave a copy of the plan to McLane, and they spoke about it.[39] During this time, the HBUK executives knew that Sabow was in California, meeting with the California-based Bridge Bank employees to poach them, acquire their confidential information, and acquire the former SVB "profitability engine."[40]

HUSI was involved because it operates with HBUS, on paper and in practice.[41] It shares its office location with HBUS, "its principal U.S. banking subsidiary," and together they offer a "wide range of commercial and consumer banking products and related financial services" to approximately 423,000 customers (thirty-eight percent are in California).[42] On March 23, 2023, Rius (the head of HR) reached out to Sabow to set up a meeting (after she obtained his contact information from Roberts) and then met with him on March 24 on Zoom to discuss Project Colony.[43] On March 29, HBUS sent Sabow documents explaining its employee benefits, and

---

[35] Opp'n – ECF No. 84 at 15.

[36] FAC – ECF No. 76 at 30 (¶¶ 116–17).

[37] *Id.* at 34 (¶ 138).

[38] *Id.* at 35–36 (¶ 144) (Sabow responded that it had been shared with Roberts, Guyett, and Stewart, and the team was discussing it with Quinn, which means that at this point, Project Colony was "disclosed to, and was under consideration by[,] executives of HSBC Holdings, HSBC UK [referred to herein as HBUK], SVB UK, and HSBC Bank USA [herein, HSUS]").

[39] *Id.* at 36 (¶¶ 150, 153).

[40] *Id.* at 36 (¶¶ 150–51), 38 (¶ 160), 39 (¶ 167).

[41] Opp'n – ECF No. 84 at 15–16.

[42] FAC – ECF No. 76 at 9–10 (¶¶ 21–22); HUSI Annual Report (Form 10-K) (Feb. 21, 2024), Ex. 4 to Hemann Decl. – ECF No. 84-5 at 3 (p. 4), 4 (p. 7) (HUSI had 2,040 employees in 2023).

[43] FAC – ECF No. 76 at 40 (¶ 171), 41 (¶ 179).

United States District Court
Northern District of California

Sabow forwarded them to the six individual defendants.[44] That day, Sabow spoke with Jennifer Capasso (the head of Embedded Banking & Platforms at HUSI and HBUS) about including Hanlon (a California-based employee and defendant) in the onboarding discussion.[45] While he was in California, Sabow arranged to meet with HUSI and HBUS executives in New York, flying there on April 3 and meeting with them on April 4.[46] The day of the meeting, Sabow created spreadsheets to illustrate his staffing model for Project Colony, including targeting California employees.[47] On April 6, 2023, Sabow wrote to Rius and two other HBUS executives (Dianna Hollin, the head of executive recruitment, and Rose) asking about the progress of the recruitment process for the six individual defendants (referred to as the pillars). Rius responded, "[g]etting the engine ready," and Sabow replied, "Whoo hoo!" First Citizens surmises that this is when the individual defendants received their officers of employment.[48]

The defendants submitted declarations with jurisdictional facts for each entity.

HSBC Holdings, HBUK, and HUSI have no offices or employees in California and did not recruit, offer employment to, or employ any of the former SVB employees who were poached.[49]

HSBC Holdings does not employ Roberts, O'Byrne, Crowell, Guyett, MacLeod, McClane, or Seo.[50] Noel Quinn is "not employed by HSBC Holdings;" he is its CEO and a director. It would not be "within the ordinary scope of [his] duties as a director or officer of HSBS Holdings, which is a bank holding company, to engage in such recruitment activity. Accordingly, to the extent [that the FAC] alleges Mr. Quinn engaged in any specific conduct related to the hiring of the Former

---

[44] *Id.* at 42 (¶ 191).

[45] *Id.* at 42–43 (¶ 192).

[46] *Id.* at 48–49 (¶¶ 213–15).

[47] *Id.* at 49 (¶ 216).

[48] *Id.* at 51–52 (¶ 223).

[49] Strybel Decl. – ECF No. 81-1 at 2 (¶¶ 2–8) (HBUK's COO); Alioto Decl. – ECF No. 81-2 at 2–3 (¶¶ 2–3, 6–11) (HSBS Holdings' Deputy Group Chief Officer); Privitera Decl. – ECF No. 81-3 at 2–6 (¶¶ 2–3, 8–20) (HUSI's COO).

[50] Alioto Decl. – ECF No. 81-2 at 3 (¶ 10).

United States District Court
Northern District of California

SVB Employees by HBUS, those allegations do not refer to conduct that was undertaken on HSBC Holdings' behalf."[51]

HUSI has corporate officers but no employees.[52] Michael Roberts is HUSI's Chairman of the Board and HBUS's Chairman of the Board, President, and CEO. The allegations in the complaint do not concern his conduct as HUSI's Chairman or otherwise on HUSI's behalf because HUSI never recruited, offered employment to, or employed any former SVB employees.[53] For the same reason, the allegations about other HUSI officers (Ruis, Crowell, and Capasso) are not conduct on HUSI's behalf.[54] (The point here is that only HBUS hired the former SVB employees, and HBUS does not challenge jurisdiction). [55]

### 1.2 Jurisdictional Facts: Individual Defendants

First Citizens contends that personal jurisdiction exists over Stepanis, Longo, and Andersen because they were SVB and Bridge Bank employees, reported to a California-based employer, led teams with California-based employees, and convinced their California reports to resign en masse to join HBUS.[56] First Citizens then summarizes the allegations by individual.[57] The next paragraphs synopsize the allegations.

Stepanis knew about Project Colony by at least March 21, 2023: that is the date that Sabow met with her and other defendants (Patel, Longo, Hanlon, and Andersen) to solicit them to leave

---

[51] *Id.* (¶ 11).

[52] Privitera Decl. – ECF No. 81-3 at 2 (¶ 6).

[53] *Id.* at 3 (¶ 9).

[54] *Id.* at 3–5 (¶¶ 10 (Ruis), 12 (Capasso), and 14 (Crowell)); *see also id.* at 3–4 (¶ 11) (Catherine Twarorwski has an HR role at HBUS and has no corporate role or title at HUSI), 5 (¶ 15) (Sabow, Patel, Kidder, and Hanlon have never worked for HUSI), 5 (¶ 16) (HUSI never offered or intended to offer compensation to Sabow, Andersen, Kidder, Patel, Stepanis, Hanlon, Longo, or other former SVB employees), 5–6 (¶¶ 17–20) (HUSI never offered or intended to offer Andersen any "financial terms" or employment; HUSI does not employ (or provide any corporate role to) Hanlon or any of her reports; HUSI does not regularly conduct business in California "in concert with" HBUK or SVB UK, as the FAC alleges; HUSI did not direct the former SVB employees to resign or provide them email templates because it never hired or intended to hire any of the former SVB employees).

[55] Mot. – ECF No. 81 at 18 (making this point).

[56] Opp'n – ECF No. 84 at 16–17 (citing FAC – ECF No. 76 at 12–15 (¶¶ 35 (Stepanis), 37 (Longo), 39 (Andersen), 21 (¶ 71) (SVB was a California state-chartered bank)).

[57] *Id.*

SVB/the Bridge Bank.[58] Sabow, Hanlon, and Patel participated in person in California, and the others participated via Zoom.[59] Sabow asked for their help to recruit "30, 40, 50 people out of the gate."[60] Over the next days, Sabow met with members of Stepanis's team in California.[61] On March 23, Stepanis printed a confidential SVP report (named the "9-Block Report"), which listed 830 employees and evaluated their work performance and potential, ranking them on a scale of 1 to 9.[62] On March 26, Sabow sent her a calendar invite titled "Follow-up Colony Discussion."[63] By March 31, Stepanis was googling "negotiating salary job offer" and "hsbc glass door."[64] On March 31, while Longo was on the phone with Roberts, Stepanis told Longo to ask Roberts for one hundred offer letters and revised salaries to present to First Citizens employees.[65] On April 6, Stepanis called a member of her team; First Citizens believes it was to recruit her because the employee resigned with the other employees to join HSUS.[66] On April 8, Stepanis participated in an executive-recruitment Zoom with other members of her team and Michael Roberts.[67]

    Longo knew about Project Colony by March 21: he participated in the same conversation synopsized in the previous paragraph.[68] On March 26, he received the same calendar invite titled "Follow-up Colony Discussion."[69] By March 27, he had already told Sabow that he was "in" and had

---

[58] FAC – ECF No. 76 at 37 (¶ 154).

[59] *Id.*

[60] *Id.* (¶¶ 154–55).

[61] *Id.* at 38 (¶ 160), 39 (¶ 168).

[62] *Id.* at 40 (¶¶ 173–74) (describing the report as a talent-management tool that allows HR and managers identify leaders and prepare employees for future roles).

[63] *Id.* at 41 (¶ 183) (invite sent to Stepanis, Longo, Andersen, Patel, and Hanlon).

[64] *Id.* at 44 (¶ 201). Glassdoor is a website where current and former employees anonymously review companies. *Id.* at 41 (¶ 186).

[65] *Id.* at 45 (¶ 203).

[66] *Id.* at 41 (¶ 222), 75 (¶ 310); *see id.* at 74 (¶¶ 307–08 (Sabow recruited Stepanis and Andersen to recruit other employees; Stepanis was "in on the plot" by March 23, and Andersen was thereafter (sometime after March 23 and before April 8); Jensen Decl. – ECF No. 84-9 at 2 (¶ 3) (one California-based employee on Stepanis's team resigned on April 9, 2023).

[67] *Id.* at 53 (¶ 228), 74 (¶ 307), 75 (¶¶ 311–12).

[68] *Id.* at 37 (¶¶ 154–55).

[69] *Id.* at 51 (¶ 183) (invite sent to Stepanis, Longo, Andersen, Patel, and Hanlon).

googled "hsbc glassdoor."[70] After March 27, he "accessed and modified (fifteen times) a spreadsheet containing confidential information" that "aligns with information used to develop and execute Project Colony." For the members on his team, the spreadsheet has hire dates, positions, salaries, bonuses, data underlying the bonuses, and aggregate statistics about loan performance (broken down by loan type, region, and loan-growth numbers).[71] On March 31, he participated in the "100 offer letters" call with Roberts and Stepanis, synopsized in the previous paragraph.[72] Also on March 31, a California-based employee asked him, "can we get Sabow back," and Longo responded, "I keep texting him to please come back," thereby misleading the employee to keep the upcoming mass departure a secret and putting his own interests above First Citizens' interests.[73] On April 4, a First Citizens employee asked Longo whether Sabow was going to HSBC; Longo responded that he had "no clue." By this time, Longo had agreed to help Sabow recruit employees.[74] First Citizens believes that Longo recruited California-based employees to participate in the April 8 call with Roberts to discuss Project Colony. Ultimately, eight California-based First Citizens employees joined the April 8 call with Roberts and resigned with the other thirteen California-based employees on April 9.[75]

Andersen knew about Project Colony by March 20, when she spoke with Hanlon by phone for twenty-one minutes, presumably about Project Colony.[76] On March 21, she participated in the same conversation synopsized above in the Stepanis section.[77] On March 26, she received the same calendar invite titled "Follow-up Colony Discussion."[78] "After March 27, 2023, in the days leading up to her departure, [she] repeatedly accessed, modified, or downloaded (dozens of times) spreadsheets and other documents containing confidential information" that "aligns with

---

[70] *Id.* at 41 (¶ 186).

[71] *Id.* at 47 (¶ 208).

[72] *Id.* at 45 (¶ 203).

[73] *Id.* (¶ 204); Brown Decl. – ECF No. 84-10 at 2 (¶ 3).

[74] FAC – ECF No. 76 at 49–50 (¶ 217), 76 (¶ 315).

[75] *Id.* at 76 (¶ 316); Jensen Decl. – ECF No. 84-9 at 2 (¶ 2).

[76] FAC – ECF No. 76 at 36 (¶ 146).

[77] *Id.* at 37 (¶¶ 154–55).

[78] *Id.* at 41 (¶ 183) (invite sent to Stepanis, Longo, Andersen, Patel, and Hanlon).

United States District Court
Northern District of California

information used to develop and execute Project Colony."[79] On April 2, 2023, she "promise[d] followership" to Roberts, meaning, she could recruit others.[80] On April 8, she participated in the executive-recruitment Zoom with other members of her team and Michael Roberts (synopsized in the Stepanis summary).[81]

The defendants submitted declarations with jurisdictional facts for the three individuals. Stepanis has resided in Connecticut at all times since March 10, 2023, to the present. She did not travel to California between March 10, 2023, and April 10, 2023.[82] Any Google searches were done in Connecticut.[83] The March 31 call was with Longo (who resides in Massachusetts). The April 8 call was with Roberts (based in New York).[84] She was not active on the call. Andersen is based in Massachusetts.[85] Longo similarly declares that he was in Massachusetts during the relevant times.[86]Andersen too was in Massachusetts during the relevant times.[87] SVB's servers were located in Arizona or Texas.[88]

### 1.3 Application of Legal Standard to Jurisdictional Facts

There is no personal jurisdiction over HBUK, HSBC Holdings, and HUSI or Stepanis, Longo, and Andersen.

First, as to the entity defendants, as the declarations establish, the executives that First Citizens named did not work for (or, in the cases of officers of HSBC Holdings, act for) HBUK, HSBC

---

[79] *Id.* at 46–47 (¶ 207) (documents include a spreadsheet with employee information (names, titles, tenures, managers, compensation, and other data), client information, and overviews and analyses).

[80] *Id.* at 48 (¶ 211).

[81] *Id.* at 53 (¶ 228), 74 (¶ 307), 75 (¶¶ 311–12).

[82] Stepanis Decl. – ECF No. 81-4 at 2 (¶¶ 3–4).

[83] *Id.* (¶ 6).

[84] *Id.* (¶¶ 7–8).

[85] *Id.* at 3 (¶ 10).

[86] Longo Decl. – ECF No. 81-5 at 2–4 (¶¶ 3–13).

[87] Andersen Decl. – ECF No. 81-6 at 2–3 (¶¶ 3–12).

[88] Sefton Decl. – ECF No. 81-7 at 2 (¶¶ 3–4, 7) (former head of information technology at SVB UK and current head of information technology at HSBC Innovation Banking).

Holdings, or HUSI.[89] Wearing their HBUS hats, the executives' actions are directed at the California forum, but not otherwise. First Citizens nonetheless contends that the declarants lack personal knowledge, other evidence contradicts the declarations, and the conduct of the executives can be attributed to the entities.[90] These arguments do not change the conclusion that there is no personal jurisdiction over the entities.

The declarants all have roles that establish their personal knowledge of the jurisdictional facts.[91] The other evidence is three HSBC webpages and a *Reuters* article that purportedly make the executives part of HSBC Holdings.[92] Three exhibits do not identify the executives as employees, officers, or directors of HSBC Holdings.[93] The fourth identifies Roberts as "Chief Executive Officer, HSBC USA and Americas," which is not a position at HSBC Holdings either. The exhibit lists Guyett, Hoyte, and O'Byrne as, respectively, CEO of Global Banking & Markets, Group Chief Legal (the HSBC enterprise as a whole), not at HSBC Holdings.[94] HUSI does not have employees and thus any actions taken by the executives could not have been on behalf of HUSI.[95]

A closer issue is HBUK. HBUK's declarant (its COO) does not address her personal knowledge of the roles played by HBUK CEO Ian Stuart and Head of Commercial Banking Stuart Tait, who — on dates starting on March 15 and continuing to March 21 — received copies of Project Colony and discussed it with Sabow as an "exciting opportunity."[96] HBUK responds that Sabow sent them the

---

[89] This order does not rely on facts in the declarations that are not relevant to the jurisdictional analysis.

[90] Opp'n – ECF No. 84 at 22–25.

[91] *See supra* n.43 (Strybel is HBUK's COO, Alioto is HSBS Holdings' Deputy Group Chief Officer, and Privitera is HUSI's COO).

[92] Exs. 1–3 & 5 to Hemann Decl. – ECF Nos. 84-2–82-4, 82-6.

[93] Exs. 1–3 to Hemann Decl. – ECF Nos. 84-2–82-4.

[94] Alioto Supp. Decl. – ECF No. 89-1 at 2 (¶¶ 6–8) (discussing Ex. 5 to Hemann Decl. – ECF No. 84-6).

[95] Privitera Supp. Decl. – ECF No. 88-2 at 2 (¶ 6) (verifying earlier declaration, see supra, and noting that the Form 10-K defines HUSI as "HSBC USA" and states that "[i]n this Form 10-K, HSBC USA and its subsidiaries are referred to as 'HUSI,' 'we,' 'us,' and 'our.'") (cleaned up and emphasis omitted).

[96] Opp'n – ECF No. 84 at 24; *see supra* text accompanying nn.29–31 (discussing Sabow's pitch to HBUK and the resulting interest by HBUK's executives).

pitch, and they discussed it over Zoom, which is not enough.[97] But at this point, Sabow (a former SVB senior executive who became an SVB UK employee and, after HBUK acquired SVB UK on March 13, an HBUK employee) is pitching to his new bosses. That said, given the declaration, First Citizens has not met its burden.

It seems unlikely that a jurisdictional case can be made against HSBC Holdings or HUSI, but possibly it can against HBUK. The court allows the limited jurisdictional discovery described below.

While a district court is vested with broad discretion to permit or deny jurisdictional discovery, courts generally require a plaintiff to make out a "colorable basis" for jurisdiction to warrant discovery. *See, e.g.*, *Teras Cargo Transp. (Am.), LLC v. Cal Dive Int'l (Austl.) Pty Ltd.*, No. 15-cv-03566-JSC, 2015 WL 6089276, at *8 (N.D. Cal. Oct. 16, 2015) (citing cases). Courts may properly deny jurisdictional discovery where "there is insufficient evidence to give rise to more than a 'hunch'" that discovery will make out a case for exercising personal jurisdiction over a defendant. *See id.* (denying jurisdictional discovery where "there is insufficient evidence to give rise to more than a 'hunch' that jurisdictional discovery might assist [plaintiff] in making out a case for personal jurisdiction over [defendant]" and observing that "speculation cannot rise above the 'mere hunch' bar that the Ninth Circuit requires cleared to obtain jurisdictional discovery").

The alter-ego and agency theories that First Citizens advances for HSBC Holdings and HUSI seem slight on this record and founded in a misunderstanding of the corporate structure. Corporate structures exist for a reason. That said, the issue here involves more than a hunch, and it's answerable through a better understanding of the corporate structure and who works where. Perhaps the equivalent of a Rule 30(b)(6) deposition would be the right start. For HBUK, given its acquisition of SVB UK on March 13, the time period is relatively short (through the mass departures on April 9), and jurisdictional discovery should not be onerous. The relevant jurisdictional discovery also overlaps with merits discovery and can be staged at the same time.

In sum, the court dismisses the three entity defendants without prejudice and allows discovery.

---

[97] Reply – ECF No. 88 at 10 (referencing its argument about how Zoom contacts were not enough for personal jurisdiction over the individual defendants) (discussed below).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second, as to the individual defendants Stepanis, Longo, and Andersen, the jurisdictional allegations against them are slight: they looked online for information about HSBC salaries (from Connecticut and Massachusetts, where they lived), they had recruitment meetings with HBUS (with someone based in New York), they downloaded confidential information from servers outside of California, and possibly helped to recruit other SVB employees, and Longo allegedly downplayed what was going on with the planned mass exit, thus putting his interests above First Citizens. It might be, as First Citizens contends, that an orchestrated scheme directed at a California employer to poach its employees, steal confidential information, and appropriate its business would establish specific jurisdiction against an out-of-state aggressor.[98] *Weisel Partners LLC v. BNP Paribas*, No. C 07–6198 MHP, 2008 WL 3977887, at *6 (N.D. Cal. Aug. 26, 2008). But the allegations here do not rise to that level. The court dismisses the three defendants for lack of personal jurisdiction.

## 2.   Failure to State a Claim

The defendants move to dismiss on the following grounds: (1) the allegations against certain defendants for conduct after March 27 do not plausibly plead claims, (2) CUTSA preempts the tort claims, and (3) First Citizens does not otherwise plausibly plead the common-law tort or contract claims. The court grants the motion on all grounds (except under (3), the court denies the motion to dismiss the contract claim against Sabow based on the SVB agreement (claim one)).

### 2.1 Claims Based on Conduct After March 27

The defendants at issue are HBUK, HSBC Holdings, HUSI, three out-of-state defendants (Stepanis, Longo, and Andersen) and three California-based defendants (Patel, Kidder, and Hanlon).[99]

First, for the entity and out-of-state defendants, the defendants contend only that "the specific allegations of post-March 27 activity attributable to these Defendants are either conclusory or amount to efforts by *other* individuals (*e.g.*, Sabow and Roberts) to purportedly recruit them. These Defendants thus should be dismissed not only for lack of personal jurisdiction but also for failure to

---

[98] Opp'n – ECF No. 84 at 19 (citing *Weisel Partners LLC v. BNP Paribas*, No. C 07–6198 MHP, 2008 WL 3977887, at *6 (N.D. Cal. Aug. 26, 2008)).

[99] Mot. – ECF No. 81 at 22; Reply – ECF No. 88 at 18.

state a claim."[100] Given this argument, the dismissal for these defendants is for lack of personal jurisdiction only.

Second, for the claims against the California-based defendants, the relevant claims are claims one through three and six through ten (for Patel and Kidder) and three, six, seven, and ten (for Hanlon). Claims one and two are for breach of the employment agreements with SVB and First Citizens, claim three is for breach of the duty of loyalty to First Citizens, claim six is for tortious interference with First Citizens' prospective economic advantage by inducing the mass resignations and breaches of the duty of loyalty, claim seven is engaging in unfair and deceptive trade practices by executing the mass departures of former SVB employees, in violation of N.C. Gen. Stat. § 75-1.1, claims eight and nine are the trade-secrets claims, and claim ten is civil conspiracy.[101]

For Patel, First Citizens identifies the following relevant allegations. On March 16, 2024, Sabow told a Bridge Bank employee to send information to Patel about gross profits, allegedly so that Sabow could incorporate the information into Project Colony.[102] On March 17, 2024, Sabow sent Patel (in California) a copy of Project Colony and asked for her thoughts.[103] On March 21, she participated in the same conversation synopsized above in the Stepanis section.[104] By March 23, Sabow listed her as "in" on his tracking spreadsheet.[105] That day, Sabow sent her an email with his "initial idea" for staffing in the San Francisco, New York, and Boston areas.[106] First Citizens characterizes this as context for what happened after March 27.[107] On April 5, she spoke with Sabow by Zoom, Sabow accessed his spreadsheet with his staffing model, and presumably they

---

[100] Mot. – ECF No. 81 at 22–24 (analyzing only the California-based defendants); Reply – ECF No. 88 at 18–19 (same).

[101] *See* Introduction and Statement, *supra*.

[102] FAC – ECF No. 76 at 30–31 (¶¶ 119–22).

[103] *Id.* at 33 (¶ 133).

[104] *Id.* at 37 (¶¶ 154–55).

[105] *Id.* at 39 (¶ 166).

[106] *Id.* at 40 (¶ 172).

[107] Opp'n – ECF No. 84 at 27.

discussed Project Colony and an employment offer.[108] On April 8, she participated in the executive-recruitment Zoom with other members of her team and Michael Roberts (synopsized in the Stepanis summary).[109] The allegations establish only that Sabow offered Patel a job and she attended a recruitment call. The claims against her are dismissed.

For Kidder, by March 14, 2024, Sabow identified him (like the other individual defendants) as a core leader to execute Project Colony.[110] On April 6, Kidder received an email from a direct report alerting him to competitive threats that could result in "a run on the bank's talent." He did not respond or alert anyone, thereby putting his interests above First Citizens' interest[111] At best, the allegations show that he was recruited. The claims against him are dismissed.

For Hanlon, she discussed Project Colony with Andersen on March 20, 2023, and she met with Sabow in California on March 21 to discuss the plan.[112] On March 21, she googled "michael roberts hsbc."[113] On March 31, she accessed the 9-Block Report and other confidential information and continued to access, modify, and download other confidential information that "align[s] with the information used to develop and execute Project Colony."[114] The allegations support the theft of trade-secret claims. There are no allegations, if true, that plausibly plead breach of contract. The tort claims are otherwise preempted by CUTSA, as discussed below.

### 2.2 CUTSA

The defendants contend that CUTSA preempts the tort claims: claims three through six and ten.[115] The claims (again) are breach of the duty of loyalty to First Citizens (claim three against Patel, Stepanis, Longo, Hanlon, and Andersen), aiding and abetting that breach (claim four against the HSBC entities and Sabow), tortious interference with First Citizens' contracts by inducing the

---

[108] FAC – ECF No. 76 at 50 (¶ 220).

[109] *Id.* at 53 (¶ 228), 74 (¶ 307), 75 (¶¶ 311–12).

[110] FAC – ECF No. 76 at 27 (¶ 105).

[111] *Id.* at 52 (¶ 224).

[112] *Id.* at 36 (¶ 146), 37 (¶¶ 154–55).

[113] *Id.* at 36 (¶ 148).

[114] *Id.* at 45–46 (¶¶ 205–06).

[115] Mot. – ECF No. 81 at 24–27.

United States District Court
Northern District of California

mass resignations and causing the breaches of the employment agreements (claim five against the HSBC entities and Sabow), tortious interference with First Citizens' prospective economic advantage by inducing the mass resignations and breaches of the duty of loyalty (claim six against all defendants), and civil conspiracy (claim ten against all defendants).[116] The analysis turns on whether First Citizens plausibly pleads claims that are independent of the trade-secrets claims.

"CUTSA provides the exclusive legal remedy for conduct falling within its terms and supersedes other civil remedies based on misappropriation of a trade secret." *Waymo, LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (citing Cal. Civ. Code § 3426.7 and *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010), *as modified on denial of reh'g* (May 27, 2010), and *disapproved of by Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310 (2011), and *disapproved of by Swarmify, Inc. v. Cloudflare, Inc.*, No. C 17-06957 WHA, 2018 WL 1609379 (N.D. Cal. Apr. 3, 2018). "It therefore supersedes claims . . . based on the same nucleus of facts as trade secret misappropriation." *Id.* (cleaned up) (citing *Silvaco*, 184 Cal. App. 4th at 232). "At the pleadings stage, the supersession analysis asks whether, stripped of facts supporting trade secret misappropriation, the remaining factual allegations can be reassembled to independently support other causes of action." *Id.*

To the extent that the allegations are based on appropriation of trade secrets to solicit customers and employees, the claims are preempted. But if they are grounded on other conduct that does not implicate trade secrets (such as competing while still employed, which is a breach of fiduciary duty regardless of whether the defendants used trade secrets to do so), then the claims are not preempted. *Arthur G. Gallagher & Co. v. Tarantino*, No. 20-cv-05505-EMC, 2022 WL 4092673, at *9–10 (N.D. Cal. July 27, 2022).

For the three entity defendants and the six individual defendants addressed so far in this order, no claims survive (except for the trade-secrets claim against Hanlon). For the remaining entity and individual defendants, First Citizens' theory of the case is at least in part that there was a wholesale steal of the business model, in violation of some defendants' duty of loyalty and a

---

[116] *See* Introduction and Statement, *supra*.

United States District Court
Northern District of California

resulting tortious interference with contract and interference with business advantage by all defendants. That theory — if supported by fact allegations — could result in claims that survive CUTSA preemption, at least at the pleadings stage. (Such claims might be better addressed at summary judgment.) The problem — discussed above for the three California-based defendants and in the next section — is that allegations do not support non-trade-secret claims. That means that CUTSA preempts the tort claims.

### 2.3 Common-Law Tort and Contract Claims

The tort claims at issue are (1) breach of the duty of loyalty (claim three against Patel, Stepanis, Longo, Hanlon, and Andersen), (2) aiding and abetting that breach and tortious interference with contract (claims four and five against the HSBC entities and Sabow), (3) tortious interference with prospective economic advantage (claim six against all defendants), and (4) conspiracy (count ten). The contract claims are breach of employment agreements with SVB (claim one) and First Citizens (claim two). The court denies the motion to dismiss claim one but otherwise grants the motion.

For the breach-of-the-duty-of-loyalty claims (claims three and four), First Citizens is a North Carolina corporation with its principal place of business there.[117] North Carolina does not allow employers to sue for a breach of the duty of loyalty; California does.[118] The briefing is slight on the choice-of-law issue (given page limits and the overarching jurisdictional issues). But assuming California law applies,[119] the fact allegations do not support a claim for breach of the duty of loyalty. There was a thirteen-day period between First Citizens' acquisition of SVB assets and the employees' departure. The new-hire acknowledgment form required them to comply with First Citizens' code of ethics, compliance policy, information-security standards, and other like policies.[120] The forms do not identify any job functions or responsibilities. *Ledesma v. CSX Intermodal Terminals, Inc.*, No. 16-cv-05237-EDL, 2017 WL 2617938, at *3 (N.D. Cal. June 16, 2017) (must allege facts illustrating the

---

[117] FAC – ECF No. 76 at 9 (¶ 19).

[118] Mot. – ECF No. 81 at 27 (collecting cases); Opp'n – ECF No. 84 at 31 (California law trumps North Carolina law because California has a legitimate interest in enforcing its law here).

[119] The parties more or less do this. Mot. – ECF No. 81 at 27–28 (assuming California law applies without conceding the issue). Given the slight briefing, the order takes that approach here.

[120] Order – ECF No. 71 at 9; New Hire Acknowledgments, Exs. P–U to Compl. – ECF Nos. 1-16–1-21.

United States District Court
Northern District of California

1   employment relationship). There are no allegations about what the duty of loyalty was or what the

2   employees did to breach it (except take a new job). There is no plausible claim. That in turn means

3   that there is no predicate for the aiding-and-abetting claim (claim four). Also, there are no allegations

4   that the defendants knew about the alleged duty of loyalty.

5       The next claim is tortious interference with contract (claim five against Sabow and the HSBC

6   entities). The elements of a claim for tortious interference with contract are as follows: "(1) the

7   existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge

8   of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the

9   contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

10  resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020). As with the

11  aiding-and-abetting claim (claim four), there are no allegations that Sabow or the HSBC entities

12  knew about the individual defendants' loyalty duties or contractual obligations, and thus there is no

13  plausible claim. *Parallel Synthesis Techs. Inc. v. DeRisi*, 5:13–cv–05968–PSG, 2014 WL 4748611,

14  at *5 (N.D. Cal. Sept. 23, 2014); *Nexsales Corp. v. Salebuild, Inc.*, No. C–11–3915 EMC, 2012 WL

15  216260, at *4 (N.D. Cal. Jan. 24, 2012).

16      The next claim is tortious inference with prospective economic advantage (claim six against all

17  defendants). The elements of the claim generally are the factors for tortious interference with

18  contract: (1) the existence of an economic relationship between the plaintiff and a third party; (2)

19  the defendant's knowledge of the relationship; (3) the defendant's intentional acts to disrupt the

20  relationship; (4) actual disruption; and (5) economic harm proximately caused by the disruption.

21  *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 996 (N.D. Cal. 2014). Also, a plaintiff must

22  plead the commission of an independently wrongful act, meaning that the defendants' conduct was

23  "wrongful by some measure other than the fact of interference itself." *Ixchel Pharma, LLC*, 9 Cal.

24  5th at 1142. "An act is independently wrongful if it is unlawful, that is if it is proscribed by some

25  constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.*;

26  *accord Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). The allegedly

27

28

United States District Court
Northern District of California

unlawful act is inducing employees to leave en masse.[121] But First Citizens does not allege

independently wrongful conduct proscribed by a determinable legal standard (beyond the

interference itself). *Martin P. v. Premera Blue Cross*, No. 18-cv-00934-RS, 2018 WL 10579525,

at *4–5 (N.D. Cal. Sept. 19, 2015). Also, First Citizens does not explain how relationships were

jeopardized (such as customer relationships). *AlterG v. Boost Treadmill LLC*, 388 F. Supp. 3d

1133, 1151–52 (N.D. Cal. 2019) (dismissing interference claim because the plaintiff did not

"identify" the "vendors, suppliers, and prospective or current customers" or allege "facts to

explain their economic relationship").

The conspiracy claim (claim ten) depends on the underlying claims, and to the extent that those

fail, claim ten fails too.

For the breach-of-contract claim based on the SVB agreement (claim one against Sabow,

Patel, Stepanis, Longo, and Hanlon), the court previously held that First Citizens acquired the

rights to bring contract claims under the contracts.[122] The defendants now contend that the

counterparty on the contracts was SVB Financial Group, not SVB, and Bridge Bank never

acquired the contracts because SVB never had them.[123] But as First Citizens counters, the

contracts, which cover "New and Current SVB Employees," lists the counterparty as "SVB

Financial Group, a Delaware corporation, or any of its current or future subsidiaries, affiliates,

successors or assigns (collectively, the "Company")"[124] The earlier analysis controls, at least at the

pleadings stage: First Citizens acquired the contracts. There is an issue as about Sabow: First

Citizens contends that, even though his employment relationship with SVB ended in January

2023, when he began work for SVB UK, he had a six-month non-solicitation covenant.[125] The

defendants respond that his obligations were owed to SVB UK, purchased by HBUK.[126] That is

[121] Opp'n – ECF No. 84 at 35.

[122] Order – ECF No. 71 at 12–14 (analyzing the transfer and purchase agreements).

[123] Mot. – ECF No. 81 at 30 (citing Agreements, Exs. I–L to Compl. – ECF Nos. 1-9–1-12).

[124] Opp'n – ECF No. 84 at 36; *see, e.g.*, Agreement, Ex. I to Compl. – ECF No. 1-9 at 2.

[125] Opp'n – ECF No. 84 at 36 (citing FAC – ECF No. 76 at 63 (¶ 277)).

[126] Reply – ECF No. 88 at 24.

1    not enough of an argument for the court to dismiss the claim.

2        For the breach-of-contract claim based on the First Citizens agreement (claim two against Patel,

3    Stepanis, Longo, Hanlon, and Andersen), the defendants contend that First Citizens does not allege

4    any actionable conduct during the brief thirteen-day window between signing and departure.[127] As

5    discussed above, the individual defendants generally attended meetings (recruitment meetings with

6    Roberts, for example) and resigned.[128] The allegations do not plausibly plead breach. First Citizen

7    counters that the former SVB employees promised to comply with company policies, including the

8    ethics policy, which requires them to (1) "promptly report any act or omission you know or suspect to

9    be illegal, dishonest, fraudulent or unethical that may affect or involve First Citizens," (2) "safeguard

10   and protect non-public information . . . even after you are no longer employed by First Citizens," (3)

11   "avoid any activity or situation that involves, or appears to involve, a conflict of interest, and (4)

12   "avoid engaging in activities that place you in competition with" First Citizens.[129] The gist of First

13   Citizens' argument is that the former SVB employees knew that they were going to decamp, knew

14   Sabow had trade-secret information, didn't report it, and unfairly competed.[130] But alleging

15   knowledge of trade secrets and a subsequent resignation does not plead a breach of contract. *M/A-*

16   *COM Tech. Solutions, Inc. v. Litrinium, Inc.*, No. SACV 19-220 JVS (JDEx), 2019 WL 6655274, at

17   *9 (C.D. Cal. Sept. 23, 2019) ("The allegation that Garez had knowledge of trade secret information

18   and was then recruited to Litrinium describes a change in employment, but not wrongful conduct.")

19       The final claim is claim seven against all defendants for a violation of North Carolina's Unfair

20   and Deceptive Practices Act. It makes unlawful "unfair methods of competition in or affecting

21   commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. §

22   75-1.1. The elements of the claim are (1) the defendant committed an unfair or deceptive act or

23   practice; (2) the act in question was in or affecting commerce, and (3) the act proximately caused

24

---

25   [127] Mot. – ECF No. 81 at 31–32.

26   [128] *Id.* (chart summarizing allegations); *see* summaries of allegations by defendant, supra.

27   [129] Opp'n – ECF No. 84 at 36–37 (quoting Code of Ethics, excerpted in the FAC – ECF No. 76 at 66–68 (¶ 288) (cleaned up).

28   [130] *Id.*

injury to the plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656 (2001).

First Citizens does not allege an "in-state, injurious effect on his business operations in North Carolina." *The In Porters, S.A. v. Hanes Printables*, 663 F. Supp. 494, 501–02 (M.D.N.C. 1987). It did not allege "deceptive conduct emanating from North Carolina or having a substantial effect on commerce within North Carolina." *Negrel v. Drive N Style Franchisor SPV LLC*, No. SACV 18-00583 JVS(KESx), 2018 WL 6136151, at *5 (C.D. Cal. Aug. 27, 2018) (citing minority view in North Carolina). It did not allege "unfair acts" that occurred in North Carolina. *In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1017 (E.D. Mo. 2009).

## CONCLUSION

The court dismisses the claims against HSBC Holdings, HUSI, HBUK, Stepanis, Longo, and Andersen for lack of personal jurisdiction (and allows jurisdictional discovery about the entity defendants), grants the motion to dismiss claims one through three and six through ten (for Patel and Kidder) and three, six, seven, and ten (for Hanlon), dismisses claims three through six as preempted by CUTSA, and (under a Rule 12(b)(6) analysis) dismisses claim two (against Patel, Stepanis, Longo, Hanlon, and Andersen), claim three (against Patel, Stepanis, Longo, Hanlon, and Andersen), claims four and five against the HSBC entities and Sabow), claim six (against all defendants), claim seven (against all defendants), and claim ten (against all defendants). The court denies the motion to dismiss claim one under Rule 12(b)(6), which means that the claim survives only against Sabow. Claims eight and nine (for theft of trade secrets) are live against HBUS, SVB UK, Sabow, and Hanlon.

The jurisdictional allegations might be able to be firmed up against HBUK (but probably not against HSBC Holdings and HUSI). Maybe discovery will support claims for a nefarious scheme to poach trade secrets and steal a business model, but right now, the allegations against most defendants show only a failed bank and employees decamping to a better business opportunity.

Given the need for jurisdictional discovery, the court defers setting a deadline for amendment and will address the issue at the case-management conference set for August 22, 2024, at 11 a.m. In their joint case-management statement, the parties can propose a discovery plan and a date for

United States District Court
Northern District of California

amendment of the pleadings. Any amended complaint must include as an attachment a blackline compare of the amended complaint against the current complaint.

This disposes of ECF No. 81.

**IT IS SO ORDERED.**

Dated: July 9, 2024

_____

LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California